| | |
|---|---|
| FREDERICK L. ALLEN and<br>NAUTILUS PRODUCTIONS, LLC<br>                Plaintiffs<br>      v.<br>PATRICK LLOYD MCCRORY, Governor of the State of North Carolina, *in his official capacity*;<br>SUSAN WEAR KLUTTZ, Secretary of the North Carolina Department of Natural and Cultural Resources, *individually and in her official capacity*;<br>KARIN COCHRAN, Chief Deputy Secretary of the North Carolina Department of Natural and Cultural Resources, *individually and in her official capacity;*<br>KEVIN CHERRY, Deputy Secretary of the North Carolina Department of Natural and Cultural Resources, *individually and in his official capacity;*<br>CARY COX, Assistant Secretary, Marketing and Communications of the North Carolina Department of Natural and Cultural Resources, *individually and in her official capacity;*<br>STEPHEN R. CLAGGETT, State Archaeologist, *individually and in his official capacity;*<br>JOHN W. MORRIS, Deputy State Archaeologist – Underwater and Director of the Underwater Archaeology Branch of the North Carolina Department of Natural and Cultural Resources, *individually and in his official capacity;*<br>JAMES W. DAVIS, North Carolina Senator, *individually and in his official capacity;*<br>NORMAN W. SANDERSON, North Carolina Senator, *individually and in his official capacity;*<br>NORTH CAROLINA DEPARTMENT OF NATURAL AND CULTURAL RESOURCES;<br>STATE OF NORTH CAROLINA; and<br>FRIENDS OF QUEEN ANNE'S REVENGE, A NON-PROFIT CORPORATION<br>              Defendants | |

# EXHIBIT 1

## Settlement Agreement

## Settlement Agreement

This Settlement Agreement, made this the 15th day of October, 2013, by and between the North Carolina Department of Cultural Resources ("DCR"), Intersal, Inc. ("Intersal"), and Rick Allen and Nautilus Productions, LLC (collectively, "Nautilus"):

WHEREAS, Intersal, a private research firm, operating under a valid permit issued to it by DCR, discovered the site believed to be *Queen Anne's Revenge* ("QAR") on 21 November 1996. QAR was located near Beaufort Inlet, North Carolina, by Intersal's director of operations, Michael E. Daniel, who used historical research provided by Intersal's president, Phil Masters. Daniel now heads up Maritime Research Institute ("MRI"), the non-profit corporation formed to work on the project in cooperation with State archaeologists and historians of the North Carolina Department of Cultural Resources, Office of Archives and History; and

WHEREAS, DCR, MRI, and Intersal previously executed a Memorandum of Agreement on 1 September 1998 ("1998 Agreement"); and

WHEREAS, as a result of the 1998 Agreement, Intersal and Michael E. Daniel agreed to forego entitlement to their share of any coins and precious metals recovered from the QAR site in order that all QAR artifacts remain as one intact collection, and in order to permit DCR to determine ultimate disposition of the artifacts;

WHEREAS, Nautilus has been filming underwater and other footage of the QAR project for approximately fifteen (15) years as the project's videographer;

WHEREAS, various disputes and uncertainties have arisen between DCR, Intersal, and Nautilus regarding the terms of the 1998 Agreement and related issues; and

WHEREAS, Intersal and DCR currently are in administrative appeal litigation regarding the terms of the 1998 Agreement, and desire to fully settle such litigation and related issues; and

WHEREAS, DCR, Intersal, and Nautilus desire to resolve fully their differences and continue their mutual efforts to promote the history of Blackbeard the Pirate, and continue the archaeological recovery and conservation of his flagship, the *Queen Anne's Revenge* ("QAR").

NOW, THEREFORE, DCR, Intersal, and Nautilus contract, settle and agree as follows:

## I. GENERAL

1. **Prior Agreements.** This Agreement supersedes the 1998 Agreement, attached as **Attachment A**, and all prior agreements between DCR, Intersal, and Nautilus regarding the QAR project.

2. **No Admission of Liability.** DCR, Intersal, and Nautilus mutually agree that this Agreement is entered into for the purpose of compromising all disputed claims, grievances, or allegations, and is not to be construed as an admission by DCR, Intersal, or Nautilus regarding the merit or lack of merit of DCR's, Intersal's, or Nautilus's contentions, nor an admission of any wrongdoing by the same.

## II. *EL SALVADOR* PERMIT

3. ***El Salvador* Permit.** In consideration for Intersal's significant contributions toward the discovery of the QAR and continued cooperation and participation in the recovery, conservation, and promotion of the QAR, DCR agrees to continue to issue to Intersal an exploration and recovery

permit for the shipwreck *El Salvador* in the search area defined in the current permit dated 9 August 2013. DCR agrees to continue to issue the permit through the year in which the QAR archaeology recovery phase is declared complete so long as the requirements contained in the permit are fulfilled. Subject to the provisions of Article 3 of Chapter 121 of the North Carolina General Statutes, entitled, "Salvage of Abandoned Shipwrecks and Other Underwater Archaeological Sites," and the North Carolina Administrative Code, DCR agrees to recognize Intersal's efforts and participation in the QAR project as sufficient to satisfy any performance requirements associated with annual renewal of Intersal's permit for the *El Salvador*. DCR expects to complete recovery of the QAR shipwreck by the end of 2016. The Secretary of DCR shall have the exclusive authority to determine when recovery of QAR is complete. The Secretary shall timely notify Intersal in writing of DCR's determination that recovery is complete. If the recovery phase is complete prior to 2016, DCR agrees to renew the permit through at least the end of 2016.

### III. EXACT AND MINIATURE REPLICAS AND COLLECTIBLES

4. **Artifact Replicas.** DCR and Intersal may make, or have made, molds or otherwise reproduce, or have reproduced, replicas of QAR artifacts for educational, scientific, retail sale, or other commercial purposes. All aspects of the conservation of artifacts, including whether or not to conserve the artifact, shall be at the sole discretion of DCR.

5. **Types of Replicas.** DCR and Intersal may make two types of replicas:

   a. <u>Miniature or Exact Replicas</u>. Miniature or exact replicas shall be museum or archival quality and shall be produced on a limited edition basis, be individually numbered, or otherwise uniquely identified to facilitate authentication.

   b. <u>Collectibles</u>. Collectibles shall be true representations of artifacts. Collectibles do not have to be miniatures or exact replications, and may be constructed of materials that do not rise to the level of museum or archival quality, and may be mass produced without being individually identifiable.

6. **Selection of Miniature or Exact Replicas to Produce.** Up to ten (10) QAR artifacts may be in the replication process at any given time. DCR and Intersal shall select one artifact each, taking alternate turns, until each has selected up to five (5) artifacts for possible replication. DCR and Intersal must present a separate business plan for the production, marketing, and sale of each of its selected replicas. The Business Panel must review and approve the business plan. Once a prototype is made, the Business Panel must review and approve the prototype, and accompanying packaging, marketing, or audio, visual, or literary materials (e.g., booklets, DVDs, etc.) for replication quality and historical accuracy. The Business Panel will issue its decisions in writing and provide the same to Intersal and DCR. Upon approval by the Business Panel, the entity seeking to reproduce the artifact may proceed with production, marketing, sales, and distribution. If, two (2) years after the written approval of the prototype by the Business Panel, the replica has not been offered for sale or distribution, the artifact will be placed back into the available pool of artifacts to replicate. The replication, sale, or distribution of replicas (as opposed to selection) need not be on alternating bases, but may be done according to DCR's and Intersal's respective plans and schedules.

   Intersal agrees that the sword hilt it currently plans to produce as a miniature or exact replica shall be Intersal's first selection and shall fall under the terms of this Agreement.

7. **Production of Subsequent Miniature or Exact Replicas.** DCR and Intersal may, individually or collectively, produce more than one artifact replica at a time. When either DCR or Intersal completes a replica and has offered it for sale or distribution, it may begin producing another

artifact according to the approval process in ¶ III.6.  Once DCR or Intersal has offered an artifact for sale and distribution, it may choose another artifact from the artifact pool so that it has up to five (5) artifacts eligible for replication at any given time.  If either DCR or Intersal decides to relinquish an artifact before the end of two (2) years, the artifact will be placed back into the available pool of artifacts to replicate.  DCR and Intersal may enter into a written agreement as to the further selection of artifacts after the first ten (10) have been selected.

Except by written agreement, neither Intersal nor DCR may select additional artifacts until they have produced, or the Business Panel has declined, all five (5) of its initially-selected artifacts.

8.  **Collectibles.**  Either DCR or Intersal may propose the reproduction, marketing, sales, and distribution of collectible replicas as defined above.  The reproduction, marketing, sales, and distribution of collectible artifacts shall be approved in advance by DCR and Intersal, or, if consensus cannot be reached between them, by the Business Panel.

9.  **Replicas to be Used in Exhibits, Scientific Study, or Educational Tools.**  Understanding that there may be times when original artifacts cannot be used, DCR may make, or have made, molds or otherwise reproduce, or have reproduced, any QAR artifacts of its choosing for use in museums or traveling exhibits, as educational props in its exhibits, museums or laboratories, as scientific tools, or for scientific study.  These replicas shall not be sold.

10.  **Costs.**  DCR and Intersal shall each be responsible for their own costs of making miniature or exact replicas, or collectibles produced by or for them.

11.  **Profits.**  DCR and Intersal agree to share the profits generated by the sale of miniature or exact replicas and collectibles.  The entity producing the replica shall receive 80% of the net income after taxes; the other entity shall receive the remaining 20%.  Where DCR is the entity producing, selling, and distributing the replica, DCR will account for its marketing and operations in determining net income.  Either DCR or Intersal may request from the other documentation regarding marketing, distribution, or other costs.

12.  **Miniature or Exact Replicas Sold at Auctions or Fundraisers.**  If DCR or Intersal sells a miniature or exact replica at auction or a fundraiser, the gross/net income shall be based on a fair market value and not on the price the replica was sold for at auction or a fundraiser.

13.  **Termination.**  After five (5) years, either DCR or Intersal may terminate, with or without cause, this Reproduction Agreement section upon ninety (90) days written notice.

## IV.  PROMOTION OPPORTUNITIES

14.  **Commercial Documentaries.**  Intersal, through Nautilus, has documented approximately fifteen (15) years of underwater and other activities related to the QAR project.  For purposes of this Commercial Documentaries section, Intersal represents to DCR that Nautilus Productions shall remain Intersal's designee.  Intersal shall have the exclusive right to produce a documentary film about the QAR project for licensing and sale.  Intersal may partner with DCR if it chooses to do so.  If Intersal chooses to partner with DCR, DCR and Intersal shall negotiate an appropriate cost-sharing agreement, and will agree about the documentary script for historical accuracy, content and story line.  If DCR and Intersal do not partner to make a documentary, the Intersal documentary script shall be reviewed by DCR for historical accuracy prior to final release by Intersal or its agents.

Intersal agrees to allow DCR to use its completed documentary, free of charge, in its museums and exhibits for educational purposes. DCR agrees to recognize Intersal's participation in the making of the documentary.

**Termination.** Either DCR or Intersal may terminate this Commercial Documentaries section at any time after four (4) years have passed from the date the Secretary of DCR notifies Intersal in writing of DCR's determination that recovery is complete. Notice of termination must be given in writing six (6) months in advance.

15. **Other Commercial Narrative.** DCR and Intersal agree to collaborate in making other commercial narrative such as, but not limited to, books and e-books, mini- and full-length documentaries, and video games. Any profit-sharing agreements shall be based on the amount of work contributed by each entity. If DCR and Intersal cannot reach an agreement on the sharing and production of any such commercial ventures that they propose to undertake, DCR and Intersal will refer the issues to a mutually selected, neutral arbitrator for binding arbitration, with arbitration to be concluded within three (3) months of selection of the neutral arbitrator.

16. **Media and Access Passes.**

   a. **Procedure**.

      1) DCR agrees to establish and maintain access to a website for the issuance of Media and Access Passes to QAR-project related artifacts and activities.

      2) DCR shall manage the issuance of Media and Access Passes after receiving access requests from third parties via the website.

      3) The website shall be the primary means of access for requests, and shall include, at a minimum:

         (a) An Intersal terms of use agreement, to be electronically submitted;

         (b) The QAR media fact sheet; and

         (c) Links to DCR, Intersal, and Nautilus Productions websites.

      4) Upon electronic submission of requests and terms of use, if applicable, electronic notice shall be sent to DCR and Intersal or its designee showing acceptance or non-acceptance of the terms of use.

      5) Intersal shall bear the sole responsibility for managing and enforcing its terms of use.

      6) For requests for access that are not received through the website, DCR shall provide the requestor with substantially the same information contained on the website.

   b. **Non-commercial Media.**

      1) All non-commercial digital media, regardless of producing entity, shall bear a time code stamp, and watermark (or bug) of Nautilus and/or DCR, as well as a link to DCR, Intersal, and Nautilus websites, to be clearly and visibly displayed at the bottom of any web page on which the digital media is being displayed.

      2) DCR agrees to display non-commercial digital media only on DCR's website.

c. **Termination.**  This Media and Access Pass section shall terminate after the 5th anniversary of the signing of this Agreement.  After five (5) years, DCR and Intersal may agree to extend this provision by mutual written consent.

## V.  RECORDS

17. **Public Records.**  Nothing in this Agreement shall prevent DCR from making records available to the public pursuant to North Carolina General Statutes Chapters 121 and 132, or any other applicable State or federal law or rule related to the inspection of public records.

18. **Records Management.**  During the recovery phase of the QAR project, DCR and Intersal agree to make available to each other records created or collected in relation to the QAR project.  The entity requesting copies bears the cost of reproduction.  Within one (1) year after the completion of the recovery phase, Intersal shall allow DCR to accession duplicate or original records that were created or collected by Intersal during the project and that are related to the site, or the recovery or conservation of the QAR materials.  Such records shall include relevant field maps, notes, drawings, photographic records, and other technical, scientific and historical documentation created or collected by DCR or Intersal pursuant to the study of the site and the recovery of materials therefrom.  These materials shall become public records curated by DCR.  All digital media provided by Intersal under the terms of this paragraph shall include a time code stamp and watermarks (or bugs).  It is expressly recognized and agreed that, to the extent Intersal possesses confidential information or documents related to its search for *El Salvador*, no such documents or information fall under the terms of this paragraph.

## VI.  Business Panel

19. **Business Panel.**  Members of the Business Panel shall include a secretary level representative from DCR, the president of Intersal, the president of Nautilus Productions, one representative from the North Carolina Department of Commerce or its successor, and one member of the academic community.

    Business Panel meetings shall be subject to the open meetings laws codified at Article 33 of Chapter 143 of the North Carolina General Statutes.

## VII.    NAUTILUS PRODUCTIONS

20. **Right of First Refusal.**  Nautilus Productions shall have the right of first refusal on the production of all commercial and non-commercial digital media for which no time code stamp, and watermark or bug of Nautilus has been affixed. Nautilus Productions agrees that digital media produced in-house by DCR staff shall not be included in this right of first refusal.

    **Termination.**  This Right of First Refusal provision shall terminate after the 5th anniversary of the signing of this Agreement.

21. **Return of Video.**  DCR agrees to return to Nautilus Productions all archival footage, still photographs, and other media, produced by Nautilus Productions, which do not bear a time code stamp and a Nautilus Productions watermark (or bug).  DCR may retain, for research purposes, archival footage, still photographs, and other media that contain a time code stamp and watermark (or bug), and as to such media, DCR shall provide Nautilus with a current, accurate list.

22. **Copyright Violations.**  DCR agrees to compensate Nautilus Productions by payment of the cash sum of $15,000 for any copyright infringements by DCR or its support groups occurring through the date of the signing of this contract, including Friends of the Maritime Museum display photograph

of the pile (central portion of the QAR shipwreck), DCR's Flickr account showing anchor A1 on the pile, DCR's website showing anchor A1 on the pile, DCR's News website showing anchor A2, and Friends of the QAR website showing mapping dividers (artifact). DCR shall pay Nautilus Productions $15,000 by 31 January 2014.

## VIII. MISCELLANEOUS

23. **DCR Agreement and Release.** Except as expressly provided in this Agreement, DCR and the State, their successors and assigns hereby release and forever discharge Intersal and Nautilus, including their officers, agents and employees, from any and all claims, demands, actions, causes of action, rights, damages, costs, attorney fees, expenses and compensation whatsoever, whether arising out of common law or statute, whether state or federal claim, that DCR or the State now have, or that were or could have been made relating to their rights under the 1998 Agreement or any other prior agreements related to the *Adventure*, *El Salvador*, or *Queen Anne's Revenge* shipwrecks. DCR expressly represents that it is not aware of any contracts that other State agencies have entered into that infringe upon the intellectual property rights of Nautilus Productions.

24. **Intersal Agreement and Release.** Except as expressly provided in this Agreement, Intersal and its successors and assigns hereby release and forever discharge the State, its officers, agents and employees, including DCR, from any and all claims, demands, actions, causes of action, rights, damages, costs, attorney fees, expenses and compensation whatsoever, whether arising out of common law or statute, whether state or federal claim, that Intersal now has, or that were or could have been made relating to Intersal's rights under the 1998 Agreement or any other prior agreements related to the *Adventure*, *El Salvador*, or *Queen Anne's Revenge* shipwrecks.

25. **Petition for Contested Case Hearing.** Intersal agrees to withdraw its petition for contested case hearing in *Intersal v. N.C. Dep't of Cultural Resources* (13DCR15732) within five (5) business days of the signing of this Agreement.

26. **Nautilus Productions/Rick Allen Agreement and Release**. Except as expressly provided in this Agreement, Nautilus and Rick Allen, and their heirs, successors, and assigns, hereby release and forever discharge the State, its officers, agents and employees, including DCR, whether individually or in their capacity as State employees, and its support groups, including the Friends of the Maritime Museum and the Friends of the QAR, from any and all claims, demands, actions, causes of action, rights, damages, costs, attorney fees, expenses and compensation whatsoever, whether arising out of common law or statute, whether state or federal claim, that Nautilus now has, or that were or could have been made relating to Nautilus's and Rick Allen's rights under the 1998 Agreement or any other prior agreements related to the *Queen Anne's Revenge* shipwreck or United States Copyright Act. Nautilus and Rick Allen agree that, as part of this Agreement and Release, Nautilus/Rick Allen shall withdraw the public records request it submitted to DCR on 28 August 2013, within five (5) business days of the signing of this Agreement.

27. **Binding Effect of Agreement on Successors in Interest.** This Agreement shall be binding on and inure to the benefit of the successors and assigns of DCR, Intersal, and Nautilus.

28. **Non-disparagement Clause.** DCR, Intersal, and Nautilus agree that they will not disparage one another professionally or in any public forum regarding any allegations related to this Agreement.

29. **Choice of Laws.** This Agreement is entered into in the State of North Carolina and shall be construed and interpreted in accordance with its laws.

30.  **Counterparts.**  This Agreement may be executed in counterparts, any of which shall be deemed to be an original and all of which together shall be deemed the same instrument.

31.  **Entire Agreement.** The foregoing constitutes the entire agreement as specified by DCR, Intersal, and Nautilus, and the considerations stated herein are contractual and are not mere recitals.

32.  **Effect of Breach of Agreement.**  In the event DCR, Intersal, or Nautilus breaches this Agreement, DCR, Intersal, or Nautilus may avail themselves of all remedies provided by law or equity.

33.  **Review and Construction.**  Intersal, DCR and Nautilus have read and reviewed all of the terms of this Agreement, with the benefit of advice from legal counsel of their choosing.  The terms of this Agreement have been drafted and revised with input from all of them and, thus, the terms of this Agreement shall not be construed for or against any of them as author.

34.  **Notice.**  Notices under this Agreement shall be provided as follows:

**To DCR:** Secretary, North Carolina Department of Cultural Resources, 109 East Jones Street, Raleigh, NC 27601

**To Intersal:** Intersal, Inc., c/o Haft Steinlauf & Co., 1200 South Pine Island Road, Plantation, Florida 33324

**To Nautilus:** Nautilus Productions, LLC, c/o Mr. Rick Allen, P.O. Box 53269, Fayetteville, NC 28305

Any of the entities named above may change its contact information as stated above by providing written notice of the new information to all other entities named above.


**[THIS SECTION INTENTIONALLY LEFT BLANK]**

**Intersal, Inc.:**

BY: _David J. Reeder, President_

DATE: _10. 23 · 13_

STATE OF FLORIDA
COUNTY OF _Brevard_

Sworn to (or affirmed) and subscribed before me this _23_ day of _October_, 2013, by David J. Reeder.

_Julie A Stone_
Notary Public

_Julie A Stone_
Print Name

JULIE A. STONE
NOTARY PUBLIC
STATE OF FLORIDA
Comm# EE836549
Expires 9/19/2016

(NOTARY SEAL)

Personally Known _____ OR Produced Identification _✓_
Type of Identification Produced _Florida Drivers License_

My Commission Expires:

_9|19|2016_

**Nautilus Productions:**

BY: _Frederick Allen_

Frederick Allen, Owner

DATE: _10/23/13_


STATE OF NORTH CAROLINA

COUNTY OF _DURHAM_

    I, _G. JONA POE JR_, a Notary Public in and for the County of _DURHAM_ and State aforesaid, do hereby certify that Frederick Allen, personally appeared before me this date and acknowledged the due execution by him of the foregoing instrument as for the purposes therein expressed.

    WITNESS my hand and Notarial Seal, this the _23_ rd day of _OCTOBER_, 2013.

_G. Jona Poe_

Notary Public

_G. JONA POE JR_

Print Name

My Commission Expires:

_7/17/2017_

G. JONA POE
NOTARY
MY
COMMISSION EXPIRES
7/17/2017
PUBLIC
DURHAM COUNTY, NC

**North Carolina Department of Cultural Resources:**

BY: _Susan W. Kluttz_
Susan W. Kluttz, Secretary

DATE: _10-24-13_


STATE OF NORTH CAROLINA

COUNTY OF WAKE

I, _Jennifer M. Fontes_, a Notary Public in and for the County of _Wake_ and State aforesaid, do hereby certify that _Susan W. Kluttz_, personally appeared before me this date and acknowledged the due execution by her of the foregoing instrument as for the purposes therein expressed.

WITNESS my hand and Notarial Seal, this the _24th_ day of _October_, 2013.

_Jennifer M Fontes_
Notary Public

_Jennifer M. Fontes_
Print Name

My Commission Expires:

_10/21/17_

JENNIFER M. FONTES
NOTARY
PUBLIC
WAKE COUNTY, NC

STATE OF NORTH CAROLINA

COUNTY OF WAKE


AGREEMENT


THIS AGREEMENT is entered into this **1st** day of **Sept.**, 1998, by and among the

State of North Carolina represented by the Department of Cultural Resources (hereinafter the

"Department"), Intersal, Inc., a Florida corporation (hereinafter "Intersal"), and Maritime

Research Institute, Inc., a North Carolina nonprofit corporation (hereinafter "MRI").

WITNESSETH, THAT:

WHEREAS, under the provisions of the federal Abandoned Shipwreck Act of 1987 (43

U.S.C. §§ 2101-2106) and Article 3 of Chapter 121 of the General Statutes of North Carolina

(N.C.G.S. §§121-22 through 121-28), the title to non-federal abandoned shipwrecks and artifacts

embedded in the submerged lands of the State of North Carolina is transferred by the United

States to the State of North Carolina and all such artifacts are placed under the custody and

control of the Department; and

WHEREAS, working under a permit issued by the Department, Intersal, under the

direction of Michael E. Daniel, located a shipwreck site believed to be that of the ship *QUEEN

ANNE'S REVENGE* (hereinafter "QAR") within the State waters of North Carolina, and are to be

credited with the discovery of said vessel; and

WHEREAS, QAR was the flagship of the pirate Edward Teach or Thatch (a.k.a.

"Blackbeard") and was lost while attempting to enter Beaufort Inlet in 1718 and is of inestimable

historical and archaeological value; and

WHEREAS, Intersal has been searching for QAR and other 18th Century shipwrecks at Beaufort Inlet under permits issued by the Department since 1987, and has expended a considerable amount of personnel and financial assets in that effort; and

WHEREAS, paragraph L of the QAR Permit (BUI 585) issued to Intersal states that "Any material recovered during Phase Five [the salvage phase] of the project shall be divided between the Department and the Permittee, according to a system to be developed, with 25% of all coins and precious metals retained by the Department, and 75% of the material awarded to the Permittee. The Department and the Permittee agree that the most appropriate disposition of other artifacts, such as vessel structure, ship's fittings, weapons, personal effects, and non-precious cargo shall be a suitable facility, possibly in the Beaufort area [the North Carolina Maritime Museum], where the material can be curated for scientific study and public display;" and,

WHEREAS, Intersal and Michael E. Daniel are willing to forego entitlement to any coins and precious metals recovered from the QAR site in order that all QAR artifacts remain as one intact collection and in order to permit the Department to determine ultimate disposition of the artifacts; and,

WHEREAS, the Department recognizes MRI, as a partner in the project for the life of this Agreement; and,

WHEREAS, in order to facilitate this Agreement, the Department recognizes Intersal and MRI as partners, to work in partnership with the Department to research, survey, search, recover, preserve, protect, conserve, curate, and promote the collection for the life of this Agreement; and,

WHEREAS, Intersal, MRI, and the Department, in a spirit of partnership, are willing to establish a five-member project Advisory Committee with the responsibilities set out in

paragraph 12 of this Agreement; and,

WHEREAS, Intersal has shown in the past, and continues to evidence, a strong awareness of and commitment to the historical significance of QAR through the quantity and quality of Intersal's historical research, its willingness to employ state of the art equipment in its underwater search and recovery efforts, and the prompt reporting of its activities to the Department; and,

WHEREAS, all of the Parties to this Agreement are desirous that all aspects of the project be accomplished in a manner that will preserve and protect the QAR and its artifacts and will provide the highest degree of historical and archaeological knowledge both to the general public and to serious scholastic study; and

WHEREAS, the Department is responsible for the protection of the public heritage of North Carolina; and

WHEREAS, the officers of Intersal, aware of their responsibility to protect the interests of their stockholders, are also aware of the importance of the QAR site to the public heritage of North Carolina; and

WHEREAS, Intersal and MRI agree that title and ownership of the QAR and its artifacts shall be as set out in paragraph 14 of this Agreement; and

WHEREAS, the Parties believe that the terms of this document will create a relationship that will facilitate and finance the project in an appropriate manner;

NOW, THEREFORE, the Parties to this Agreement hereby agree as follows:

## ARTICLE I- PARTIES

1.      The Department is an agency of the State of North Carolina;

4

2.      MRI is a North Carolina non-profit corporation incorporated under the provisions of Chapter 55A of the General Statutes of North Carolina.  MRI shall be fully qualified under State and Federal law to engage in fund raising and to receive philanthropic tax exempt contributions as project funds.

3.      Intersal is a corporation incorporated under the laws of the State of Florida.

4.      By entering into this Agreement, the Parties named above certify that they are legally constituted entities with full authority to perform the terms of the agreement.  The laws of North Carolina will be applied to interpreting and enforcing the terms of this document.

## ARTICLE II - DEFINITIONS

5.      The term "Parties" means the parties to this Agreement, i.e. the Department, MRI and Intersal.

6.      The term "Recovery" means the location, identification, and retrieval of any portion of the shipwreck of the QAR, or artifact from the site area.

7.      The term "Artifact" means those materials showing human workmanship or modification or having been used or intended to be used or consumed by humans, including relics, monuments, tools and fittings, utensils, instruments, weapons, ammunition, and treasure trove and precious materials including gold, silver, bullion, jewelry, pottery, ceramics, and similar or related materials from QAR.

8.      The term "Preservation" means the protection of the shipwreck of QAR and artifacts while on the site area.

9.      The term "Conservation" means the protection, treatment and long term curation of any portion of the shipwreck of QAR or any artifacts after recovery from the site area.

10.     The term "Site Area" means the area located within 300 yards of a point at coordinates 76 degrees 40.972 minutes West Longitude and 34 degrees 40.513 minutes North Latitude, the area surrounding the shipwreck, and this may be further defined by the Parties in the event artifacts or debris from the shipwreck are discovered outside of this area.

11.     The term "Project" means all survey, documentation, recovery, preservation, conservation, interpretation and exhibition activities related to any portion of the shipwreck of QAR or its artifacts.

## ARTICLE III - GENERAL PROVISIONS

12.     The primary responsibility for the planning and accomplishment of the preservation, recovery and conservation of the shipwreck of the QAR and the artifacts and all operations, including security operations, and any determinations as to priority of operations, is that of the Secretary of the Department. The State Archaeologist, the Supervisor of the Underwater Archaeology Unit, a representative of MRI, a representative of Intersal, and a representative selected by the Secretary of the Department from outside the Division of Archives and History shall form the Advisory Committee on Archaeological Operations ("Advisory Committee") having planning and oversight responsibility for the recovery and preservation of the shipwreck of the QAR and its artifacts, however, the final decisions with regard to such matters rest with the Secretary of the Department.

13.     Any and all funds raised by MRI shall be used as directed by MRI to cover costs associated with the project, which shall include the payment of MRI's employees and operating expenses. Any MRI funds remaining after the payment of such costs may be used by MRI in the furtherance of its non-profit purpose of maritime research consistent with its charter and bylaws.

14.     Subject to their rights under this Agreement, Intersal and MRI hereby assign to the Department, and the Department hereby accepts, on behalf of the People of North Carolina, the interests of Intersal and MRI in the title and ownership of QAR and its artifacts.

15.     The Parties agree that MRI shall conduct research, documentation, search, survey, recovery, preservation, conservation and curation, in conjunction with the Department. In addition, MRI may on its own conduct fund raising activities related to the project regarding the QAR site (except as noted in paragraphs 16 and 17).

16.     Except as provided in paragraph 20 and this paragraph,  Intersal shall have the exclusive right to make and market all commercial narrative (written, film, CD Rom, and/or video) accounts of project related activities undertaken by the Parties.  Intersal (or its designee) will be responsible for its own costs related to the making and marketing of such narrative accounts, and may participate in operations in the course of making such accounts.  All Parties agree to cooperate to a reasonable degree in the making of a film and/or video documentary, or group of documentaries, that Intersal will produce (or contract to be produced) with regard to project activities.

17.     All Parties agree to cooperate in the making of a non commercial educational video and/or film documentary, or series of such documentaries, as long as there is no broadcast originating outside of North Carolina, and there is no distribution or dissemination for sale of the said educational documentary without Intersal's written permission.  Intersal shall have the rights to reasonable access and usage, subject to actual costs of duplication, of all video and/or film footage generated in the making of said educational documentary.

The Parties agree to reasonably cooperate with all legitimate news media inquiries

regarding the project, using guidelines described in this paragraph and paragraph 35.

18.     Subject to Intersal establishing compliance with standard museum practices relating to the preservation and conservation of artifacts, Intersal shall have the exclusive rights to make (or have made) molds or otherwise reproduce (or have reproduced) any QAR artifacts of its choosing for the purpose of marketing exact or miniature replicas. Intersal will be responsible for all costs related to its making and marketing of such replicas. All such replicas will be approved by the Advisory Committee, be made on a limited edition basis, and be individually numbered or otherwise uniquely identified to facilitate authentication. The Advisory Committee shall have the right to veto the reproduction, marketing or sale of a replica when the quality of the replica is deemed to be inappropriate. The Department shall have the right to sell such replicas at any state owned or state sponsored shop. Furthermore, the Department may make (or have made) molds or otherwise reproduce (or have reproduced) any QAR artifacts of its choosing for non-commercial educational purposes. The Department will be responsible for all costs related to its making and use of such replicas.

19.     MRI shall have the right to designate other entities as official sponsors of the project, or other similar designations with the approval of the Advisory Committee.

20.     The Department shall have the right to authorize access to, and publish accounts and other research documents relating to, the artifacts, site area, and project operations for non commercial educational or historical purposes. Nothing in this document shall infringe to any extent the public's right to access public records in accordance with Chapters 121 and 132 of the General Statutes of North Carolina.

21.     MRI and the State of North Carolina jointly shall have the exclusive right to

nationally and internationally tour and exhibit a representative cross section of the artifacts, if MRI establishes its compliance with standard museum practices with regard to a proposed tour and exhibit. Either entity may initiate and administer such a tour, and either entity may participate in a tour initiated and administered by the other. Each entity shall be responsible for the costs incurred by their participation in such a tour and funds generated by each entity on such a tour may be used to cover that entity's costs.

Nothing in this paragraph shall affect the Department's responsibility and authority with regard to the curation of the artifacts and their display for non commercial purposes.

22.    The Parties agree to cooperate with each other and with any law enforcement or other government agency to protect the site area from unauthorized visitation, diving and unauthorized collection of Artifacts.

23.    The Parties will neither knowingly solicit nor accept gifts from third parties when such gifts may involve conflict of interest or an appearance of a conflict of interest.

ARTICLE IV - REIMBURSEMENT TO INTERSAL: EXCESS PROCEEDS

24.    All net profits (as certified by Intersal to the reasonable satisfaction of the Department) from Intersal's sale of media rights and replicas shall be entirely due to Intersal, up to an amount which represents Intersal's costs to date which have been expended in connection with the search and recovery of artifacts from the QAR. Any further funds received by Intersal from these sources shall be divided 75% (seventy five percent) of the net profits (as certified by Intersal to the satisfaction of the Department) to Intersal, and 25% (twenty-five percent) to be donated by Intersal to MRI to be used by MRI as directed by the Advisory Committee for the purposes enumerated in this Agreement. The Advisory Committee shall take into account the

goal of ensuring that the heritage of the QAR is available to all of the citizens of the State of North Carolina.

## ARTICLE V - PLANS, REPORTS AND RECORDS

25. The Department, Intersal, and MRI shall provide the Advisory Committee with copies of their plans, status reports, records of fund raising activities and expenditures relating to the project. If the Advisory Committee determines that it needs additional or different information, it may establish a system for receiving the same. The provisions of this paragraph are in addition to the requirement of paragraph 30.

## ARTICLE VI - CHARITABLE FUND RAISING ACTIVITIES BY MRI

26. The Advisory Committee, the Department, Intersal, and MRI will all make available to each other such information and data as may reasonably be required and are generally available to inform potential donors and others about the project.

27. All Parties recognize that MRI is an independent entity with authority to solicit both funds and equipment for the purposes enumerated in this agreement.

28. All funds raised by MRI shall be used as directed by MRI, according to the provisions of paragraph 12 herein.

## ARTICLE VII - ACCESSION OF RECORDS

29. Subject to the provisions of G.S. § 70-18, for the purposes of maintaining pertinent project records, MRI, Intersal and the Department agree to make available for duplication by each other, or, when appropriate, to provide the Department with, relevant field maps, notes, drawings, photographic records and other such technical, scientific and historical documentation created or collected by MRI, Intersal or the Department pursuant to the study of

the site and the recovery of materials therefrom. These materials shall become public records curated by the Department.

### ARTICLE VIII - <u>MAINTENANCE OF FINANCIAL RECORDS AND AUDIT</u>

30.     The parties to the Agreement shall develop procedures for keeping records pertaining to costs and funds associated with the project. These procedures shall incorporate, and apply as appropriate, the standards for financial management systems set forth in the Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments, at 32 CFR Section 33.20.

### ARTICLE IX - <u>NOTICES</u>

31.     Any notice, request, demand or other communication required or permitted to be given under this document shall be deemed to have been duly given if in writing and either delivered personally or by telegram or mailed by first class, registered, or certified mail, as follows:

If to the Department:  109 East Jones Street, Raleigh, NC 27601-2807;

If to MRI:  P. O. Box 8681, Jupiter, FL 33468;

If to Intersal:  104 Stanton Road, Beaufort, NC 28516.

A Party can change the address to which such communications are to be sent by giving written notice to the other party in the manner provided in this paragraph.

### ARTICLE X - <u>OBLIGATIONS OF APPROPRIATIONS</u>

32.     Nothing herein shall constitute, nor be deemed to constitute, an obligation of current or future appropriations by the General Assembly of North Carolina.

### ARTICLE XI - <u>ADDITIONAL PROVISIONS</u>

33.    The Department recognizes that Intersal's efforts and cooperation with regard to the QAR permit have had, and will continue to have, a significant impact on its compliance with the performance standards agreed to with regard to Intersal's permit to search for the *El Salvador*. The Department believes that the cooperation and continued effort of Intersal with regard to both its QAR permit and its *El Salvador* permit are of benefit to the historical heritage of the State. The Department believes that the cooperation and effort of MRI with regard to this project and the search for the *Adventure* are of benefit to the historical heritage of the State. Subject to the provisions of Article 3 of Chapter 121 of the General Statutes of North Carolina and subchapter .04R of Title 7 of the North Carolina Administrative Code, the Department agrees to recognize Intersal's and MRI's efforts and participation in the QAR project as sufficient to satisfy any performance requirements associated with annual renewal of Intersal's permits for either *El Salvador* or *Adventure*, and for the life of this Agreement, renewal of said permits cannot be denied without just cause.

34.    In the event that it is determined that the shipwreck site which is the subject of this Agreement is not the QAR, Intersal and the State shall enter into a contract along the terms of the permit issued to Intersal for the exploration and recovery of the QAR. In the event that the ship *El Salvador* is discovered as a result of project operations, the terms of Intersal's *El Salvador* permit (BUI 584) shall apply.

35.    All press releases concerning the project shall contain the following information, when appropriate: "Intersal, Inc., a private research firm, discovered the site believed to be *Queen Anne's Revenge* on November 21, 1996. QAR was located near Beaufort Inlet, NC by Intersal's director of operations, Mike Daniel, who used historical research provided by Intersal's

president, Phil Masters. Daniel now heads up Maritime Research Institute, the non-profit

corporation formed to work on the project in cooperation with State archaeologists and historians

of the North Carolina Department of Cultural Resources, Division of Archives and History."

The Parties agree that their spokespersons and employees will be instructed, when being

interviewed by legitimate news media, to endeavor to give appropriate credit where due for the

discovery of QAR, and mention the continuing participation of each of the Parties in the project.

36. This document shall become effective when signed by all the Parties and shall be

effective for a period of fifteen (15) years, unless sooner terminated by written consent of all

Parties. The Parties shall have the option to renew this agreement for an additional period of ten

years. The option must be exercised in writing to the Department or its successors on or before

the expiration of this Agreement.

37. This Agreement shall be governed by the law of North Carolina.


IN WITNESS WHEREOF, the Parties hereto have executed this Agreement, this the 1st

day of ___Sept.___, 1998.


Maritime Research Institute, Inc.


By: _____

Witness: _____

Intersal, Inc.

By: _____

Witness: _____


The State of North Carolina

By: _____

Witness: _____

STATE OF NORTH CAROLINA
COUNTY OF WAKE

## AMENDMENT TO AGREEMENT

WHEREAS , on the 1st day of September, 1998, the State of North Carolina represented by the Department of Cultural Resources (hereinafter the "Department'), Intersal, Inc., a Florida corporation (hereinafter "Intersal"), and Maritime Research Institute, Inc., a North Carolina non-profit corporation (hereinafter "MRI") entered into an Agreement pertaining to the shipwreck site believed to be that of the ship QUEEN ANNE'S REVENGE (hereinafter "QAR"), which is located within the state waters of North Carolina.; and

WHEREAS, the parties to said Agreement desire to amend said Agreement in order to expand the Advisory Committee on Archaeological Operations ("Advisory Committee") in order to include additional persons involved in said project on the "Advisory Committee" including the QAR Project Director, the Director of the North Carolina Maritime Museum, an additional member from MRI and an additional member from Intersal;

THEREFORE, Article III, Paragraph 12 of the Agreement between the Department, Intersal, and MRI entered into on the 1st day of September, 1998 is amended as follows:

12.    The primary responsibility for the planning and accomplishment of the preservation, recovery and conservation of the QAR and the artifacts and all operations, including security operations, and any determinations as to priority of operations, is that of the Secretary of the Department.  The State Archaeologist, the Supervisor of the Underwater Archaeology Unit, the QAR Project Director, the Director of the North Carolina Maritime Museum, two representatives of MRI, two representatives of Intersal, and a representative selected by the Secretary of the Department from outside the Division of Archives and History shall form the Advisory Committee on Archaeological Operations ("Advisory Committee") having planning and oversight responsibility for the recovery and preservation of the shipwreck of the QAR and its artifacts, however, the final decisions with regard to such matters rest with the Secretary of the Department.

IN WITNESS WHEREOF, parties hereunto have executed this Amendment to Agreement this the ____ day of _____, 2001.


Maritime Research Institute, Inc.

By: _____

Witness: _____

Interan, Inc.

By: _____

Witness: George W. Shannon, Jr. Ph.D.

The State of North Carolina

By: _____

Witness: Jeffrey Crow