IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CV-627-BO

| | |
|---|---|
| FREDERICK L. ALLEN and NAUTILUS ) | |
| PRODUCTIONS, LLC, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | O R D E R |
| ) | |
| ROY A. COOPER, *et al.*,[1] ) | |
| ) | |
| Defendants. ) | |

This cause comes before the Court on a motion to dismiss filed by State defendants [DE

49] and a motion to dismiss filed by defendant Friends of the *Queen Anne's Revenge*. [DE 47].

The appropriate responses and replies have been filed and a hearing was held before the

undersigned on November 2, 2016, in Edenton, North Carolina. For the reasons discussed below,

the motions to dismiss are denied in part and granted in part.

## BACKGROUND

Plaintiffs, Frederick Allen and his production company Nautilus Productions, have been

the substantially exclusive underwater photographers of the shipwreck *Queen Anne's Revenge*

("QAR"), the ship of the pirate commonly known as Blackbeard.[2] The shipwreck was discovered

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Roy A. Cooper, Governor of North
Carolina, has been added as a party. Former Governor Patrick L. McCrory has been terminated
as a party.

[2] Edward Teach, more famously known as Blackbeard, notoriously pirated vessels across the
Caribbean and eastern coast of Britain's North American colonies. In 1717 Teach captured a
French merchant vessel, renamed her *Queen Anne's Revenge*, and equipped her with 40 guns.
After giving himself the rank of commodore, Teach formed an alliance of pirates and blockaded
the port of Charles Town, South Carolina. Shortly after ransoming the town's inhabitants, he ran
the *Queen Anne's Revenge* aground on a sandbar near Beaufort, North Carolina. This year marks

near the Beaufort inlet off the North Carolina coast in 1996. Allen's work documenting the shipwreck through video and still images began in 1998. Allen has registered copyrights in the works created in relation to his documenting of the QAR, and such works are licensed to and commercialized by Nautilus.

Plaintiffs allege that prior to October 2013, the State of North Carolina and its Department of Natural and Cultural Resources ("DNCR") infringed, contributed to infringement, and induced infringement of Allen's registered copyrights by uploading Allen's video-footage to the internet without consent. On October 15, 2013, plaintiff, the State, and DNCR entered into a written settlement agreement which provided for payment to plaintiffs from the DNCR of $15,000 for any copyrights it had infringed prior to that date. The agreement referred to some specific instances of infringement, including the Friends of the Maritime Museum display photograph of the pile (the central portion of the shipwreck), DNCR's Flickr account showing an anchor on the pile, and the Friends of the *QAR* website showing mapping dividers. The State and DNCR paid plaintiffs the $15,000 provided by the settlement agreement on February 3, 2014.

Plaintiffs allege that after entry of the settlement agreement the State and DNCR resumed infringing on plaintiffs' copyrights. Plaintiffs allege that the State and DNCR have published, performed, and/or displayed plaintiffs' video footage as well as still images in print materials. Plaintiffs further allege that in an effort to convert plaintiffs' copyright assets to State property without payment to plaintiff, defendants collectively wrote and obtained passage of an amendment to an existing North Carolina statute, the effect of which is to convert copyrighted works of plaintiffs and others into public record, upon which under state law there is no

the 399th anniversary of his death in a battle with Lieutenant Robert Maynard in Ocracoke, North Carolina.

limitation on use. N.C. Gen. Stat. § 121-25(b). The full text of the amended statute at the time of

the filing of the complaint read as follows:

> (b) All photographs, video recordings, or other documentary materials of a
> derelict vessel or shipwreck or its contents, relics, artifacts, or historic materials in
> the custody of any agency of North Carolina government or its subdivisions shall
> be a public record pursuant to G.S. 132-1. There shall be no limitation on the use
> of or no requirement to alter any such photograph, video recordings, or other
> documentary material, and any such provision in any agreement, permit, or
> license shall be void and unenforceable as a matter of public policy.

Effective July 1, 2016, Session law 2016-94, s. 162, amended subsection (b) to read as follows:

> All photographs, video recordings, or other documentary materials of a derelict
> vessel or shipwreck or its contents, relics, artifacts, or historic materials in the
> custody of any agency of North Carolina government or its subdivisions shall be a
> public record pursuant to Chapter 132 of the General Statutes.

N.C. Gen. Stat. § 121-25(b).

Plaintiffs seek a declaratory judgment that § 121-25(b) as amended is void and

unenforceable as it is preempted by the Copyright Act, 17 U.S.C §§ 101 *et seq.*, and violates the

Takings and Due Process Clause of the United States Constitution. U.S. Const. Amends. V and

XIV. Plaintiffs further allege claims for copyright infringement, for unconstitutional taking

pursuant to § 1983, as well as state law claims for unfair and deceptive trade practices and civil

conspiracy.

The State defendants have moved to dismiss plaintiffs' amended complaint, arguing that

it is barred by the Eleventh Amendment, that the individual defendants sued in their individual

capacities are protected by qualified immunity and legislative immunity, that the complaint fails

to state a plausible claim for relief, that plaintiffs lack standing to challenge § 121-25(b) as

amended, and that this Court should abstain from issuing an opinion of first impression regarding

North Carolina's public record statute. Fed. R. Civ. P. 12(b)(1), (2), (6). Defendant Friends of

*Queen Anne's Revenge* move to dismiss plaintiffs' complaint for failure to state a plausible claim for relief. Fed. R. Civ. P. 12(b)(6).

## DISCUSSION

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a claim for lack of subject matter jurisdiction. When subject matter jurisdiction is challenged, the plaintiff has the burden of proving jurisdiction to survive the motion. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647-50 (4th Cir. 1999). Rule 12(b)(2) of the Federal Rules of Civil Procedure authorizes dismissal for lack of personal jurisdiction. When personal jurisdiction has been challenged on the papers alone, the plaintiff must make a prima facie case showing that personal jurisdiction exists, and a court construes all facts and inference in favor of finding jurisdiction. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).

Rule 8 of the Federal Rules of Civil Procedure "requires only a short and plain statement of the claim showing that the pleader is entitled to relief" and which provides "the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotations, alterations, and citations omitted). A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *Papasan v. Allain*, 478 U.S. 265, 283 (1986). When acting on a motion to dismiss under Rule 12(b)(6), "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993). A complaint must allege enough facts to state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility means that the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and mere recitals of

the elements of a cause of action supported by conclusory statements do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Court addresses first the immunity defenses raised by the State and DNCR defendants.

I.    *Eleventh Amendment Immunity*

"The Eleventh Amendment bars suit against non-consenting states by private individuals in federal court." *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). This guarantee applies not only to suits against the state itself but also to suits where "one of [the state's] agencies or departments is named as the defendant." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). State officials sued in their official capacity for damages are also protected by Eleventh Amendment immunity. *Ballenger v. Owens*, 352 F.3d 842, 845 (4th Cir. 2003). Eleventh Amendment immunity may be waived expressly, *Edelman v. Jordan*, 415 U.S. 651, 673 (1974); if the defendants removed an action from a state court with jurisdiction, *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613 (2002); or if Congress has exercised its authority to abrogate Eleventh Amendment immunity. *Seminole Tribe v. Florida*, 517 U.S. 44 (1996).

Plaintiffs argue in earnest that the State has waived its Eleventh Amendment immunity by the express language in the 2013 settlement agreement. That language reads: "In the event DCR, Intersal, or Nautilus breaches this agreement, DCR, Intersal, or Nautilus may avail themselves of all remedies provided by law or equity." [DE 1-1 ¶ 32]. "The Supreme Court repeatedly has admonished that '[t]he test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one.'" *In re Sec'y of Dep't of Crime Control & Pub. Safety*, 7 F.3d 1140, 1145 (4th Cir. 1993) (quoting *Atascadero State Hosp. v.*

*Scanlon*, 473 U.S. 234, 241 (1985)). "[A] State will be deemed to have waived its immunity "only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.'" *Atascadero*, 473 U.S. at 239–40 (1985) (quoting *Edelman*, 415 U.S. at 673).

General consent to suit, including such consent as found in sue-and-be-sued clauses, has been found to be insufficient to waive a state's Eleventh Amendment immunity. *Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 306 (1990); *Baum Research & Dev. Co. v. Univ. of Massachusetts at Lowell*, 503 F.3d 1367, 1370 (Fed. Cir. 2007). Even where a state has authorized suits against it "in any court of competent jurisdiction," *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999) (quoting *Kennecott Copper Corp. v. State Tax Comm'n*, 327 U.S. 573, 577–579 (1946)), courts have been reluctant to find waiver of Eleventh Amendment immunity.

Although the State's consent to suit in this instance is broad, in the absence of any clear declaration of its intent to submit to suit in federal court, the Court is constrained to find that the State has not waived its Eleventh Amendment immunity by entering into its settlement agreement with plaintiffs. *See, e.g., Maynard v. Bd. of Regents of Div. of Universities of Florida Dep't of Educ. ex rel. Univ. of S. Florida*, 342 F.3d 1281, 1288 (11th Cir. 2003) (state's consent to "sue and be sued in all courts of law and equity" not valid waiver of Eleventh Amendment immunity).

The Court next turns to the question of whether, in passing the Copyright Remedy Clarification Act of 1990 ("CRCA"), 17 U.S.C. § 501(a), Congress abrogated North Carolina's state sovereign immunity to be sued for copyright violations of the type alleged by plaintiffs. Two questions must be answered in the affirmative in order for Congress to have properly

abrogated the states' sovereign immunity: (1) Congress must have unequivocally expressed its intent to abrogate sovereign immunity, and (2) and in so doing Congress must have acted "pursuant to a valid exercise of power." *Green v. Mansour*, 474 U.S. 64, 68 (1985).

By enacting the CRCA, there can be no doubt that Congress has stated clearly its intent to abrogate sovereign immunity for copyright claims against a state, its instrumentalities, or its officers or employees in their official capacities.[3] Turning to the second question, neither the Supreme Court nor the Fourth Circuit has directly considered whether the CRCA is an attempt to abrogate sovereign immunity pursuant to a valid exercise of power. *But see, e.g., Hairston v. N. Carolina Agr. & Tech. State Univ.*, No. 1:04 CV 1203, 2005 WL 2136923, at *3 (M.D.N.C. Aug. 5, 2005). In *Seminole Tribe* and *Florida Prepaid*, the Supreme Court held that Congress may not rely on its Article I authority to abrogate state sovereign immunity. *But see Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006) (holding that the Bankruptcy Clause of Article I "was intended not just as a grant of legislative authority to Congress, but also to authorize limited subordination of state sovereign immunity in the bankruptcy arena").

Thus, as Congress may not rely on Article I alone to abrogate the state's sovereign immunity, remaining for consideration is whether it may do so under Section 5 of the Fourteenth

---

[3] The full text of the CRCA is as follows:

> Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or of the author as provided in section 106A(a), or who imports copies or phonorecords into the United States in violation of section 602, is an infringer of the copyright or right of the author, as the case may be. For purposes of this chapter (other than section 506), any reference to copyright shall be deemed to include the rights conferred by section 106A(a). As used in this subsection, the term 'anyone' includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity.

17 U.S.C. § 501(a).

Case 5:15-cv-00627-BO   Document 69   Filed 03/23/17   Page 7 of 28

Amendment. Section 5 of the Fourteenth Amendment "grants Congress the power to enforce the provisions of the Amendment by creating private remedies against the States for *actual* violations of those provisions." *United States v. Georgia*, 546 U.S. 151, 158 (2006) (internal quotation and alteration omitted). Congress may also "pass prophylactic 'legislation which deters or remedies Fourteenth Amendment violations even if in the process it prohibits conduct which is not itself unconstitutional,' so long as 'there is a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Nat'l Ass'n of Boards of Pharmacy v. Bd. of Regents of the Univ. Sys. of Georgia*, 633 F.3d 1297, 1316 (11th Cir. 2011) (quoting *City of Boerne v. Flores,* 521 U.S. 507, 518–20 (1997)) (internal alterations omitted).

It is well-understood that the Fourteenth Amendment was "specifically designed to alter the federal-state balance." *Florida Prepaid*, 527 U.S. at 670. Indeed, whatever amount of sovereign immunity the states retained upon ratification of the Constitution was unmistakably reined in by the passage of the Fourteenth Amendment. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976) ("the Eleventh Amendment, and the principle of state sovereignty which it embodies, see *Hans v. Louisiana*, 134 U.S. 1 (1890), are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment.").

In *Florida Prepaid*, the Supreme Court considered whether the Patent Remedy Act could be viewed as "remedial or preventive legislation aimed at securing the protections of the Fourteenth Amendment" for holders of patents. 527 U.S. at 639. The Court found that Congress had not identified a pattern of infringement by the states, and had thus acted to "head off this speculative harm" of unremedied patent infringement by the states. 527 U.S. at 640–41. This Court's review of the legislative history of the CRCA leads it to conclude that Congress has acted in response to sufficient evidence of infringement of copyrights by the states. The House

Report relied on testimony regarding "the extensive use of copyrighted materials by the States" which predicted that "States might ultimately come to view immunity from monetary relief as comparable to immunity from liability . . .". H.R.Rep. 101-282, pt.2, at 8 (1989); *but see Chavez v. Arte Publico Press*, 204 F.3d 601, 606 (5th Cir. 2000) (finding that testimony presented to Congress primarily concerned threat of future abuse of immunity from damages by the States as opposed to evidence of current constitutional deprivations). Additionally, the legislative history of that Act includes many examples of copyright infringements by States. *See Hearings on H.R. 1131 before the Subcommittee on Courts, Intellectual Property, and the Administration of Justice of the House Committee on the Judiciary*, 101st Cong., 1st Sess., 93, 148 (1989); *Hearing on S. 497 before the Subcommittee on Patents, Copyrights, and Trademarks of the Senate Committee on the Judiciary*, 101st Cong., 1st Sess., 148 (1989).

Congress was clearly responding to a pattern of current and anticipated abuse by the states of the copyrights held by their citizens. If the text of the CRCA and the legislative history were not enough to demonstrate this pattern of abuse, the amount of suits filed against allegedly infringing states in recent years, even despite little chance of success, demonstrates the extent of the issue.[4] As a result, this Court finds that Congress appropriately exercised its Section 5 powers under the Fourteenth Amendment in passing the CRCA to abrogate state sovereign immunity to copyright claims.

---

[4] *See, e.g., Chavez v. Arte Publico Press*, 204 F.3d 601 (5th Cir. 2000); *Hairston v. N.C. Agric. & Tech. State Univ.*, 2005 U.S. Dist. LEXIS 20442 (M.D.N.C. Aug. 5, 2005); *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of Univ. Sys. of Ga.*, 2008 U.S. Dist. LEXIS 32116 (M.D. Ga. Apr. 18, 2008); *Mktg. Information Masters, Inc. v. Bd. of Trustees of the Cal. State Univ. Sys.*, 552 F. Supp. 2d 1088 (S.D. Cal. 2008 ); *InfoMath, Inc. v. Univ. of Ark.*, 633 F. Supp. 2d 674 (E.D. Ark. 2007 ); *De Romero v. Inst. of Puerto Rican Culture*, 466 F. Supp. 2d 410 (D.P.R. 2006); *Salerno v. City Univ. of N.Y.*, 191 F. Supp. 2d 352 (S.D.N.Y. 2001); *Jehnsen v. N.Y. Martin Luther King, Jr. Inst. for Nonviolence*, 13 F. Supp. 2d 306 (N.D.N.Y. 1998); *Rainey v. Wayne State Univ.*, 26 F. Supp. 2d 973 (E.D. Mich. 1998); *Jacobs v. Memphis Convention and Visitors Bureau*, 710 F.Supp. 2d 663 (W.D. Tenn. 2010); *Romero v. California Dept. of Transportation*, 2009 U.S. Dist. LEXIS 23193 (C.D. Cal., Mar. 12, 2009).

9

Having found that Congress appropriately abrogated State defendants' immunity to copyright claims under the standards set out by the Supreme Court in recent cases, the Court finds it appropriate at this point to note its disagreement with those very standards which have resulted from *Hans* and the Eleventh Amendment jurisprudence it has spawned. If not constrained by the Supreme Court's commands on this point, this Court believes that, under a proper understanding of the Eleventh Amendment, defendants would have no basis upon which to raise a defense of sovereign immunity in petitioning for a dismissal of this action. The Court is mindful that such an opinion is contrary to the decisions of courts in this nation which extend as least as far back as *Hans v. Louisiana*, 134 U.S. 1 (1890). Nonetheless, the Court is convinced that the central holding found by *Hans* and its progeny—namely that the Eleventh Amendment embodies a general doctrine of state sovereign immunity that extends to federal question cases in federal court—is flawed and contrary to the fundamental nature and meaning of the Constitution. These cases rest on an understanding of the Eleventh Amendment that is unsupported by the original meaning and plain text of the Constitution or the Amendment itself and which does harm to the fundamental rule of law in this nation.

The Eleventh Amendment was meant to be only what it purports to be by its plain language: a bar of suits against states by citizens of other states or nations brought under the federal courts' diversity jurisdiction. Indeed, it is clear to this Court that the Eleventh Amendment was meant to clarify the basis of diversity jurisdiction in the federal courts, commanding simply that the basis of diversity jurisdiction granted in Article III ("The judicial Power shall extend . . . to Controversies . . . between a State and Citizens of another State" and "between a State . . . and foreign . . . Citizens or Subjects") should no longer be extended so far, but instead "*shall not be construed* to extend to any suit in law or equity . . . against one of the

United States by Citizens of another State, or by Citizens of Subjects of any Foreign State." U.S. Const. Amend. XI.

The literature supports this view. Many commentators and jurists have undertaken intensive studies of the history and structure of the Amendment. Rather than undertake a rigorous exegesis of the text of the Amendment here, the Court is content to cite to the substantial body of work that demonstrates convincingly that the history and structure of the Eleventh Amendment show that it reaches only to suits subject to federal jurisdiction exclusively under the diversity clauses. The body of commentary broadly agrees with this point, as it also agrees that *Hans's* holding that a principle of sovereign immunity derived from the common law insulates a State from federal-question jurisdiction at the suit of its own citizen was wrongly decided.[5] The Court will not rehash here these points that have been made in painful detail before, but instead will simply quote Justice Brennan on this point:

> A sober assessment of the ratification debates thus shows that there was no firm consensus concerning the extent to which the judicial power of the United States extended to suits against States. Certain opponents of ratification, like Mason, Henry, and the "Federal Farmer," believed that the state-citizen diversity clause abrogated state sovereign immunity on state causes of action and predicted dire consequences as a result. On the other hand, certain proponents of the Constitution, like Pendleton, Randolph, and Pickering, agreed concerning the interpretation of Article III but believed that this constituted an argument in favor of the new Constitution. Finally, Madison, Marshall, and Hamilton believed that a State could not be made a defendant in federal court in a state-citizen diversity suit. The majority of the recorded comments on the question contravene the

---

[5] *See, e.g.*, Jackson, *The Supreme Court, the Eleventh Amendment, and State Sovereign Immunity*, 98 Yale L.J. 1 (1988); Amar, *Of Sovereignty and Federalism*, 96 Yale L.J. 1425 (1987); Fletcher, *A Historical Interpretation of the Eleventh Amendment: A Narrow Construction of an Affirmative Grant of Jurisdiction Rather than a Prohibition Against Jurisdiction*, 35 Stan. L.Rev. 1033 (1983); Gibbons, *The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation*, 83 Colum. L.Rev. 1889 (1983); Field, *The Eleventh Amendment and Other Sovereign Immunity Doctrines: Congressional Imposition of Suit Upon the States*, 126 U. Pa. L.Rev. 1203 (1978). The literature is "remarkably consistent in its evaluation of the historical evidence and text of the amendment as not supporting a broad rule of constitutional immunity for states." Jackson, 98 Yale L.J. at 44, n. 179.

Court's statement in *Hans* ... that suits against States in federal court were inconceivable. . . .

The language of the Eleventh Amendment, its legislative history, and the attendant historical circumstances all strongly suggest that the Amendment was intended to remedy an interpretation of the Constitution that would have had the state-citizen and state-alien diversity clauses of Article III abrogating the state law of sovereign immunity on state-law causes of action brought in federal courts. The economy of this explanation, which accounts for the rather legalistic terms in which the Amendment and Article III were written, does not require extravagant assumptions about the unexpressed intent of Congress and the state legislatures, and is itself a strong point in its favor. The original Constitution did not embody a principle of sovereign immunity as a limit on the federal judicial power. There is simply no reason to believe that the Eleventh Amendment established such a broad principle for the first time.

*Atascadero*, 473 U.S. at 278–79 (Brennan, J., dissenting). The congruence of the Amendment's language with the debates at ratification and following the adoption of the Amendment suggests the modest and clear conclusion that the Amendment means what it says: that henceforth a state could no longer be sued in federal court where the basis of jurisdiction was solely the diversity of the plaintiffs from the state.

The position that the Eleventh Amendment was intended to constitutionalize a broad principle of sovereign immunity does not comport with the historical evidence or the plain meaning of the Amendment. There was no consensus at the time of ratification whether the doctrine of state sovereign immunity would have any application in federal court. Even if the evidence could show a consensus view that the Eleventh Amendment should embody such a position, that still would not explain why the particular language of the amendment was ratified. Any person embarking on a study of the Amendment and its subsequent reinterpretations can be forgiven for the confusion that is sure to follow from trying to understand how these laconic words could have spawned such a far reaching doctrine. As Justice Stevens wrote, there are two Eleventh Amendments: the one in the Constitution and the one created by the Supreme Court.

Case 5:15-cv-00627-BO   Document 69   Filed 03/23/17   Page 12 of 28

*Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 23 (1989) (Stevens, J., concurring) ("It is important to emphasize the distinction between our two Eleventh Amendments. There is first the correct and literal interpretation of the plain language of the Eleventh Amendment. . . . In addition, there is the defense of sovereign immunity that the Court has added to the text of the Amendment" in cases involving suits against a state by one of its own citizens.). The Court, therefore, sees no reason, in considering either the understanding of the Amendment at the time it was ratified or the structure of the Constitution, that the courts should deviate from the plain language of the Amendment's text. *See Sturges v. Crowninshield*, 17 U.S. 122, 202–03 (1819) ("But if, in any case, the plain meaning of a provision, not contradicted by any other provision in the same instrument, is to be disregarded, because we believe the framers of that instrument could not intend what they say, it must be one in which the absurdity and injustice of applying the provision to the case, would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application.").

The founders envisioned and wrote a Constitution founded upon the sovereignty of the people, not the states. There is little doubt that the whole purpose of the Constitution was to replace the failed government of sovereign confederate states with a government of sovereign individuals whose rights and liberties were ensured by a federal Constitution and a system of courts bound to that supreme law. The people of the United States delegated through the Constitution limited powers to the various organs and branches of government. Indeed, it is clear from the first words of the Constitution ("We the People of the United States . . .) that the true sovereignty in our system lies with the people, not any entity of government. Ours is a limited government, and only those powers expressly granted may be exercised by this limited government. This is an animating principle inherent in our founding and very society; it is an

idea birthed in the Declaration of Independence and memorialized in the Constitution. No government can be sovereign when it transgresses the fundamental rights of individuals or the limits of its delegation. Just as King George III lost sovereign authority when he transgressed the inalienable rights of the colonists, neither can any organ of government maintain its sovereign immunity when it acts in violation of the Constitution. To hold otherwise is to disregard the very basis for our limited, constitutional, government.

The doctrine of state sovereign immunity to federal law in federal court has frustrated the essential function of the federal courts to ensure the uniform interpretation and enforcement of the supreme law of the land. It frustrates the ability of individuals to receive what may be the only practical remedy available to them as plaintiffs. It does not enhance constitutional protections or advance the ideals of our constitutional form of government in which the people are sovereign. It is not required by the structure of the federal system designed by the Founders, and in fact has strangely turned our federal form of government and the Supremacy Clause on its head by leaving states free to resist at their pleasure that federal law which we claim is the supreme law of the land. Far from protecting the dignity of the states or ensuring domestic harmony, in modern times this anachronistic vestige of English commonwealth doctrine has been shown to accomplish one thing only: to shield state governments from the consequences of their illegal conduct that intrudes upon federal protections.

Fundamental to the Founders' understanding of the new constitutional government they were enacting was the principle that the federal government's judicial power must be coextensive with its legislative power. *See* The Federalist, No. 80, p. 535 (J. Cooke ed. 1961) ("If there are such things as political axioms, the propriety of the judicial power of a government being co-extensive with its legislative, may be ranked among the number"); 3 Elliot's Debates, at

532 (remarks of Madison) ("With respect to the laws of the Union, it is so necessary and expedient that the judicial power should correspond with the legislative, that it has not been objected to"). Indeed, any honest assessment of these circumstances must note the peculiar absurdity of a government in which the lawmaking body can create rights and remedies that cannot be recognized in any court of law. The Founders could hardly have imagined constitutionalizing such an exercise in futility, but that is precisely what the extra-textual and unmoored application of the Eleventh Amendment has created today.

In this particular case, the effects are indeed troubling because, without express abrogation of immunity by Congress under the stringent standards laid out by the Supreme Court, plaintiffs would have been left with the unenviable and unjust position of holding a Constitutional right which cannot be vindicated in any court, federal or state.[6] Plaintiffs hold a right of such importance to the founders that it was, unique among most functions undertaken by the federal government today, expressly mentioned in Article I as an important protection to be ensured by the national government. But according to the Supreme Court today, it is not the obligation of the courts to ensure that for every right be a remedy, and the lower courts are commanded to be comfortable with meaningless declarations of form which do nothing for those harmed by the unlawful actions of their state. As Professor Akhil Reed Amar eloquently stated,

> In the end, the Supreme Court's vision of state sovereign immunity warps the very notion of government under law. The Court's invocation of state 'sovereign' immunity in cases where the state plainly is not sovereign—because it has acted ultra vires—resurrects the British theory of governmental supremacy that was anathema to the framers. It puts governments above, not under, the law. It makes government officers masters, not servants, of the People.

Amar, *Of Sovereignty and Federalism*, 96 Yale L.J. 1425, 1480 (1987).

_____

[6] *See Alden v. Maine*, 527 U.S. 706 (1999).

Case 5:15-cv-00627-BO   Document 69   Filed 03/23/17   Page 15 of 28

Though the Supreme Court's current interpretation of the Eleventh Amendment reaches back to the nineteenth century, longstanding doctrines do not become correct simply by virtue of being beholden to tradition. It is true that the honoring of precedent promotes stability in society and protects the interests of those who have relied on judicial pronouncements when ordering their affairs. But just because a doctrine is long accepted does not make it right, and the principle of stare decisis is perverted when relied upon as a defense for deliberate violations of federal law. *See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 98 (2000) (Stevens, J., dissenting). As Justice Holmes wrote, "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." *The Path of the Law*, 10 Harv. L. Rev. 457, 469 (1897)); *see also* Jackson, *Decisional Law and Stare Decisis*, 30 A.B.A.J. 334, 334 (1944) ("I never have, and I think few lawyers ever have, regarded that rule [stare decisis] as an absolute. There is no infallibility about the makers of precedents."). The immunity of states to federal law in federal court has degraded our structure of federalism, undermined the legitimacy of the federal courts, and so betrayed the very rights this constitution was meant to protect that it is the duty of the courts of this nation to reconsider this doctrine.

For these reasons, this Court is convinced that the holding of *Hans* and its progeny are in error.[7] The Court recognizes the substantial body of law that is to the contrary, and the numerous

---

[7] The Court also notes the particularly troubling context in which the decision of *Hans* was written. According to many commentators, the precedential value of the opinion should be reconsidered because the decision was "an integral part of the nation's surrender to southern intransigence and racial oppression" and constituted a "rejection of both established Eleventh Amendment doctrine and the principles of the new post-Civil War Constitution." Purcell, *The Particularly Dubious Case of Hans v. Louisiana: An Essay on Law, Race, History, and "Federal Courts"*, 81 N.C.L.Rev. 1927 (2003); s*ee also* Gibbons, *The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation*, 83 Colum. L. Rev. 1889, 2000 (1983) ("Without

admonishments of the Supreme Court that the Eleventh Amendment should be interpreted as having encompassed and memorialized a broad doctrine of sovereign immunity that extends beyond the literal words of the Amendment. However, this Court being in doubt of the soundness of such a doctrine being imported to words that, on their very face and plain meaning, do not extend so broadly, and not being convinced that such was the intended meaning of the Eleventh Amendment nor that the doctrine of sovereign immunity as it has been construed today was the original intent of the framers of the Constitution, expresses its disagreement with the holding of *Hans* and its progeny. Such a doctrine being antithetical to the plain text of the Constitution and to the structure of our government, this Court believes that such a defense should be without merit in these proceedings. To the extent it can, this Court humbly calls for the higher courts to reconsider this doctrine.

Nonetheless, this Court is constrained, under the absolute hierarchical system of courts in the federal judiciary, to hold that the defense of sovereign immunity is available to the states in federal court in a case arising under this Court's federal question jurisdiction. However, as discussed above, in this particular case Congress has clearly abrogated state immunity in cases arising under the CRCA, and such an abrogation is congruent and proportional to a clear pattern of abuse by the states. Therefore, plaintiffs' copyright claims shall not be dismissed on state immunity grounds.

weakening the contract clause, which over the next two decades the [*Hans*] Court might need both in its fight against government regulation of business and as a weapon against defaulting local governments, the justices needed a way to let the South win the repudiation war. The means [the *Hans* court] chose was to rewrite the eleventh amendment and the history of its adoption"); J. Orth, JUDICIAL POWER OF THE UNITED STATES: THE ELEVENTH AMENDMENT IN AMERICAN HISTORY 9 (1982); *but see generally* Collins, *The Conspiracy Theory of the Eleventh Amendment*, 88 Colum. L. Rev. 212, 243 (1988) (suggesting that the Southern debt crisis may not have been the only factor driving the Court's Eleventh Amendment jurisprudence during this period, but acknowledging that "[i]t is perfectly conceivable that Compromise-related politics exerted their influence at the margin—in doubtful cases in which the Court might have gone either way").

As to the state law causes of action that plaintiff asserts against the State defendants, the Court finds that such claims must be dismissed on immunity grounds. Congress cannot abrogate a state's immunity to state law causes of action, only state immunity to federal causes of action. Absent a state's express waiver of sovereign immunity, under the Eleventh Amendment, a federal court lacks subject matter jurisdiction to determine if state officers have violated the state's own law:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law.

*Pennhurst*, 465 U.S. at 106. Therefore, the State defendants are immune to state law causes of action in federal court, and counts IV and V against State defendants must be dismissed.

Finally, this Court must hold, under Fourth Circuit precedent, that plaintiffs' takings claims brought under § 1983 are barred by the Eleventh Amendment when North Carolina courts are available for such a claim to be brought. *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 552 (4th Cir. 2014) ("[W]e conclude that the Eleventh Amendment bars Fifth Amendment taking claims against States in federal court when the State's courts remain open to adjudicate such claims."). Because such a remedy is available in the State's courts, the Court finds that count III must be dismissed.

## II. *Legislative and Qualified Immunity*

Eleventh Amendment immunity does not protect the individual state defendants who have been sued in their individual capacities. The Court declines to dismiss plaintiffs' claims

against the individual defendants in their individual capacities under *Martin v. Wood*, 772 F.3d 192 (4th Cir. 2014), as the court of appeals has not addressed the holding of *Martin* in the § 1983 context. *See, e.g., Dyer v. Maryland State Bd. of Educ.*, 187 F. Supp. 3d 599 n. 17 (D. Md. 2016). Rather, the Court is instructed by the panel in *Richard Anderson Photography v. Brown*, 852 F.2d 114 (4th Cir. 1988), which in a copyright case against a state university held that the "mere fact that [defendant's] conduct was undertaken in the course of her state employment does not of course relieve her of individual liability, even if her employer could not be sued for it. A state may no more than an individual principal give its agent authority to commit torts without civil recourse." 852 F.2d at 122.

These individual defendants have raised additional defenses of legislative and qualified immunity. However, "the Court does not believe that qualified immunity applies to the individual defendants as a matter of law because the law of [copyright] infringement is clearly established, relegating the application of such immunity to be decided as a question of fact." *Kersavage v. Univ. of Tennessee*, 731 F. Supp. 1327, 1330 (E.D. Tenn. 1989). The claims against the individual defendants in their individual capacities may thus proceed.

The individual state defendants further raise legislative immunity as a defense to counts I, III, IV and V. "Legislative immunity protects those engaged in legislative functions against the pressures of litigation and the liability that may result." *McCray v. Maryland Dep't of Transp., Maryland Transit Admin.*, 741 F.3d 480, 484 (4th Cir. 2014). Plaintiffs allege that the individual defendants collectively wrote, caused to be introduced, and lobbied for passage of the amendment to N.C. Gen. Stat. § 121-25. [DE 12 ¶¶ 50-51]. Legislative immunity also extends to those who advise legislators, and it "is a shield that protects despicable motives as much as it protects pure ones." *Id.* at 485. The Court finds that, based on the allegations in the amended

complaint, a ruling on whether legislative immunity applies is premature at this time, and the Court thus defers its decision.

### III. *Standing*

Defendants argue that plaintiffs do not have standing to assert contest the validity of N.C. Gen. Stat. § 121-25(b) because they are not harmed by the statute and are under no imminent threat of harm. The Court does not agree and finds that plaintiffs sufficiently allege ongoing and imminent harm resulting from passage of the statute.

Federal courts may consider only cases or controversies, and "the doctrine of standing has always been an essential component" of the case or controversy requirement. *Marshall v. Meadows*, 105 F.3d 904, 906 (4th Cir. 1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To demonstrate standing, plaintiffs must establish that they have suffered an injury in fact that is concrete and particularized, that the injury is fairly traceable to the challenged action of the defendant, and that the injury is likely to be redressed by a favorable decision from the Court. *Chambers Med. Techs. of S.C., Inc. v. Bryant*, 52 F.3d 1252, 1265 (4th Cir. 1995). "The standing doctrine [] depends not upon the merits, but on whether the plaintiff is the proper party to bring the suit." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 460–61 (4th Cir. 2005) (citations and quotations omitted).

Plaintiffs allege in their complaint that defendants have taken the position that the 2013 settlement is no longer valid or binding on the parties as a result of the passage of N.C. Gen. Stat. § 121-25(b). This is a concrete and particularized harm. Plaintiffs further allege in their complaint that defendants are taking advantage of the statute, and their position that the settlement agreement is invalid because of the statute, to enter into contracts that grant to third

parties benefits reserved to plaintiffs under the settlement agreement. This is an ongoing harm and, accordingly, plaintiffs have alleged sufficient injuries to contest the validity of the statute.

IV. *Abstention*

Defendants next ask this Court to abstain from assessing plaintiffs' claims concerning N.C. Gen. Stat. § 121-25(b) because no North Carolina court has had the opportunity to interpret the meaning of the statute or reviewing its validity. The Court declines defendants' invitation to exercise its discretion to abstain from hearing this case.

Under *Railroad Commission v. Pullman Co.*, federal courts should abstain from hearing and ruling on matters of state law if the issues essential to the case are uncertain such that a ruling by a state court might obviate the need for the federal court's ruling. 312 U.S. 496, 500 (1941). This form of abstention allows state courts to resolve questions of unsettled state law and prevents unnecessary constitutional rulings. *Pullman* abstention applies where (1) there is an unclear issue of state law presented for decision (2) the resolution of which may moot or present in a different posture the federal constitutional issue such that state law is potentially dispositive. *Educ. Servs., Inc., v. Maryland State Bd. of Higher Educ.*, 710 F.2d 170, 174 (4th Cir. 1983). The result is that federal courts properly decline to exercise jurisdiction where an unresolved issue of state law is the most important issue in the case and predominates the questions of federal law presented to the court. The simple fact that no state court has yet interpreted a statute or ordinance does not itself provide grounds for *Pullman* abstention. *Id.*

Alternatively, and as articulated in *Burford v. Sun Oil Co.*, federal courts should also abstain from hearing and ruling on matters that involve a state's complex regulatory scheme or efforts to create a coherent policy with respect to a matter of substantial public concern. 319 U.S.

315, 318 (1943). *Burford* abstention is appropriate where a case raises difficult and important questions of state law. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). However, where the primary issue in a case is whether a state body violated federal law, *Burford* abstention is not proper. *See New Orleans Public Serv. Inc. v. Council of New Orleans*, 491 U.S. 350, 359 (1989). Such abstention should be construed narrowly and used only in rare circumstances. *See Quackenbush*, 417 U.S. at 722-23.

Further, in *Martin v. Stewart*, 499 F.3d 360 (4th Cir. 2007), the Fourth Circuit noted that *Burford* abstention is not necessary anytime "federal litigation affects an important state interest." *Id.* at 369. In fact, a great number of decisions by federal district courts will impact state interests. As such, *Burford* abstention is only appropriate where: (1) the case involves difficult questions of state law "whose importance transcends the result in the case then at bar," or (2) the exercise of federal review in this matter would be disruptive of state attempts to build coherent policy regarding a significant public interest. *New Orleans Public Service, Inc.*, 491 U.S. at 361 (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)). In finding that remand was not appropriate, the *Martin* court noted that a direct challenge to the constitutionality of a statute did not implicate the second prong of the *Burford* analysis because it did not threaten uniformity of application—meaning if the law was unconstitutional it would be unenforceable everywhere.

The Court finds that, though no North Carolina state court has reviewed the statute at issue, such an unresolved question of state law is not the predominate issue in the case and does not outweigh the important questions of federal law presented to the court. The simple fact that no state court has yet interpreted a statute or ordinance does not itself provide grounds for *Pullman* abstention, and such abstention is not appropriate here where state court clarification

22

would do little to resolve the predominate federal questions before the Court. The Court also finds that this case does not present difficult questions of state law or that the exercise of federal review would be disruptive of state attempts to build coherent policy regarding a significant public interest. The primary state law question before the Court is clear: whether the statute is superseded by federal law and in violation of the Constitution. Such a question does not involve difficult questions of state law, and review of the statute would not threaten uniformity of application of state policy because the Court's determination would either uphold or strike down the statute in its entirety. Additionally, the case primarily concerns federal copyright and Constitutional law, and does not require that the Court engage itself in difficult matters of interpreting state law or significant policy schemes. Copyright law cannot impact a vital state interest as copyright protection is the exclusive domain of the federal government. It is a matter that originates in the Constitution and is exclusively regulated by federal statute. U.S. Const. Art. I, cl. 8; 17 USC § 101 *et seq*. For these reasons, the Court finds that abstention is not warranted and that the Court should continue to hear the case.

## V.   *Motions to Dismiss under Rule 12(b)(6)*

Defendant Friends of the QAR moved to dismiss plaintiffs' complaint, arguing that plaintiffs' complaint fails to plausibly allege that it engaged in any acts of copyright infringement, unfair and deceptive trade practices, or civil conspiracy. The State defendants similarly argue that plaintiffs' complaint fails to support claims against the State or individuals sued in both their individual and official capacities.

*Count 1*

The Court finds that plaintiffs have pled facts sufficient to allow this Court to draw the reasonable inference that § 121-25(b) is invalid as it purports to regulate a matter in the express domain of federal law. "[A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . are governed exclusively by [the Copyright Act]." 17 USC § 301(a). "[N]o person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." *Id.* State laws are pre-empted by the Copyright Act when a two-prong test is met: "(1) the work must be within the scope of the subject matter of copyright . . . and (2) the rights granted under state law must be equivalent to any exclusive rights within the scope of federal copyright." *United States ex rel. Berge v. Board of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997) (internal quotation marks omitted) (quoting *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225, 229 (4th Cir. 1993)). To determine if the state law rights are equivalent to the exclusive rights within the scope of copyright, courts look to whether "the act of reproduction, performance, distribution or display will *in itself* infringe the state created right." *Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*, 351 F. Supp. 2d 436, 442 (M.D.N.C. 2005) (internal quotations omitted) (emphasis in original). If so, the state law claim is preempted by the Copyright Act. *Id.* If, however, "other elements are required, in addition to or instead of, the acts of reproduction, performance, distribution, or display," then there is no preemption. *Id.*

Central to this case is the State's passage of N.C. Gen. Stat. § 121-25(b), which even in its current form purports to convert copyrighted materials into the public record of the State where such materials are "in the custody of agency of North Carolina government or its subdivisions." N.C. Gen. Stat. § 121-25(b). Public records are "the property of the people" under

North Carolina law. N.C. Gen. Stat. § 132-1(b). North Carolina's statute therefore purports to regulate the right to use and copy "photographs, video recordings, or other documentary materials," N.C. Gen. Stat. § 121-25(b), which is subject matter within the scope of the Copyright Act. Plaintiffs assert the right to use such photographs, video recordings, and other documentary materials under exclusive copyright, but the state statute in question purports to transfer those exact same rights to the public domain. By asserting copyright over those works, plaintiffs would be in violation of this statute. For these reasons, plaintiffs have sufficiently stated a plausible claim that the statute is pre-empted by federal law and therefore invalid.

### Count II

The Court also finds that plaintiffs have sufficiently stated a claim of copyright infringement on the part of all defendants. Original works of authorship that are fixed in a tangible medium of expression are federally protected rights, rooted in the United States Constitution and protected by the federal Copyright Act. 17 USC § 101 *et seq.* 17 USC § 102; *US Ex Rel. Berge v. Board of Trustees of Univ. of Ala.*, 104 F. 3d 1453 (4th Cir. 1997). The Copyright Act provides that the copyright owner shall have the exclusive right to (1) reproduce the copyrighted work; (2) prepare derivative works; (3) distribute copies of the work by sale or otherwise; (4) perform the work publicly; and (5) display the work publicly. 17 USC § 106. A copyright owner is equipped with a "potent arsenal of remedies against an infringer of his work," including injunctions, recovery of actual or statutory damages, and attorneys' fees. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 US 417, 433–34 (1984). Those remedies are invoked by pleading a claim for copyright infringement, alleging that the plaintiff owns a copyright registration that has been infringed. *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 435 (4th Cir. 2010).

In their complaint, plaintiffs sufficiently pled specific facts that allow the inference that each defendant has infringed plaintiffs' registered copyright works after the 2013 settlement agreement. Plaintiffs identify federal registrations and detail specific instances of infringement, including the type of media allegedly infringed, where examples of the infringements can be found, and how the infringement has allegedly continued. The State defendants are not shielded by the Eleventh Amendment's immunity from this claim, and plaintiffs have pled sufficient facts that, if true, allow the inference that both State defendants and defendant Friends of the QAR have violated plaintiffs' federal copyrights. The defenses defendants raise to this claim, such as whether such uses of plaintiffs' work can constitute "fair use" under federal law, is a question of fact that cannot be determined at this stage of the proceedings.[8]

### Counts IV and V

Finally, plaintiffs brought claims alleging violations of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA") and civil conspiracy. As discussed before, State defendants are immune to such state law causes of action in federal court. As to defendant Friends of the QAR, the Court finds that plaintiffs have failed to state a plausible claims for relief and that these claims must be dismissed.

In order to state a claim for unfair or deceptive trade practices, a plaintiff must show that: (1) the defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff. *Dalton v. Camp*, 548 S.E.2d 704, 711 (2001) (citations omitted). "A practice is unfair when it offends

---

[8] 17 U.S.C. § 107 ("In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include -- (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.").

Case 5:15-cv-00627-BO   Document 69   Filed 03/23/17   Page 26 of 28

established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Marshall v. Miller*, 276 S.E.2d 397, 403 (1981). Additionally, "some type of egregious or aggravating circumstances must be alleged and proved before the Act's provisions may take effect." *Id.* Whether an act is unfair or deceptive is a question of law for the court. *Id.*

To the extent plaintiffs allege a violation of UDTPA on the basis of copyright infringement, such a cause of action is preempted by the Copyright Act. *See* 17 U.S.C. § 301(a). To the extent plaintiffs allege a violation of UDTPA on the basis of Friends of the QAR's efforts in favor of passage of N.C. Gen. Stat. § 121-25, such allegations fail to state a plausible claim for relief. "The First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances," *Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 286 (1984), and this right to petition one's government extends to lobbying. *See Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489, 491 (D.C. Cir. 1967). The mere act of advocating for passage of legislation cannot constitute an unfair or deceptive trade practice, and plaintiffs have alleged no plausible facts showing egregious or aggravating conduct necessary to state a claim under UDTPA.

Plaintiffs' claim of civil conspiracy fails for similar reasons. Under North Carolina law, "[t]here is no independent cause of action for civil conspiracy." *Toomer v. Garrett*, 574 S.E.2d 76, 92 (2002). Additionally, such a claim is preempted by federal law to the extent it is based on copyright infringement, *see* 17 U.S.C. § 301(a), and barred by the First Amendment to the extent it is based upon the conduct of lobbying and advocating for passage of a statute. *Minnesota State Bd. for Cmty. Colleges*, 465 U.S. at 286; *see also Liberty Lobby*, 390 F.2d at 491.

## CONCLUSION

For the foregoing reasons, State defendants' motion to dismiss [DE 49] is DENIED IN PART and GRANTED IN PART and defendant Friends of the *Queen Anne's Revenge*'s motion to dismiss is DENIED IN PART and GRANTED IN PART. [DE 47]. Plaintiffs' first and second claims remain against all defendants, while claims three, four, and five are dismissed.

SO ORDERED, this **23** day of March, 2017.

Terrence W. Boyle
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE