IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:15-CV-627-BO

Frederick Allen, et al.,          .
                                  .
        Plaintiffs,               .
                                  .
        VS.                       . NOVEMBER 2, 2016
                                  . RALEIGH, NORTH CAROLINA
Patrick Lloyd McCrory, et al.,    .
                                  .
        Defendants.               .
. . . . . . . . . . .

                    MOTION HEARING
          BEFORE THE HONORABLE TERRENCE W. BOYLE
          UNITED STATES DISTRICT JUDGE PRESIDING


APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF  - MR. G. JONA POE, JR.
                     MS. SUSAN OLIVE
                     3202 GUESS ROAD
                     POST OFFICE BOX 15455
                     DURHAM, NORTH CAROLINA  27705


FOR THE DEFENDANT  - MR. JEFFREY A. DOYLE
(FRIENDS OF QUEEN    MS. EMILY C. PAPPAS
 ANNE'S REVENGE)     HEDRICK, GARDNER, KINCHELOE
                       AND GAROFALO, LLP
                     4131 PARKLAKE AVENUE, SUITE 300
                     RALEIGH, NORTH CAROLINA  27612

1

2   FOR THE DEFENDANTS - MR. AMAR MAJMUNDAR
                            SPECIAL DEPUTY ATTORNEY GENERAL
3                          MS. OLGA VYSOTSKAYA DE BRITO
                            SPECIAL DEPUTY ATTORNEY GENERAL
4                          STATE OF NORTH CAROLINA
                            UNITED DEPARTMENT OF JUSTICE
5                          114 WEST EDENTON STREET
                            RALEIGH, NORTH CAROLINA  27602
6

7   DEPUTY CLERK        - MS. LINDSAY STOUCH

8

    COURT REPORTER      - LINDA W. LITTLE
9                          CAROLINA COURT REPORTERS, INC.
                            105 OAKMONT DRIVE, SUITE A
10                         GREENVILLE, NORTH CAROLINA 27858
                            (252) 355-4700
11

    Proceedings recorded by  stenomask, transcript produced  from
12  dictation.

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

November 2, 2016

(Time Noted: 11:05 a.m.)

1

2

3

4      THE COURT:  Good morning, everyone.

5      ALL:  Good morning.

6      THE COURT:  This is a particularly appropriate

7 venue for a visit to Mr. Teach for many reasons, and I'll

8 indulge my privilege to orient you before we start the

9 hearing.

10      If you had been alive in 1790, this is where you

11 would have presented yourself for United States District

12 Court.  This is one of the first venues established by

13 Congress when North Carolina became part of the Country in

14 1789.  The reason being that we had a Justice of the Supreme

15 Court named James Iredell who -- those of you who like the

16 Eleventh Amendment -- are you on the defense over here?

17      MR. AMAR MAJMUNDAR:  Yes, sir, Your Honor.

18      THE COURT:  Those of you who like the Eleventh

19 Amendment would know all about James Iredell, who was the

20 author of Dissent in Chisholm, which promptly gave rise to

21 the Eleventh Amendment.  But, Edenton also had the first US

22 Congressman for this region of the state, elected when North

23 Carolina became a State, and the first US Senator.

24      So, they had here in 1789 and 90, during the

25 first United States Congress, a US Senator, of which there

1 were probably only 24, because I doubt that Rhode Island

2 would have joined in by that time, and a US Congressman and a

3 Supreme Court Justice, and the Courthouse that was as

4 suitable as any in the State to hold Federal Court. And so,

5 this became one of the locations in which Federal District

6 Court, United States District Court was held at the beginning

7 of our Country. It was held in Wilmington and New Bern and

8 Edenton and Raleigh.

9 But, we're the only place that still has the

10 Courthouse. There were no Federal Courthouses built, to my

11 knowledge, until after the Civil War, anywhere. They used

12 public buildings that belonged to the State. So, this is

13 where you would have had Federal Court.

14 And, as for Mr. Teach, his pal and benefactor

15 and protector was Governor Eden, for whom this town is

16 named. And, so, the likelihood or assurance that he was

17 right down the street here many times, it was almost

18 absolute, and that's so interesting in this, in the context

19 of this case.

20 And, some other odd, but interesting, touch

21 points about Blackbeard and Teach -- North Carolina --

22 the congressman about whom I spoke was Hugh Williamson,

23 who was in the first and second US Congresses, but more

24 importantly, he was one of the 39 signers of the US

25 Constitution, and was a North Carolina delegate to the

1    Constitutional Convention in 1789, and was a very prominent

2    figure there.  A little note of history, but -- but very

3    significant in the debates and the maneuvering that went on

4    in the draft -- in the writing of the Constitution, which,

5    you know, it took place in 1789.  And, he was a medical

6    doctor in Springfield, Philadelphia; he was a confidant of

7    Franklin's.  He had studied medicine in Scotland and in

8    Germany and was a very prominent person.  He was the Surgeon

9    General of the North Carolina forces during the

10    Revolutionary War.  He was a member of the State Legislature,

11    but he was also a member of the articles of Confederation of

12    Congress.  You know, between 1777 and 1788 there was a

13    Government, but it just wasn't this Government.  It was

14    the Articles of Confederation, and there were members of

15    Congress sent from every one of the States to the Articles

16    Convention, which met -- met in New York most of the years.

17    And, that's where it was during the later years.  I think

18    it may have met in Philadelphia earlier.

19          But, his mother -- okay, we're talking about

20    Hugh Williamson, who was a delegate to the Constitutional

21    Convention, his mother and her father in 1708 are captured by

22    Blackbeard.  How do you like that for coincidence?  In their

23    voyage from England to America, I think, destined for

24    Wilmington, they're captured and ransomed.  And, fortunately,

25    the ransom was paid, and they went on for their life.  And,

1   her brother, so, the later son of the father who was captured

2   -- it's hard to follow all of this -- is General Davidson,

3   who is a revolutionary war hero and for whom Davidson College

4   is named and from whose family the land was given for

5   Davidson College.

6           And then, later in time, our Hugh Williamson,

7   who's the nephew of the Davidsons and grandson of the

8   father, is here in Edenton.  So, it's remarkable that you

9   have these little pieces of history that continue to

10   germinate.  And continue to -- as long as you keep things

11   in place you might get a comeback.  And, we've been

12   fortunate enough in Edenton to keep everything in place.

13   And, then, you've got Iredell, who is the center in the

14   Chisholm case and rapidly produces -- he doesn't, but

15   Congress and the States rapidly produced the Eleventh

16   Amendment on which the defendants rely in some part to bar

17   suits in Federal Court against States.

18           So, with all those points of interest, I'll

19   hear from the State first and then the other Defendant with

20   their motion to dismiss.

21           MR. AMAR MAJMUNDAR:  Thank you, Your Honor.

22   My name is Amar Majmundar; I'm with the Attorney General's

23   Office.  I'm joined today by my colleague, Olga Vysotskaya,

24   also, with the DOJ, Mr. Doyle and Ms. Pappas, who are here on

25   behalf of the Friends of the Queen Anne.

1          We're here today on the Defendants' respective

2   Motions to Dismiss.  And, as you've just indicated, Your

3   Honor, obviously, this all involved Edward Teach and the

4   Queen Anne's Revenge, which, as you are familiar with, ran

5   aground in Topsail Inlet, sank.  And, over the last 20 years

6   or so, the State has endeavored to recover as many artifacts

7   and articles from that site.

8          THE COURT:  So, how is the State involved in

9   doing that?  It -- was the wreck in the ocean, off Beaufort?

10         MR. MAJMUNDAR:  It ran aground in Topsail Inlet,

11  so, by proximity to the Coast, the Shoreline, it is deemed by

12  both Federal and State Law to be State property.

13         So, that vessel and all the articles in it

14  belong to you and they belong to me and everybody in this --

15         THE COURT:  How does the State have title to

16  things that are -- simply, because of the Territorial

17  Amendment out from the shoreline?

18         MR. MAJMUNDAR:  That's correct.

19         THE COURT:  How far out does that go?

20         MR. MAJMUNDAR:  I want to say three miles, Your

21  Honor, but --

22         MS. VYSOTSKAYA DE BRITO: It's less than three

23  miles.

24         MR. MAJMUNDAR:  It's just short of three miles,

25  I believe.

1              THE COURT:  And, so, the wreck or the salvage of

2    this Queen Anne's Revenge is within three miles.

3              MR. MAJMUNDAR:  Yes, Your Honor.

4              THE COURT:  Okay, and it's in Topsail Inlet?

5              MR. MAJMUNDAR:  Yes, sir.

6              THE COURT:  Which is near Topsail Beach?

7              MR. MAJMUNDAR:  Not far; that's correct.

8              THE COURT:  Okay.

9              MR. MAJMUNDAR:  And so, over the last 18 years,

10   give or take.  The State --

11             THE COURT:  Does the State have title to all

12   wrecked or derelict vessels that are abandoned?

13             MR. MAJMUNDAR:  They had title to all except

14   to the extent that a treaty has been entered with a foreign

15   nation.

16             THE COURT:  Like a Spanish Galleon.

17             MR. MAJMUNDAR:  Exactly, so, the Kingdom of

18   Spain would have title to it.

19             THE COURT:  Because of the treaty.

20             MR. MAJMUNDAR:  Correct.

21             THE COURT:  So, his ship is a pirate ship, so,

22   it's not flagged by anyone.

23             MR. MAJMUNDAR:  Formally a French vessel, but

24   once it commandeers --

25             THE COURT:  I thought it was a Portuguese

1   vessel.

2           MR. MAJMUNDAR:  You may be right, Your Honor.

3   I think it's called -- the Concord was the original title of

4   the ship.  I may be wrong about that, though.  My pirates

5   history is vague at best, to be honest with you.

6           THE COURT:  Sharpen it up.

7           MR. MAJMUNDAR:  I should.  Well, for my kids'

8   sake.  Your Honor, that's part of, you know, why we're here.

9   The State has gone and expended resources, marginal and

10   expended resources.

11           THE COURT:  The State -- doesn't the State first

12   have to own it before it can exert these claims?

13           MR. MAJMUNDAR:  By virtue of State and Federal

14   Law, though, it's proximity to the State shores make it a

15   State vessel.

16           THE COURT:  Every vessel that goes down and is

17   no longer occupied is State property; is that what you're

18   saying?

19           MR. MAJMUNDAR:  Every derelict vessel, every

20   shipwreck.  Within that --

21           THE COURT:  Not otherwise governed by a treaty?

22           MR. MAJMUNDAR:  I'm sorry?  Not otherwise

23   governed by a treaty, correct.

24           THE COURT:  Okay.

25           MR. MAJMUNDAR:  Now, when it's in international

1   waters, I'm sure that there's maritime law to address those

2   issues.

3             THE COURT:  Okay.

4             MR. MAJMUNDAR:  But I'm not sure they're

5   pertinent to the analysis here.

6             THE COURT:  Okay.

7             MR. MAJMUNDAR:  So, since -- in about the last

8   18 years --

9             THE COURT:  And the State never abandons that

10   claim, so, if there was a 16th-century vessel that preceded

11   North Carolina, how does -- 'cause North Carolina didn't,

12   you know, come into existence in some of these centuries.

13             MR. MAJMUNDAR:  Yeah, but they're considered

14   our waters.  So, anything in our real waters belongs to

15   everybody in this courtroom.

16             THE COURT:  Okay.

17             MR. MAJMUNDAR:  They're all public records or

18   public artifacts that we have access to.

19             THE COURT:  Okay, whether you know it or not.

20             MR. MAJMUNDAR:  Whether you know it or not, and,

21   frankly, there's a lot I've learned that I have access to by

22   virtue of this case.

23             THE COURT:  No, I don't mean whether you know

24   it, I mean, whether we know that the vessel exists or not.

25             MR. MAJMUNDAR:  Yeah.  If it pre-existed, yeah,

1   that would --

2           THE COURT:  The floor of the ocean is probably

3   saturated with things no one knows anything about.

4           MR. MAJMUNDAR:  Certainly, without question.

5           THE COURT:  All right.

6           MR. MAJMUNDAR:  So, given that this vessel and

7   its artifacts belong to the public, the question that's

8   raised with this lawsuit is what access to the public and

9   the media for the discussion has to the media and the

10  materials produced regarding these artifacts.  So, for the

11  last 18 years, they've gone down -- state employees have gone

12  down to dive at the site and --

13          THE COURT:  Whose done the recovery, is it the

14  private citizens or public activities?

15          MR. MAJMUNDAR:  Public activities.

16          THE COURT:  So, the actual recovery, the diving

17  and the location and the tracking of these things is all done

18  by public employees?

19          MR. MAJMUNDAR:  All public.  The original

20  discovery was private.  The original location or the finding

21  is --

22          THE COURT:  Is that -- is that the Plaintiff?

23          MR. MAJMUNDAR:  No, it's not.

24          THE COURT:  It's somebody else.

25          MR. MAJMUNDAR:  Somebody else entirely.

1          THE COURT:  And, what did they get out of it,

2     anything?

3          MR. MAJMUNDAR:  Besides the acclaim, I'm sure

4     they got some money out of it, Your Honor.  I don't know what

5     the mechanics were back then.

6          THE COURT:  Okay.

7          MR. MAJMUNDAR:  But, it was a private dive

8     group, for lack of a better term, who found it in the first

9     place.

10          THE COURT:  Okay.

11          MR. MAJMUNDAR:  But, given its proximity to the

12     State, it's State property.

13          THE COURT:  Okay.

14          MS. VYSOTSKAYA DE BRITO:  Your Honor, if I

15     could jump in, because I do have a piece of information

16     that reflects that question.  The original company that

17     discovered the ship is Intersal Company.  And, there was

18     a 1998 Settlement Agreement or Agreement between the State

19     of North Carolina and Intersal that basically allowed

20     Intersal to receive 15 or 20 percent of any recovered

21     treasures, like, precious metals, for example, if any are

22     recovered from the ship, but left all the artifacts and

23     everything else to the State.

24          THE COURT:  Okay.

25          MR. MAJMUNDAR:  So, durative they would get

1  profit out of it if these things are, in fact, recovered

2  -- these precious metals.  I'm sorry.  I should have

3  remembered that, Your Honor.

4  So, as Plaintiffs allege in their Complaint,

5  these parties have been working together for almost 20 years.

6  The State goes out; they take their vessel.  They go down on

7  these dives --

8  THE COURT:  And, the Plaintiffs documented what

9  the State is doing; is that what the Plaintiffs did?

10  MR. MAJMUNDAR:  And, the Plaintiffs documented,

11  by virtue of photographs and video, digital or whatever it

12  was 18 years ago.  But, they documented the State's efforts,

13  so, the State has allowed for that documentation by allowing

14  Nautilus to ride along on these trips up to the dive site, go

15  down with the State actors and come back up with the State

16  actors.

17  So, for 18 years, this process has been going

18  on, they've been collaborating.  Collaborating, not always

19  harmonious, but they've been working together.  During that

20  18-year period of time, Nautilus has provided to the State

21  pieces of media.  I'll just call it media as a catch all,

22  but they're photographs and videos.  And, they provided to

23  the State pieces of media.  And, upon doing so, those pieces

24  of media become public.  Just as though, perhaps, if Nautilus

25  emailed a DCR official the picture of a cannon or no picture

1  at all.  That email is public.

2          THE COURT:  And the taking of the photographs

3  was copyrighted?

4          MR. MAJMUNDAR:  So, yeah, and that gets to the

5  heart of the matter that the contention with respect to the

6  public records aspect, which we'll go into, is that once a

7  document or whatever it might be, a piece of film, is given

8  to the public, according to the State's Public Record Laws,

9  it's given to a State Agency, according to the Public Record

10  Laws, it is publicly discoverable.  It's part of the public

11  record.

12          So, during that time, Nautilus did, in fact,

13  provide the State with some pieces of media.  So, now, this,

14  in a lawsuit, suggests two theories of violations on behalf

15  of the State.  The first is this copyright infringement

16  concept that --

17          THE COURT:  Well, do you deny that the material

18  was copyrighted?

19          MR. MAJMUNDAR:  I think the question of whether

20  it's copyrighted or not, we haven't explored.  We haven't

21  done any discovery, Your Honor.  And, I'm not sure I'm in a

22  position, at this point, to declare affirmatively whether or

23  not it's been copyrighted.  I know the assertion is that it's

24  been copyrighted.

25          So, these pieces of media provided to the State

1  became part and parcel with other media that the State had

2  that was uploaded to the State's YouTube Station or channel.

3  I'm not sure what the correct terminology is, but the State

4  runs a YouTube website, and snippets of Nautilus's work were

5  included in some of these videos that were uploaded to the

6  State's YouTube website.  Moreover, snippets of Nautilus's

7  work were included in the State's digital archives.

8           Now, as you've just demonstrated, this history

9  is an important part of North Carolina history.  And, these

10 videos were put up or uploaded or whatever the term is, so,

11 that people could learn and appreciate our common history,

12 our maritime history; same things with the digital archives.

13 They're made available for the purpose of letting people

14 learn and understand what we all share.

15          And, you know, just as an example, Your Honor,

16 my wife and I take our kids to Ocracoke every year.  And,

17 they love the sand and they love the surf, but I think they

18 like Blackbeard's Museum more than anything else.  So, that's

19 -- that's a great part of being out there.  And so, they

20 appreciate it; it's a part of their growing up in North

21 Carolina.  And, these videos are designed to supplement their

22 experience and everybody else's experience to educate, to

23 learn and to appreciate.

24          So, -- but, according to Nautilus, there's a

25 copyright infringement associated with including those

1  snippets of videos within these other videos.  And, in fact,

2  upon a take-down notice, those videos have been removed.

3  None of us have access to them any more.  They no longer

4  are public.

5          The second kind of avenue of claim that

6  Nautilus proposes is this idea that various members of the

7  State of North Carolina, starting with Governor McCrory on

8  down, have conspired to conceive, propagate and enact here

9  NCDF 121-25B. What's important to note here is that statute,

10  since the filing of this lawsuit, has changed very

11  dramatically.  As it exists now, 121 --

12          THE COURT:  Well, this lawsuit was only filed

13  in December; wasn't it?

14          MR. MAJMUNDAR:  A lawsuit was filed, and the

15  Amended Complaint was filed in December; right.

16          THE COURT:  So, something's happened since

17  December --

18          MR. MAJMUNDAR:  The --

19          THE COURT:  -- in the Legislature?

20          MR. MAJMUNDAR:  The session law -- it was part

21  of that -- it's part of what's called An Act to Modify the

22  Current Operations and Capital Improvements Appropriations

23  Act of 2015.  And, that was -- that became in -- Ms.

24  Vysotskaya will find the date, Your Honor.  But I don't think

25  any of the parties disagreed that the statute was amended and

1  that it had the current form.

2                THE COURT:  Okay.

3                MR. MAJMUNDAR:  And, what that form is now,

4  essentially, ties in these derelict vessels and shipwrecks

5  memorializations to the preexisting Public Record Laws of

6  North Carolina in the Chapter 121 and Chapter 132.  And, in

7  fact, the plain language of -- well, I'll find it for you --

8  but the plain language says that, "All materials produced

9  regarding derelict vessels and shipwrecks are subject to

10  Chapter 132 of these General Statues," which are Public

11  Records Laws.

12                The statute, as it exists now, simply, just

13  refers anyone from the shipwreck articles to the public

14  record's articles; that's all it does.  That's the statute

15  that's at issue before you today.

16                And the public records aspect of it all has been

17  acknowledged by both parties.  In fact, all parties in this

18  courtroom.  In 2013, the parties entered into a Settlement

19  Agreement.  As part of that Settlement Agreement, there is a

20  paragraph, it's paragraph 17; what it says is, "Nothing in

21  this Agreement shall prevent DCR from making records

22  available to the public, pursuant to North Carolina General

23  Statutes Chapters 121 and 132 or any other applicable

24  standards by the Statue.

25                So, the Settlement Agreement signed off by

1   the parties acknowledges the public records aspect of the

2   various materials that have been produced depicting the

3   State's efforts to raise artifacts from the Queen Anne's

4   Revenge.

5           THE COURT: So, what are you saying, that there's

6   an estoppel or some waiver that the Plaintiff made by joining

7   in that Settlement?

8           MR. MAJMUNDAR:  It's not presented so much in

9   the form of a waiver, Your Honor, but, rather, in this

10   context, we have not only the intent, but the obligation

11   to make public records available to the public.  And, in

12   2013, even though they had a copyright claim, irrespective

13   of the merits of that claim, they, too, have stipulated and

14   conceded that State Public Record Laws are in effect.  So,

15   what they provide to the State becomes part of the public

16   record.

17           THE COURT:  But, you can't take something that's

18   copyrighted and convert into public property just by

19   expropriating it.

20           MR. MAJMUNDAR:  And -- well, I would suggest

21   that this is material that's provided to us.  And, that

22   really is the nut of the issue, if we ever get to the point

23   where we are presenting evidence about whether or not there

24   is, in fact, a copyright infringement.

25           The issues before you today, Your Honor, are

1    more jurisdictional.  As you referenced, there's an Eleventh

2    Amendment aspect to all this, as well as, other immunity

3    aspects.  And, I think that's a good jumping off point.  We

4    have a Complaint that features five counts.  Two are State

5    Law claims, one is a 1983 action, one is a declaratory

6    judgement action, and, one is the copyright infringement

7    claim.  Obviously, in order to present these claims to you,

8    This Court has to have the predicate jurisdiction to

9    entertain that.

10           So, if it's okay with you, Your Honor, I'm going

11   to present the Eleventh Amendment aspects of it.  Ms.

12   Vysotskaya is going to present the other individual type of

13   immunities aspects of it.  And, I suppose, the Friends can

14   proceed thereafter.

15           THE COURT:  Yeah, I sat on a case -- this just

16   came to my mind -- I sat on a case in the Fourth Circuit in

17   1985 called -- somebody versus Radford Uni -- Virginia.  It

18   was a Virginia case; it was a State College.  And, it had

19   taken some copyrighted material, and they had the Eleventh

20   Amendment as a bar; did you find that case?

21           MR. MAJMUNDAR:  We did see that case, Your

22   Honor, and it was --

23           THE COURT:  What's the name of it?

24           MR. MAJMUNDAR:  Richard Anderson Photography

25   versus Brown.

1          THE COURT:  Anderson Photography -- versus what?

2          MR. MAJMUNDAR:  Brown.

3          THE COURT:  Brown?

4          MR. MAJMUNDAR:  Yeah.

5          THE COURT:  But it was about Radford University.

6          MR. MAJMUNDAR:  It was.  It was.

7          THE COURT:  And Judge Phillips wrote the

8     opinion, I think.

9          MR. MAJMUNDAR:  Right.

10          THE COURT:  Did I write a --

11          MR. MAJMUNDAR:  You wrote a dissent.

12          THE COURT:  A dissent?

13          MR. MAJMUNDAR:  Yes.  And, it was under the old

14     copyright law.

15          THE COURT:  Huh?

16          MR. MAJMUNDAR:  It was under the old copyright

17     law.

18          THE COURT:  Does that matter?

19          MR. MAJMUNDAR:  It does matter, I think, to a

20     certain extent, because the law that exists now -- we'd be

21     glad to provide counsel a copy at some point, if they need

22     it.

23          THE COURT:  How about that.  Was it an '85 or

24     '86 case?

25          MR. MAJMUNDAR:  1987 it was argued and decided

1  in 1988.

2          THE COURT:  Oh, okay.

3          MR. MAJMUNDAR:  So, but, yes, we did see that,

4  Your Honor.

5          THE COURT:  Yeah.

6          MR. MAJMUNDAR:  But, given that was under the

7  old statute, it, kind of, changes the dynamics somewhat.

8          THE COURT:  Okay.

9          MR. MAJMUNDAR:  So, on the Eleventh Amendment

10  issue, Your Honor knows that a State that does not consent

11  to a suit in Federal Court may not be sued.  That's -- any

12  private suit, and that should be clear, a private party may

13  not sue a State in Federal Court absent consent.  That

14  includes claims for compensation and money.

15          THE COURT:  Right.

16          MR. MAJMUNDAR:  And, that bar, that immunity,

17  also, applies to public officials, because they're deemed to

18  be the alter ego of the State Agency.

19          Now, there are some exceptions, of course.

20  Three exceptions of note are whether the State waived its

21  immunity to be sued in Federal Court.

22          THE COURT:  That's not here.

23          MR. MAJMUNDAR:  Whether this -- whether the

24  Congress has abrogated --

25          THE COURT:  That's not here.

1          MR. MAJMUNDAR:  And, finally, the ex parte

2    beyond exception for the 1983 --

3          THE COURT:  Why isn't that here?

4          MR. MAJMUNDAR:  -- portion of the question.  So,

5    Your Honor, this goes back to the statute as it exists now.

6    For a 1983 action to be in effect, we first have to

7    acknowledge that it's prospective and injunctive relief that

8    it seeks.  It doesn't apply to the Fifth Amendment; it's only

9    Fourteenth Amendment.  So, it applies to prospective and any

10   injunctive relief sought by the claimants to prevent State

11   Officials from enforcing or threatening to enforce in the

12   future an unconstitutional statute.  That's what ex parte

13   Young provides.

14          Now, these State officials aren't just officials

15   who have general enforcement authority over the laws of North

16   Carolina.  There has to be a special relationship between

17   that official and the statute in question.  They have to have

18   proximity to and responsibility for the enforcement provision

19   of that statute.

20          So, if you look at the array of allegations

21   asserted against public officials with respect to the 1983

22   action, what you'll see, Your Honor, is Governor McCrory and

23   the Secretary of DCR, on down the line, a variety of public

24   officials who had general authority to enforce the laws in

25   the State, but do not have that special relationship to the

1    Statute 121-25B in question.  Moreover, there -- so, there's
2    no allegation that statute, as it exists before you today, is
3    being enforced or is being threatened to be enforced.
4    There's no allegation whatsoever.  And that statute, even if
5    enforced, is benign.  All it says, Your Honor, is that in
6    keeping with our public record laws, materials associated
7    with the memorialization of artifacts and articles of
8    derelict vessels and shipwrecks are public records.

9            So, the statute itself, the statute at issue
10   doesn't do anything; it just reminds people that these are
11   also public records.  There's no enforcement of it.  It's --
12   for the lack of a better term, it's definition, these, too,
13   belong in public records.  That's all it does.

14           And, so, the allegations made by the Plaintiffs
15   in this case under 1983 -- I'm not sure there's any basis for
16   them because they haven't made any allegations, that, for
17   instance, Governor McCrory has allowed these media pieces to
18   be disseminated to, you know, this private person or the
19   public.  That the Secretary of DCR knew that these pieces
20   were here, but, nevertheless, allowed those pieces to go out
21   to the public.  They're no such allegations.  Every one of
22   the allegations offered by Plaintiff in their Amended
23   Complaint is of a very, very general nature.  And that's not
24   in keeping with ex parte Young.  It has to be specific that
25   these public officials have proximity to any responsibility

1    for the enforcement of a statute.  And that, simply, doesn't

2    exist here, Your Honor.

3            So, if your question is why does 19 -- why is

4    the 1983 claim barred, it's barred because there is no

5    proximity.  There's no responsibility and there's nothing to

6    enforce.  There is no intricate relationship between these

7    named officials and the statute in question, and that's

8    what's needed here.  That's absolutely what's needed in order

9    for the ex parte Young exception to apply to allow a State

10   entity to be sued in Federal Court under the Eleventh

11   Amendment.  And, that's just lacking here, Your Honor.

12           The other, kind of, aspect of this, Your Honor,

13   is that, in their Complaint, Plaintiffs have said, in the

14   past, the State has allowed X, Y and Z.  Now, I referenced to

15   you before the YouTube Channel where Plaintiffs have said,

16   hey, you need to take that down, there's some of our material

17   in there.  And, so, we took it down.  There is no ongoing

18   violation.  And, if it's perspective in injunctive relief

19   that is offered by 1983, there is no allegation that there's

20   an ongoing violation.  Whatever violation is purported to

21   happen, has happened in the past.  It's done.  We've

22   responded.  We've been provided no indication or inclination

23   by Plaintiffs that there are ongoing violations.

24           Now, I assume that, at some point, Plaintiffs

25   would seek to amend their complaint.  They made some

1    allusions to it -- I'm sorry, Your Honor, -- made some

2    allusions to it in their brief.  Now, they've not filed a

3    motion, and they've not filed a motion with the purported

4    Amended Complaint that we can review.

5            But, I suppose what will happen is that

6    Plaintiffs will try to present to The Court, well, of course

7    there's ongoing violations.  I think that would be futile,

8    Your Honor.

9            But, the reality is, as we sit here, and the

10   four corners of the Complaint that was filed by the

11   Plaintiffs, the Amended Complaint, there is absolutely no

12   indication, none at all, that there is an ongoing violation,

13   and that's what 1983 is designed to -- to stop.  Moreover,

14   1983 doesn't offer monetary compensation.  It provides

15   injunctive relief, but it doesn't give them a penny for what

16   they claim was an infringement on their copyrights.  And,

17   again, this is related to a statute that, if you read it in

18   its current iteration, is entirely benign, it's neutral.  It

19   doesn't say anything but see Chapter 132.

20           So, that portion of the immunity, I think, -- I

21   think the law and the facts as alleged by Plaintiff need to

22   be taken in that the light was favorable to Plaintiff.  It's

23   pretty clear that the public officials involved here have not

24   been involved in an enforcement and if -- even if they were,

25   there's nothing to enforce.  I'll point out, too, is that

1   Plaintiffs, at this point, lack standing, there is no injury

2   alleged in their Complaint. They've not been injured. They

3   own their copyrights, Your Honor, they've not been stripped

4   of those copyrights. They own their property; they've not

5   been stripped of their property. The contention in their

6   Complaint is that, well, you know, there's been a demolition

7   in value. But, as we sit here, in this Complaint, there is

8   no factual allegation whatsoever to support the idea that

9   they've been injured. And, as a consequence, they lack

10   standing to pursue this issue with respect to this statute.

11           THE COURT: Okay.

12           MR. MAJMUNDAR: I'll be glad to answer any

13   questions you have, Your Honor.

14           THE COURT: I don't have any right now. Thank

15   you.

16           MS. VYSOTSKAYA: Your Honor, if I may?

17           THE COURT: Yes.

18           MS. VYSOTSKAYA: A little bit pertaining to what

19   my co-counsel was arguing in regard to 1983 section, and,

20   then, I will jump into the individual liability, because we

21   have all of the statements he shows, with the exception of

22   Governor McCrory, were also sued in individual capacity.

23           So, the only point I wanted to make sure that we

24   explain clearly to The Court is that there is an issue of

25   public records law. And, there is a separate issue of

1   Plaintiffs' copyright.  All the public records law says is
2   that the public has right of inspection of public records in
3   the State's possession.  Copyright does not provide Plaintiff
4   with right to be free of inspection.  There is just no such
5   right incorporated within the copyright act.  Public records
6   law of North Carolina, either the old statute or the new
7   statutes, do not take away anybody's copyrights.  In other
8   words, if a third party had access to Plaintiffs' materials
9   and used them for improper purposes, for infringement
10  purposes, there would be nothing that would prevent
11  Plaintiffs from filing a lawsuit against that third party for
12  infringing use of that property.  Nothing -- it has nothing
13  to do with -- the public records law and has nothing to do
14  with Plaintiffs' copyright.

15          As to -- another very small comment that I have
16  with 1983 action is that 1983 action does not give Plaintiffs
17  right to be filing lawsuits premised on State Laws.  So, to
18  the extent Plaintiff seeks to assert any 1983 rights upon
19  their allegations of single conspiracy or unfair trade
20  practices, they cannot do that using 1983 mechanism.

21          As to the individual claims, Your Honor, there
22  are several immunities that we asserted in our motions to
23  dismiss, to protect -- that exists to protect public
24  officials from exactly the type of claims that Plaintiffs are
25  trying to seek here.  Half of Plaintiffs' lawsuit has to do

1   with the act or enactment of a State Statute.  Count 3, Count

2   4 and Count 5 of Plaintiffs' Complaint was premised upon the

3   act of passing, drafting and enacting of a State Statute.

4   That type of action is clearly protected by Legislative

5   Immunity.  Legislative Immunity is absolute.  It would

6   protect defendants from prospective relief or retrospective

7   relief.  It's very unique among the immunities in that

8   respect.  So, all of these three claims have to be thrown

9   away against the individuals to be sued in their individual

10  capacities.

11          Plaintiffs tried to argue in their response to

12  our Motion to Dismiss.  Well, those officials' job titles did

13  not include legislative type of function, but it doesn't

14  matter.  What matters for The Courts who looked at

15  legislative immunity question is what kind of function the

16  Defendant was actually involved in.  And, there is nothing

17  more purer than passing, drafting and enacting a State Law

18  that would qualify an official for absolute Legislative

19  immunity.

20          We cited there was a case law, Your Honor.  I

21  don't want to take your time unless you have questions on

22  that issue, but it would bar Plaintiffs' Counts, 3, 4, and 5.

23          THE COURT:  Okay.

24          MS. VYSOTSKAYA:  We also asserted qualified

25  immunity in relation to both -- to the part of the Complaint

1 that deals with infringement action and with the part of the

2 Complaint that deals with enactment of the law.

3      As to qualified immunity, Your Honor, usually a

4 Court -- an official would be allowed to make a mistake in

5 his action as long as that mistake is reasonable. And, The

6 Court is usually looking at two different factors. Factor

7 number one is whether the fact as alleged in Plaintiffs'

8 Complaint showed that Defendants violated a clearly

9 established constitutional right. In the context of

10 copyright action, The Court usually does not look at whether

11 copyright law is clearly established. They look at what the

12 Defendants have actually done, and whether those types of

13 actions violated clearly established constitutional right.

14      In this context, I would argue that the facts

15 failed woefully to establish that Defendants violated a

16 clearly established right, for various reasons. Reason

17 number one is the type of use that Defendants engaged in on

18 the basis of the facts as alleged by Plaintiffs are fair use.

19 The Plaintiff basically alleged that he had 18 hours of

20 videos of State employees working retrieving the artifacts,

21 and they alleged only a couple of minutes of that work, at

22 most, were used. That would play in favor of finding a

23 fair -- a fair use. Also, the purpose of the work is looked

24 at and, clearly, this is an educational, scholarly type of

25 work. The nature of Plaintiffs' work is moved that all these

1   factors, Your Honor, would show that, at the very least,

2   there is an ambiguity based on the facts, as alleged by

3   Plaintiff, as to whether or not it was a fair use, and that

4   would weigh in favor of Your Honor finding that qualified

5   immunity applies.

6          And, also, the second inquiry The Court

7   undertakes is whether or not a reasonable individual would

8   know that he was violating a clearly established

9   constitutional right.  And, for the same reason as I cited a

10  support of Your Honor finding that no constitutional, clear

11  constitutional violation occurred here, for the same reason,

12  a reasonable person would not understand that he or she is

13  violating this right.

14         So, those factors would weigh in favor of

15  finding a qualified immunity.  The most the Plaintiffs have

16  alleged here is that all these individual Defendants

17  supervised is infringing work.  The cases that we cited show

18  that this type of allegation's simply not enough.  Those

19  facts would not overcome to qualify immunity.

20         And, finally, we made an argument that, despite

21  the fact that these claims are sought against individuals in

22  their individual capacity under Martin versus Wood case,

23  sovereign immunity would apply to protect individuals

24  because, really, the real interest that Plaintiffs seek to

25  enforce is a State interest here.  If the law -- if a

1    judgement is rendered against these individual Defendants in

2    their individual capacity, State would be required to pay

3    that judgement under North Carolina's Defense of State

4    Employees Act.  Clearly, the whole question of infringement

5    affects State interest rather than these individuals,

6    individual interest.  And, we outlined why, and I know Your

7    Honor recently weighed on Martin versus Wood case, so, I --

8              THE COURT:  What case was that?

9              MS. VYSOTSKAYA:  It was a case that came out, I

10   think, within this past month.  And, the question there -- it

11   was a foot note from Your Honor.  We found it that under 1983

12   type of action, it's not clear whether the Fourth Circuit

13   ruled that Martin versus Wood type of analysis would apply.

14             THE COURT:  Uh-huh.

15             MS. VYSOTSKAYA:  So, Your Honor, drafting

16   immunities are from two different grounds, basically.  And, I

17   don't remember the name -- I apologize -- very recent case.

18             THE COURT:  Okay.  Thank you.

19             MS. VYSOTSKAYA:  But this case is different

20   because the State here would be required to pay whatever

21   judgement is rendered under The Defense of State Employees

22   Act.  And, I'm not sure if the facts in that other case that

23   Your Honor decided were exactly the same.  I think it's

24   pretty clear that the State is the real party in interest

25   here, despite the fact that Plaintiff is attempting to

1 circumvent the Eleventh Amendment Immunity by naming these

2 people in their individual capacities.

3          THE COURT:  Okay.

4          MS. VYSOTSKAYA:  We, also, argue, Your Honor,

5 and I don't want to go at lengths on these, because I know

6 the Friends would want to argue that issue that the way

7 Plaintiffs pleaded their Complaint does not establish

8 plausible cause of action under Ashcroft and Twombly

9 standard, that there is -- there's just a duress of fact

10 about real violations by individuals of State officials in

11 their official capacity for numerous reasons, including the

12 reasons that the fair use defense is just apparent from the

13 face of this Complaint.

14          THE COURT:  Thank you.

15          MS. VYSOTSKAYA:  And, to the extent Your Honor

16 is interested in abstention doctrine, there are reasons to

17 abstain, as well, if Your Honor finds our arguments

18 unpersuasive on jurisdictional grounds.  And, of course, we

19 do object to any potential motion to amend for the reasons

20 my counsel are outlined.

21          THE COURT:  All right.  Thank you.

22          MS. VYSOTSKAYA:  Thank you.

23          THE COURT:  All right.  Did the Friends want to

24 be heard?  Can you see me?  You're Mr. Doyle?

25          MR. JEFFREY DOYLE:  Yes.  Jeff Doyle, Your

1    Honor.  Thank you.  I'll try and be as brief as possible.

2             THE COURT:  Is this the organization that was

3    founded under State Law only for the purpose of supporting

4    the recovery of Queen Anne's Revenge?

5             MR. DOYLE:  This was -- is a nonprofit

6    organization.  It was established, primarily, for purpose of

7    raising funds to help with the salvage effort.

8             THE COURT:  I mean, but is it part of the State

9    Friends support system that usually are attached to State

10   historic sites?

11            MR. DOYLE:  I --

12            THE COURT:  You don't know?

13            MR. DOYLE:  I don't know the answer.  I'm sorry,

14   Your Honor.

15            THE COURT:  That's all right.  Okay.

16            MR. DOYLE:  It's not -- it's not something

17   that's contained within the, you know, in the face of the

18   Complaint.

19            THE COURT:  Okay.

20            MR. DOYLE:  Our position, Your Honor, is when

21   you take a look at the Amended Complaint, I mean, it appears

22   that the addition of the Friends of the Queen Anne's Revenge

23   was an after thought.

24            THE COURT:  Who are the Friends?  Is it a --

25   does it have a board of directors or trustees?

1          MR. DOYLE:  Well, it no longer exists now.  It

2   did have a board of directors when it was in existence and in

3   operation.

4          THE COURT:  It's no longer in existence?

5          MR. DOYLE:  That's correct.

6          THE COURT:  What happened to it?

7          MR. DOYLE:  It was disbanded, dissolved within

8   the past year.  I don't remember the exact date, Your Honor.

9          THE COURT:  Okay.  So, how is it -- how is it

10  appearing here?  How did you -- how did they get service up?

11         MR. DOYLE:  Your Honor, I took the suit over

12  from another attorney, and I didn't go back and look at the

13  service issues.  By the time I had gotten the case, we were

14  into the filed motions, and I'll argue that part, so.

15         THE COURT:  I mean, how do you sue something

16  that doesn't exist?  I mean, you have to serve somebody to

17  bring a Complaint.  You don't know?

18         MR. DOYLE:  I don't know the answer.

19         THE COURT:  That's okay.

20         MR. DOYLE:  I'm sorry.  Our position, Your

21  Honor, is that the allegations against the Friends are

22  completely insufficient and, frankly, almost non existent for

23  most of the claims that are raised.  If you, you know, I'm

24  sure Your Honor's read through the pleadings and the

25  allegations as to the Friends are -- the first one is found

1  in paragraph 20, which is just that we're a non-profit

2  corporation.  In paragraph 34, it says that in mid 2013, the

3  Friends entered into an Agreement to pay $70,000 for

4  production of various educational materials, including videos

5  and educational website scholastic educational packets.  I

6  point out, first of all, those actions take place prior to

7  the Settlement that was entered into in October of that same

8  year, of 2013.

9                THE COURT:  How do you end a non profit?  Do you

10  dissolve it under State Law, as if some formal methodology

11  for bringing it to conclusion?  You don't have to pay a -- an

12  annual fee; do you, to be a non profit?

13                MR. DOYLE:  I don't think so.  I think they just

14  file as to disillusion with the Secretary of State --

15                THE COURT:  So, you're just here as a volunteer

16  today?

17                MR. DOYLE:  Your Honor --

18                THE COURT:  I mean, why are you here?  Whose

19  hired you if it doesn't exist?

20                MR. DOYLE:  Their insurance company that

21  existed --

22                THE COURT:  Oh, okay.

23                MR. DOYLE:  -- prior to the case.

24                THE COURT:  Okay.  All right.

25                MR. DOYLE:  And, that's who -- that's who

1  retained us, our services to The Court.

2          So, they've alleged that we entered into a

3  contract to produce some educational materials back prior to

4  the resolution that occurred in October of 2013.  So, all of

5  that -- those specific actions were resolved prior to --

6  prior to anything that could have come up today.  So, after

7  that, there is really no other allegation included --

8  included in the Amended Complaint that suggests that the

9  Friends of the Queen Anne's Revenge did anything to either

10 appropriate or encroach upon the copyright -- the copyright

11 that the Plaintiffs have at a relevant time.  And, there's

12 nothing to fulfill the various -- no allegations -- well,

13 pleaded allegations other than just general conclusory ones

14 where we might be included, grouped in "Defendants" in broad

15 sweeping allegations.  There are no specific allegations with

16 respect to the Friends of the Queen Anne's Revenge.

17         The only other act that they -- there's only one

18 other allegation about them, and that is found in paragraph

19 50.  And, that says, "The Defendants collectively wrote or

20 caused to be introduced, lobbied for the passage of, and

21 obtain the passage of an amendment to an existing North

22 Carolina Statute."

23         So, you have an allegation that they contracted

24 to produce some educational materials back in the middle of

25 2013.  And, you have a sweeping conclusory allegation that

1   they participated in lobbying for and trying to get the

2   statute passed for the amendment to the statute.  I know Your

3   Honor is certainly familiar with the Iqbal and Twombly

4   standards in terms of the difference between conclusory

5   allegations and well-pleaded allegations and what's to be

6   considered in the term and whether or not the Plaintiffs have

7   stated the cause of action.  There are essentially three

8   causes of actions that were raised against my client, the

9   first being copyright infringement.  With respect to that,

10  you've got to have an owner -- ownership of valid copyright.

11  They've alleged that, and they also have to allege some sort

12  of encroachment and some sort of use of that property by my

13  clients.  And, as I've pointed out already, they haven't

14  raised any such allegation.  The only allegation they made

15  was that my clients contracted to produce some educational

16  materials at a time that's not relevant to this lawsuit.

17  That being a time that was prior to the Settlement in October

18  of 2013.

19          We've cited in our brief the Bon Aqua Decision

20  of District Court, which really seems to be right on point

21  with the two main things that I've had to say.  There were

22  various copyright claims, infringement claims that were

23  dismissed in that suit for two different reasons.

24          One of them -- one of the claims was dismissed

25  because there was no allegation that a particular Defendant

1  had, in fact, used the materials.  We have that same

2  situation here because there's been no allegation that, at

3  any relevant time period, that -- that the Friends used any

4  of the copyrighted materials.  And the -- there was a second

5  group of copyright infringement claims that were also

6  dismissed in the Bon Aqua Decision.  They were dismissed

7  because the only -- because it's insufficient to just say

8  "Defendants" and group everyone in with a broad sweeping

9  allegation that the copyright was infringed without alleging

10 some specific facts to support it.

11         The second claim is the Unfair and Deceptive

12 Trade Practices claim.  And, that seems to be based entirely

13 upon the allegation that the Friends participated in lobbying

14 for the passage of the amendment to the statute.  I mean, to

15 have an unfair and deceptive trade practices claim, you've

16 got to show that they committed an unfair and deceptive act,

17 is the first and foremost of the three criteria.  Alleging

18 that participating in lobbying for a statutory change simply

19 does not meet that.  Lobbying for -- for passage of statute

20 or amendment to the statute is covered -- has been previously

21 ruled upon by the Supreme Court to be covered as part of the

22 activities that fall under the First Amendment right to

23 petition the Government.  There's no way that, you know,

24 exercising your First Amendment rights can give rise to an

25 unfair and deceptive trade practice as claimed.

1          There is -- evidently, Plaintiffs intend to

2    include my clients within the 1983 claim, but that's defeated

3    by their own allegations they pleaded and alleged that we're

4    a non-profit corporation.  They don't allege in any way that

5    the Friends were a State actor or --

6          THE COURT:  Right.

7          MR. DOYLE:  -- and that pretty much eliminates

8    that claim.

9          The last thing was a civil conspiracy, which,

10   frankly, it's not a separate claim.  It's just a means of

11   grouping parties together.  If the underlying claims fail, as

12   I've already discussed with Your Honor, the three underlying

13   claims against my client will fail.  There's no civil

14   conspiracy at that point.  But, furthermore, there are no

15   well-pleaded facts to support, other than just a broad

16   sweeping generalization in one of the allegations, the

17   complaint that Defendants conspired together without any

18   specific pleadings to suggest that the Friends somehow

19   participated.

20         Unless you have questions, Your Honor, I think

21   its well covered in our brief.

22         THE COURT:  I'm good.  Thank you.

23         MR. DOYLE:  Thank you.

24         THE COURT:  I'll hear from the Plaintiff.

25         MS. SUSAN F. OLIVE:  Thank you, Your Honor.  I'm

1  going to apologize because I actually wasn't planning to be

2  here today.  Mr. McKenzie was going to argue this, and he

3  came down with apparently pneumonia.  I got an email at about

4  9:00 yesterday morning saying, "You may have to go for this

5  argument," at 6:00, "Go, I've got x-rays scheduled."  So,

6  you're going to have to put up -- I apologize with my lack of

7  knowledge of all of the cases in depth, since I was not

8  prepared to be here.

9              THE COURT:  Don't worry about it.

10             MS. OLIVE:  But let me begin, I think the

11 easiest way to start is to go through a few of the points

12 that the Plaintiff -- the Defendants here have raised.  And,

13 I want to begin with just the location of this particular

14 wreck, which, actually, was not in Topsail Inlet.  It was the

15 old Topsail Inlet, but, actually, is Beaufort Inlet.

16             THE COURT:  Okay.

17             MS. OLIVE:  So, just -- just to put it in

18 context because I think -- and we are in a historic location,

19 it's nice to know where things actually happened and where

20 they occurred.

21             THE COURT:  So, it's in an inlet or near an

22 inlet?

23             MS. OLIVE:  That's -- that's right.  And it is

24 within three miles.

25             THE COURT:  Okay.

1          MS. OLIVE:  Now, interestingly enough, the

2    State -- and this is irrelevant to this lawsuit and to the

3    facts that are before it, before The Court for this hearing,

4    but the State actually has asked the Nation of Spain to get

5    involved in this, and is in a separate lawsuit that's pending

6    in State Court.

7          THE COURT:  Having to do with Teach?

8          MS. OLIVE:  Yes, sir.  And with the -- with who

9    actually owns what's inside that wrecked vessel.

10         THE COURT:  Because -- was the vessel a Spanish

11   Flag vessel originally?

12         MS. OLIVE:  It was carrying, at least, Spanish

13   Galleons, as I understand it.  I'm sorry -- Mr. Poe, you want

14   to --

15         MR. G. JONA POE, JR.:  If I could remind Your

16   Honor, I'm Joe Poe, and I've been representing Nautilus and

17   Mr. Allen for quite some time, a number of years with this

18   suit and other actions.  And, I was involved with the action

19   in 2013 resulting in the Settlement Agreement that occurred

20   at that time between the State.

21         THE COURT:  And, that was an action in State

22   Court?

23         MR. POE:  That was an action that was generated

24   through the Administrative Procedures Act of North Carolina.

25         THE COURT:   Was it in a Court?

1          MR. POE:  Excuse me?

2          THE COURT:  Was it in a Court?

3          MR. POE:   It was in the Administrative

4  Procedures Act Court.

5          THE COURT:  So, it wasn't in a Court?

6          MR. POE:  Not in the Court System, yet.

7          THE COURT:  Okay.  It wasn't in Federal Court?

8          MR. POE:  Oh, no.  No.

9          THE COURT:  It wasn't in Superior Court?

10          MR. POE:  No.

11          THE COURT:  Okay.

12          MR. POE:  It was an Administrative Law Judge.

13          THE COURT:  That -- okay.  That's fine.

14          MR. POE:  And that's what resulted in the

15  Settlement Agreement that's been talked about several times

16  here between the State --

17          THE COURT:  Yeah.

18          MR. POE:  -- and Intersal Corporation.

19          THE COURT:  Right.

20          MR. POE:  And Nautilus and Mr. Allen, who's the

21  Plaintiff here in this action.

22          THE COURT:  Right.

23          MR. POE:  So, all the clauses that were

24  mentioned earlier or cited by the Plaintiff come from that

25  Settlement Agreement.

1          THE COURT:  Which is an administrative
2  proceeding, not a judicial proceeding.
3          MR. POE:  That is correct.
4          THE COURT:  Okay.
5          MR. POE:  It was done --
6          THE COURT:  I got this, it was a higher
7  hierarchy.
8          MR. POE:  Exactly.
9          THE COURT:  Okay.
10         MR. POE:  It resulted in the contract, actually,
11  the agreement.
12         THE COURT:  I understand.
13         MR. POE:  And has been cited here a number of
14  times, as well as in the briefs.
15         THE COURT:  There's no Judge; there's an
16  Administrative Law Judge --
17         MR. POE:  An Administrative Law Judge.
18         THE COURT:  -- who is not a Judge.
19         MR. POE:  That is correct, yes.  But it did
20  involve that particular wreck, which is a few hundred yards
21  off of the shore in Beaufort, right off the Beaufort Inlet.
22         THE COURT:  This wreck that we're talking about.
23         MR. POE:  This wreck.
24         THE COURT:  The Queen Anne's Revenge.
25         MR. POE:  The Queen Anne's Revenge.

1          THE COURT:  And what kind of a ship was it

2   before they pirated it and took it over; was it a Portuguese?

3          MR. POE:  It was a French vessel.

4          THE COURT:  A French vessel.

5          MR. POE:  Yes.

6          THE COURT:  Okay.  And, I'm familiar because of

7   Cape Lookout and my intimate involvement as the Judge on all

8   of that.  I know the geography of that area.  So, --

9          MR. POE:  Yeah, where the Fort is.

10          THE COURT:  -- yeah, but I'm -- but I'm talking

11   about Beaufort and Shackleford Banks and Money Island.

12          MR. POE:  Correct.

13          THE COURT:  And, where is this in relation to

14   Shackleford Banks and Cape Lookout?

15          MR. POE:  It would be just south of that, Your

16   Honor.

17          THE COURT:  South.

18          MR. POE:  You know where the fort is --

19          THE COURT:  Yeah.

20          MR. POE:  -- on the point?

21          THE COURT:  Yeah.

22          MR. POE:  When you stand on the beach right

23   there and you look a few hundred yards out into the channel,

24   that's where the wreck is.

25          THE COURT:  Okay.

1              MR. POE:  It's in about 20 feet of water.

2              THE COURT:  That shallow?

3              MR. POE:  Yes, Your Honor.  And that's one of

4      the reasons --

5              THE COURT:  And, undiscovered for 200 and some

6      odd years.

7              MR. POE:  That's exactly right.  There was

8      debris there covered by sand.

9              THE COURT:  And, where, in 1718, where would the

10     inlet have been?

11             MR. POE:  The inlet -- well, that's one of the

12     important points to Intersal, was what's the movement been --

13             THE COURT:  Yeah.

14             MR. POE:  -- of the channel that is used now by

15     the ships coming in and where was it at the time.  So, there

16     has been some movement there.  And, if you look at the old

17     maps, you'll see that it's probably back north of that just a

18     little bit as to where its located right now.

19             THE COURT:  Where -- I didn't hear you 'cause

20     you turned around?

21             MR. POE:  Yes, I did.  It would have been just a

22     little bit north of, in terms of the channel itself --

23             THE COURT:  Okay.

24             MR. POE:  -- of where it's located at the

25     present time.  The dredging --

1          THE COURT:  And where is that in relation to

2     Shackleford Banks?

3          MR. POE:  Shackleford Banks would be slightly

4     north of where the wreck is now.

5          THE COURT:  And Emerald Isle or Atlantic would

6     be --

7          MR. POE:  Exactly.  Well, it would be -- it

8     would actually be --

9          THE COURT:  -- and Fort Macon would be on the

10    south end.

11         MR. POE:  Exactly.

12         THE COURT:  Because they're all barrier islands.

13         MR. POE:  That's correct.

14         THE COURT:  And they're interrupted by inlets.

15         MR. POE:  Yes.  Fort Macon, if you'll -- like I

16    said, if you were standing on Fort Macon on the balance there

17    and you looked right out east, look east right from there.

18    Because if you know the configuration of it, it's really

19    going kind of in an east/west direction more than a

20    north/south direction.  But, if you went about 100 yards --

21         MR. FREDERICK ALLEN:  Actually a mile.

22         MR. POE:  Huh?

23         MR. ALLEN:  A mile.

24         MR POE:  Is it that far?  It looks a lot closer

25    because, if you go out of the channel, if you were in a boat

1    and you were leaving Beaufort, Morehead area, going out the

2    channel, you pass right by where this is.

3               THE COURT:  Okay.  And it went down in 1718?

4               MR. POE:  Correct.  Well, it was abandoned.  It

5    was abandoned by Teach at that point.  And he abandoned it

6    with a number of the men that were on that vessel.  They

7    had -- he had actually taken that vessel earlier in

8    exchange -- and he had another vessel with him at the time.

9               THE COURT:  So, they boarded the other vessel.

10              MR. POE:  They boarded the other vessel, moved

11    most everything to the new vessel and, then, left that one

12    there, because -- along with some of the men that he didn't

13    need.

14              THE COURT:  But it still had all of its

15    armamentum, its weapons?

16              MR. POE:  It did.  And, so far, they've actually

17    recovered 20 some cannons, I believe.  If I could check with

18    Mr. Allen; what do you have?

19              MR. ALLEN:  Twenty-three.

20              MR. POE:  Twenty-three.  Twenty-three cannons,

21    so far, have been recovered.  It was not discovered because,

22    like many of the things off our coast, for example, German

23    submarine, the U-701, it was covered by sand most of that

24    time.

25              THE COURT:  Right.

1          MR. POE:  So, if you went there before the

2     archaeological survey began by the Underwater Archaeology

3     Branch back in the late 1990's, you would see sand and you

4     might see a few metal things, for example, a couple of the

5     anchors that have also been recovered.  But, they actually

6     had to dig to get the items that now are on display.  And,

7     they're more than a thousand or more, actually, tens of

8     thousands, I think, of artifacts if you cover -- if you

9     actually count the little grains of balls and things that

10     were used in the muskets.

11          So, that -- the history of it, the end results

12     from Intersal, the company out of Florida which has been

13     mentioned here, and Intersal is involved now in State Court

14     Action involving the same wreck.

15          Intersal found that particular vessel and

16     entered into a memorandum of understanding with the State as

17     to what would happen with that vessel, giving its rights to

18     ownership of the vessel whatever it had to the State, but

19     retaining a number of the media rights that we're talking

20     about today.

21          There were then Agreements between Intersal and

22     the State and Nautilus, Mr. Allen, who also had agreements

23     between Nautilus, the Plaintiff here, Mr. Allen and the State

24     with respect to the Department of Cultural Resources --

25     Natural and Cultural Resources.

1          THE COURT:  Is there a trademark associated with

2  -- with Blackbeard?

3          MR. POE:  A trademark?  I don't know that --

4  there, certainly, there are emblems and stuff, but not

5  involved in --

6          THE COURT:  Well, this is all copyright, but I'm

7  just curious as to if anyone has a trademark with respect --

8          MR. POE:  I don't know of anyone that's actually

9  done a trademark on that.

10         THE COURT:  Okay.

11         MR. POE:  Never -- never saw it.

12         THE COURT:  Okay.

13         MR. POE:  Thank you.

14         THE COURT:  Yeah.  Ms. Olive?

15         MS. OLIVE:  Thank you, Your Honor.  I wanted to

16  give you -- just because it is interesting and because the

17  people mentioned different things relating to the sort of

18  overall picture.

19         THE COURT:  What's your copyright?  Do you have

20  a valid copyright?

21         MS. OLIVE:  Yes, sir.

22         THE COURT:  Okay.  How did you achieve that?

23         MS. OLIVE:  Well, Mr. Allen and Nautilus were

24  given the exclusive access rights to the vessel for the

25  purpose of filming its recovery.  There was nothing in the

1    Agreements whatsoever that transferred the copyright in the

2    work that he did to the State or to Intersal.

3              THE COURT:  Well, how did it become copyrighted,

4    just by documenting through some media what was being done?

5    Does that automatically give you the copyright --

6              MS. OLIVE:  Yes, sir.

7              THE COURT:  -- without any filing?

8              MS. OLIVE:  Yeah, you'll remember that, under

9    the copyright law, copyright exists as soon as a work is

10   created in a tangible medium of expression.  So, it

11   attaches --

12             THE COURT:  So, if --

13             MS. OLIVE:  -- immediately.

14             THE COURT:  -- so, if you have a film or a

15   whatever medium you're using, and that immediately becomes

16   copyrighted.

17             MS. OLIVE:  That's correct.  And, then, the

18   copyright is owned by the author, the person who takes it or

19   the organization of which they are the full-time employees.

20   And, then, they have the option, and it is advisable to

21   record that copyright with the United States Copyright,

22   which, in this case they also did.  And, those copyright

23   certificates are alleged in the -- in the Complaint.

24             THE COURT:  Okay.

25             MS. OLIVE:  And, so, he's got both the original

1  copyright that attached and then the recordation of it, just

2  like the title to a house that you record.  You buy the

3  house, you own the house, but if you don't record your title,

4  you've got, you know, --

5          THE COURT:  Yes.  All right.  So, the registered

6  copyright gives you further protection against third parties.

7          MS. OLIVE:  It does, and it allows you to bring

8  suit in Federal Court.

9          THE COURT:  Okay.

10         MS. OLIVE:  Which you are -- if you're a US

11 Citizen, you can't do without that registration.

12         THE COURT:  Is there any dispute that you've

13 copyrighted all this material?

14         MS. OLIVE:  We have not heard any dispute prior

15 to today.

16         THE COURT:  Okay.

17         MS. OLIVE:  There has not -- there has not been

18 any -- let me put it this way -- the Answer does not appear

19 to dispute that, and there is nothing in the briefs which

20 dispute that.  Of course, that would be a summary judgement,

21 you know, question.

22         THE COURT:  Yeah.

23         MS. OLIVE:  After discovery, if they want to

24 dispute --

25         THE COURT:  And, the copyright itself, the

1  registered copyright is the property interest; isn't that

2  right?

3             MS. OLIVE:  That is correct.

4             THE COURT:  Okay.

5             MS. OLIVE:  And we contend provides fairly

6  valuable copyrights and the infringements of it themselves

7  have value because what Nautilus does is it sells the right

8  in it's copyrighted material to third parties such as

9  National Geographic to --

10            THE COURT:  So, what your client has copyrighted

11 is the activity that went on in the recovery process and

12 continues to go on as further recovery is engaged.

13            MS. OLIVE:  Well, it hasn't copyrighted that

14 activity, but what it has copyrighted --

15            THE COURT:  The memorial of it.

16            MS. OLIVE:  Correct.

17            THE COURT:  Yeah.

18            MS. OLIVE:  Yeah, exactly, just like if an

19 author wrote a book about it, they would own the rights to

20 the copyright --

21            THE COURT:  Or if you --

22            MS. OLIVE:  -- in a way in which they describe

23 that copyright system.

24            THE COURT:  -- if you went out on an

25 architectural -- put it on land -- if you went out an

architectural dig at some site, well, in South America or in

the Middle East or somewhere, and you filmed the

architectural recovery of an area where they were exposing

mined relics or lost sea -- the dead sea scrolls or something

like that, the filming of it and the -- the filming, the

visual thing is what's copyrighted?

            MS. OLIVE:  That's correct.

            THE COURT:  And, you can sell it.

            MS. OLIVE:  Yes, sir.

            THE COURT:  You can make a movie of it.  You can

do with it whatever you want out of it.

            MS. OLIVE:  That's right.  And that -- that

expression, that filming has a lot of value.  And, if

somebody else had done it, it wouldn't look the same way,

which is why he's got the copyrights in it because he has by

virtue of his years, decades of experience, some pretty

unique talents in doing this underwater videography, which is

pretty difficult to do.  And, you can imagine in that shallow

water, I mean, you've got all the sand coming up, you've got

all kinds of stuff.  You've got to figure out the right way

to do it.  I mean, he'll film for hours in order to get

something that is worthy --

            THE COURT:  And so, basically, the State then

passed a law and said that it belongs to us.

            MS. OLIVE:  That's correct.

1          THE COURT:  And while it may not be ex post

2     facto 'cause it's not a crime, it might be a taking without

3     compensation.

4          MS. OLIVE:  Right.  And that is what we alleged

5     in the -- in the Complaint, Your Honor.

6          THE COURT:  And, that's the 1983 Complaint.

7          MS. OLIVE:  That was our feeling, yes, sir.

8          THE COURT:  What about the Eleventh Amendment?

9     You can bar the State from continuing to expropriate your

10    property interest in this in the future by an injunction.  I

11    don't know that you'd get money from them now; can you?

12         MS. OLIVE:  Well, Your Honor, we've got to --

13    two things I want to say about that.  First of all, the State

14    has alleged in their brief, as a matter of interest, I

15    suppose, that they have, in fact, taken down all these

16    materials.  Now, that would be a question of fact to be

17    discovered later.  But, I can tell you that, as of eight

18    o'clock this morning, those things were still posted on the

19    internet.  And, one could access it, and all you've got to do

20    is go the State's site.  You can go to the locations that we

21    put in the brief.  You can go to the State's Site and search

22    Queen Anne's Revenge, and you can find those same things

23    still posted now.

24         THE COURT:  But, how do you get around the

25    money bar that the Eleventh Amendment contains?  I mean, I

1    remember arguing this with the panel back 30 years ago, and

2    I don't know what I said in that dissent or concurrence,

3    but I think I probably said it's unfortunate that the

4    Eleventh Amendment bars money damages.  But, it does, and

5    until the Supreme Court changes that, you have to live

6    with it.

7           MS. OLIVE:  Well, I mean, -- let me put it

8    this way -- we believe that, in this case, although I saw

9    you nodding when they said the State has not abrogated its

10    rights.  We actually think that they did abrogate their right

11    not to be sued.  That they've waived their right not to be

12    sued, and they did so specifically in the Settlement

13    Agreement that we cited and attached to our Complaint, in

14    which they specifically noted, yet, there have been these

15    allegations of infringement of the United States copyright

16    laws.  If we breach this agreement, Mr. Allen can sue us,

17    period, under any -- any -- he can bring any claims at law

18    or in equity.  And, that is in our view, Your Honor, that

19    falls squarely within the Atascadero versus Scanlon, that

20    '85 case --

21           THE COURT:  Yeah.  It takes it out of the

22    Eleventh Amendment.

23           MS. OLIVE:  Pardon?

24           THE COURT:  It takes -- you're saying --

25           MS. OLIVE:  Yes.

1          THE COURT:  -- it takes it out of the Eleventh

2    Amendment.

3          MS. OLIVE:  That's exactly right, yes, sir.

4          THE COURT:  That -- that from a damage stand

5    point, they've now participated in a settlement on that.

6          MS. OLIVE:  That's exactly right, and

7    prospectively said, if we don't honor this, you can go

8    after us.

9          THE COURT:  Yeah.

10         MS. OLIVE:  So, in our view, that takes it

11   squarely out of it, and regardless of what other immunities

12   they might have been able to assert, that, by itself, is

13   sufficient reason for us to be able to go after them for

14   money damages.

15         THE COURT:  What kind of money damages are you

16   talking with?  Do you have an expert that can monetize this

17   at a trial?

18         MS. OLIVE:  Nautilus regularly sells excerpts of

19   its work, and so, yes, sir.  We would be able to talk about

20   what it is that other companies typically pay for this.  And,

21   it turns out that the State has -- we contend, improperly,

22   but been attempting to sell these types of materials to third

23   parties.

24         THE COURT:  And, the trial on the damage

25   question, which is a fact question, would be before a jury.

1  Would the State have the right to a jury?

2              MS. OLIVE:  Yes, they would.  In a copyright

3  claim, there's a right to a jury.

4              THE COURT:  So, you could have a jury trial, the

5  issue of which you'd have the burden on would-be-liability

6  and damage.

7              MS. OLIVE:  That is correct.

8              THE COURT:  In front of a jury of 6 to 12

9  people.

10             MS. OLIVE:  That is correct.  And, they would

11  have the obligation to show, if they were going to do so,

12  that there was some fair use involved in this posting of

13  protected materials to the internet.  To a wide --

14             THE COURT:  If I deny --

15             MS. OLIVE:  -- scale audience.

16             THE COURT:  If I deny their motion to dismiss on

17  Eleventh Amendment grounds, would they have the right to take

18  that up as not being an interlocutory order, but being a

19  subject matter jurisdiction b-1?

20             MS. OLIVE:  I don't know.

21             THE COURT:  You see what I mean?

22             MS. OLIVE:  I do see what you mean, and I do not

23  know whether that would by itself be interlocutory.

24             THE COURT:  You can take a b-1 --

25             MS. OLIVE:  You can.

1           THE COURT:   -- thing up.

2           MS. OLIVE:   That was not, though, the -- I mean,

3    technically that's not the basis on which they filed their

4    motions, but, certainly.

5           THE COURT:   It -- no, but just --

6           MS. OLIVE:   But, I mean, as a practical

7    matter --

8           THE COURT:   -- thinking it through.

9           MS. OLIVE:   Right.

10          THE COURT:   Okay.

11          MS. OLIVE:   Yeah.  The other -- the other --

12          THE COURT:   That put -- that casts a different

13   light on the case.

14          MS. OLIVE:   Yes, sir.

15          THE COURT:   The fact that they may have

16   abrogated their Eleventh Amendment here.

17          MS. OLIVE:   Yes.  Now, there are a couple of

18   other points that they brought up with respect to immunity.

19   One of those is --

20          THE COURT:   How about the -- go ahead.  Say what

21   you're going to say.  Then I'll --

22          MS. OLIVE:   No.

23          THE COURT:   -- remark.  Go ahead and finish, Ms.

24   Olive.

25          MS. OLIVE:   Well, I was going to say that with

1  respect to the -- one of their arguments with respect to

2  immunity was that there is no allegation that the parties

3  were involved as State actors.  That their actions were

4  not -- were not those of State actors.  We've got two things

5  which I wanted to point out about that.  And, one is, goes

6  back to an old Supreme Court case that we did not cite

7  because this issue arose in their reply brief, but Dennis

8  versus Scanlon, which is a 1980's Supreme Court case,

9  involved a corruption, basically, a Judge taking a bribe.

10 And, in that case, the question was whether the private

11 parties who worked with the Judge to bribe him, were State

12 actors.

13          THE COURT:  Uh-huh.  Vi -- vicariously.

14          MS. OLIVE:  That's right, and whether or not a

15 1983 action against them was or was not appropriate or

16 whether or not they were immune under some theory of --

17          THE COURT:  Well, what did the Court say?

18          MS. OLIVE:  The Court said that the private

19 parties who engage in these unlawful types of activities are

20 co-conspirators with this.  They come -- they're treated the

21 same as the --

22          THE COURT:  State actors.

23          MS. OLIVE:  That's right.  And, become liable

24 under 1983 for their misconduct.

25          THE COURT:  Interesting.

1          MS. OLIVE:  So, that, I thought, was a --

2          THE COURT:  What about the Friends?  Why do

3  you, I mean, how do you get to them and why do you need them?

4          MS. OLIVE:  Okay.  First of all, how we got to

5  them, they hadn't dissolved when this lawsuit was brought.

6          THE COURT:  Okay.

7          MS. OLIVE:  And, according to the newspaper

8  reports, they dissolved because of the lawsuit.

9          THE COURT:  Okay.

10         MS. OLIVE:  So, at the time we got service on

11  them, they were an existing entity, as I understand it.  They

12  certainly were at the time we sued them.

13         THE COURT:  So, you made service.

14         MS. OLIVE:  Yes.

15         THE COURT:  Okay.

16         MS. OLIVE:  Uh-huh.  And there's been no contest

17  about that.  It was on --

18         THE COURT:  Okay.

19         MS. OLIVE:  -- an officer, you know, and so

20  forth.

21         THE COURT:  All right.

22         MS. OLIVE:  And that's why -- that's why I

23  presume they didn't contest it.

24         THE COURT:  Yeah.

25         MS. OLIVE:  Then, with respect to what we get

1    out of it, I mean, to the extent they've got insurance,

2    there's another party who can pay for the activities.  Our

3    allegation is that, essentially, this -- the Department of

4    Cultural Resources and the Friends were --

5              THE COURT:  Colluding?

6              MS. OLIVE:  Yes, sir.  And, that there was

7    essentially an incestuous relationship between them in order

8    to benefit the members of DCR and their relatives, who

9    essentially were the Friends.  That this was -- this was a

10   way in which --

11             THE COURT:  The inside job?

12             MS. OLIVE:  -- the employees could get extra

13   money, for example, Mr. Morris/Mrs. Morris.  Mrs. Morris was

14   on the Friends, she gets a contract to do what the State

15   wasn't allowed to do, which is to take and use these

16   materials.  And, then, she gets paid for doing that.  She

17   gets a $70,000 contract to go and use.

18             THE COURT:  Who gauges --

19             MS. OLIVE:  And that, that --

20             THE COURT:  Where did the $70,000 come in?  The

21   State gave Friends 70 --

22             MS. OLIVE:  There was a contract between the

23   State and the Friends.

24             THE COURT:  For $70,000?

25             MS. OLIVE:  For -- as I recall, the amount was

1    $70,000.  I could be mistaken on that, Your Honor.  But

2    that's my --

3                MR. POE:  It was actually involving not only

4    Mrs. Morris, but two other video operators who were brought

5    in by the new head of the underwater archeology branch from

6    out of state to do the work that was in the purview of Mr.

7    Allen and Nautilus.  And, there was a $70,000 amount paid to

8    the videographers and to Mrs. Morris.  She got $10,000 of

9    that, and the videographers got the other 60.

10               But this involved two contracts.  One was a

11   contract between the State and QAR, Friends of the QAR.  And,

12   the other was a contract, then, between FQAR or Friends of

13   the QAR and the videographers and Mrs. Morris.  And, they're

14   all laid out at that point.  None of which was known, of

15   course, to Mr. Allen at the time, and came out during the

16   Administrative Procedures Act matter, which resulted in the

17   settlement.  And, acknowledged those contracts, which we were

18   able to obtain at that time, as well as, the acknowledgment

19   by the State that they had violated copyright law and paid

20   for that violation through the Settlement Agreement at that

21   time.

22               THE COURT:  How did the Legislature get its

23   teeth into this?  I mean, what provoked them to come up with

24   a cure-all amendment?

25               MS. OLIVE:  Well, what we alleged in the

1  complaint, Your Honor, is that what happened was they didn't

2  like the fact that they had to enter into this settlement

3  agreement.  And that they --

4            THE COURT:  They, meaning the Department of --

5            MS. OLIVE:  They, meaning the --

6            THE COURT:  -- Cultural Resources?

7            MS. OLIVE:  -- the Department of Cultural

8  Resources and FQAR.  They didn't like the fact that they had

9  to enter into this -- that the State had to enter into the

10 settlement agreement, essentially, admitting copyright

11 infringement, paying for it and saying, we aren't going to do

12 this again.  And, as a result, they said, well, it won't be

13 copyright infringement if we can get this statute passed that

14 allows us to say that just because we own it, it's ours and

15 we can do whatever we want to, including, directly copy it.

16 And, so, that was the impetus for the passage of the

17 Legislation as it then existed.

18           THE COURT:  So, it was a corrupt law, basically.

19           MS. OLIVE:  That's our position, yes, sir.

20           THE COURT:  Right.

21           MS. OLIVE:  And, as a result of it being a

22 corrupt law, it really is no different from bribing a Judge,

23 that it is something that every one of them -- every one of

24 them knew because they had personally participated in this

25 transaction.

1          THE COURT:  Yeah, it's like they were upset that

2   somebody was going to make a profit on this, so, they just

3   decided to expropriate it.

4          A couple of years ago, I had the Alcoa Aluminum

5   case on the Yadkin River, and they got mad at Alcoa for

6   making a lot of money.  And, so, they passed a law and said

7   its ours or words to that effect.  No problem.

8          MS. OLIVE:  Yeah.

9          THE COURT:  That -- that was argued last week.

10  I don't know how it'll come out.  It'll probably get thrown

11  out, but --

12         MS. OLIVE:  Well, that is our theory, is that

13  essentially they got -- they figured out, okay, we lost -- we

14  agreed not to do this, well, we're going to pass a law so we

15  can do what we just agreed not to do.

16         THE COURT:  That's the beauty of being the

17  Legislature.

18         MS. OLIVE:  Well, yeah, and -- but, you know,

19  the -- I guess that's where the Dennis V. Scanlon case --

20         THE COURT:  Wouldn't it be great if there were

21  no Federal Courts and they could just do all of this?

22         MS. OLIVE:  Not from our perspective, Your

23  Honor.  And, you know, that -- I will say that, that is what

24  Congress had in mind when Congress passed the statute which

25  says States are, in fact, liable for violations of the

1    copyright act.  We'd love to say and to argue to you that

2    that is a valid statute.  I'll tell you that it is, but I can

3    also say that every Court that's looked at it, says it

4    doesn't pass the Florida Seminole test.  So, you know, I

5    could ask you to find that, but I think that would be -- and

6    I will, but I will tell you that if you did base a decision

7    on that, you'd get slapped down by the Fourth Circuit 'cause

8    -- and, then, it would have to go up to Supreme Court, which

9    hasn't yet ruled on that.

10            You know, the argument of fair use that the

11   State has made, I think that one is clearly a summary

12   judgement issue.  There is nothing in the Complaint that

13   would allow you to find, I don't think, fair use on the basis

14   of what's been alleged.  There's -- there's nothing in there

15   that says that this is posted for -- for limited educational

16   use.  It's posted up on the internet where anybody can get

17   it.  It's up on Google; it's up on YouTube, any person who

18   wants to can download for entertainment or for anything else,

19   for exactly the kinds of things that he sells it for.

20            And, I think, Your Honor, that that covers the

21   issues that they raised.  Were there any other things you

22   wanted me to --

23            THE COURT:  No, I'm good.

24            MS. OLIVE:  Okay.  Thank you, Your Honor.

25            THE COURT:  Anything further?

1          MR. MAJMUNDAR:  Your Honor, briefly, a few

2   points of clarification.  You referenced b-1, these were

3   raised pursuant to 12b-1.

4          THE COURT:  Yeah, I mean, I know that.  It says

5   it right here.

6          MR. MAJMUNDAR:  I think counsel wasn't quite

7   sure, so, --

8          THE COURT:  I am.

9          MR. MAJMUNDAR:  -- yeah, affirmatively so.

10  Counsel referenced the State acted, I'm presuming, in terms

11  of 1983.  We don't contend State actors weren't involved or

12  weren't -- I'm sorry -- weren't pled, rather, we're saying

13  that the State actors that were pled had no intimacy with the

14  enforcement of this statute, which, according to the 1983, is

15  a requisite.  So, I don't mean to suggest that State actors

16  aren't alleged but, rather, whether or not these State actors

17  were involved in enforcement or threatened enforcement of

18  prospective use of the statute has not been alleged.

19          I want to be sure that we're not talking about

20  abrogation, and we're talking about waiver.  Counsel kind of

21  said we abrogated our immunity.  Abrogation would be by

22  virtue of Congress's Act, and, as counsel noted, that, that

23  just hasn't really been seen by The Court with respect to

24  this copyright act as being abrogation of State's Eleventh

25  Amendment immunity.

1        If we're talking about waiver, the Atascadero

2   case is pretty clear.  The waiver language has to be

3   expressed.  It has to be so expressed that there's no other

4   reasonable construction that can be drawn from the language.

5   And, Your Honor, if I can, I'm just going to read to you what

6   Plaintiffs rely on as being this expressed language.  And,

7   it's found in paragraph 32 of the Settlement Agreement.  It

8   says, "In the event DCR, Intersal or Nautilus breaches this

9   Agreement, DCR, Intersal or Nautilus may avail themselves to

10  all remedies provided by law or equity."  That's it.  It's a

11  mile wide and an inch deep.  What it doesn't do is say the

12  State waives its immunity to copyright claims.  What it

13  doesn't do is say that the State waives its immunity to

14  Federal Court.  And, what it, essentially, does, according to

15  North Carolina Law, is, it says, "That in the event this

16  agreement is breached and there is a breach of contract

17  action, that lies exclusively in State Court."

18       So, the idea that this waiver is a visa to bring

19  all matters of actions in Federal Court does not comport with

20  the language of this waiver.  And, Atascadero says that

21  language has to be explicit.  It can't be generalized

22  language.  And, that's exactly what we're looking here -- at

23  here.  Your Honor, with respect to the Legislation and the

24  idea that these -- this cabal got together and decided let's

25  come up with Legislation to deprive them of their rights.

1          THE COURT:  It was just an accident.

2          MR. MAJMUNDAR:  It -- well -- I will point out,

3  though, that this public record's law which has been in

4  existence for a long time, is what they agreed to in 2013,

5  prior to the enactment of this statute.  So, the idea that

6  this came up sua sponte, out of nowhere, is, actually,

7  incorrect.  These folks agreed that these are public records,

8  and that these materials were subject to public records.  So,

9  the idea that they've created a statute that suddenly

10 converted them to public records is a big mistake.

11          If you have any questions on those points?

12         THE COURT:  I have no questions.

13         MR. MAJMUNDAR:  Okay.

14         MR. DOYLE:  Your Honor?

15         THE COURT:  Yes, sir.

16         MR. DOYLE:  Very, very -- did you want to say

17 something?

18         MS. VYSOTSKAYA:  I do, Your Honor, if I may.

19 On the issue of the take-down notices, because it's

20 relevant to 19 -- the possibility of a 1983 action, what

21 we have in the Complaint.  We have allegations of five or

22 six specific infringements upon which Plaintiffs rely.  And,

23 we provided as an attachment to our brief, specific --

24 specific YouTube, basically, links that relates to those

25 -- that correspond to those alleged infringements.  And,

what those links clearly show is that the note -- that the
take-down notices were respected.  That there is no
infringing video materials available at those sites.  There
is nothing else specifically alleged by Plaintiffs in the
Complaint, no other sites.  So, The Court has clear
evidence that there is no ongoing violation; there is no
on-going infringement.  And, Plaintiffs have not presented
in their Complaint any other websites or references.  And,
I'm sure if they brought to the Department's attention any
material that may be mistakenly posted by the Department on
the website, I'm sure the Department would be happy to take
it down on its own.  So, there is just no evidence to show
any ongoing violation under 1983 action.

There is also a problem.  There was
allegation of some kind of personal profit that some
members of the Friends and the Department were receiving
-- two points are important in that regard.  Number one,
Plaintiff has settled any and all infringements -- alleged
infringements that occurred in his 2013 Settlement Agreement
with the Department.  And, there is no allegation in the
Complaint that any individuals received any private profit
past -- after the date of that Settlement Agreement, for
which Plaintiff has already been paid.  There is no
allegation that Mrs. Nicole Morris or anybody else who is
named as an individual Defendant in this lawsuit has

1   received any personal benefit.  Plaintiff is basically

2   making up the facts, standing here, that are not alleged

3   in the Complaint.  And, finally, there is no acknowledgment

4   in the Settlement Agreement that the State has infringed

5   any of Plaintiff's works in the past.  There is a clear

6   preamble to the Settlement Agreement that says that neither

7   party participating in the Settlement Agreement acknowledges

8   any -- any wrong doing, and, in most of the Settlement

9   Agreements that I have dealt with, state exactly that.

10  It's -- it's a compromise.  So, this is the same situation

11  here.

12          Fair use defense, it's only in this context

13  applicable to actions against the individual, well, it will

14  be applicable to the actions against the State, if there

15  is a finding of a waiver.  Which, we don't think Your Honor

16  shall be able to find here.  But, it's also applicable to

17  actions against individual defendants in their individual

18  capacity.  And, Your Honor, the way the Complaint is

19  drafted, it clearly shows on the face of the Complaint that

20  the only use that State would have possibly engaged in by

21  posting on DCR's website several minutes that may have

22  contained some pieces of Plaintiff's work could be fair use.

23  Just, if you look at the four factors, Plaintiffs have not

24  overcame any of those four factors that Congress said would

25  constitute fair use.  And fair use is not an infringement at

1    all.

2              THE COURT:  All right.  Mr. Doyle?

3              MR. DOYLE:  Your Honor, extremely, briefly.

4    I think, as you go through and apply the tenants of the

5    Ashcroft versus Iqbal, you'll find that there are no well-

6    pled facts that substantiate any claim against the Friends.

7    Under Iqbal, first, you get rid of all the conclusory

8    allegations and, then, you look only at the well-pled ones.

9    As I go through the Amended Complaint, there were only five

10   that referenced my clients in any way.  Three of those were

11   general "Defendants" that were conclusory allegations with

12   no well-pled facts.  There were only two allegations with

13   well-pled facts.  One was that my client was a non-profit

14   corporation.  The second was the one that they evidently

15   spent $70,000 to engage someone else to produce some video.

16   And, you discussed that with Plaintiff's counsel, and I

17   wanted to just point out two important things from that.

18   Ms. Vysotskaya pointed out one of them, which is that those

19   payments and all those issues were already resolved by the

20   prior Settlement.  But I, also, wanted to point out that,

21   to the extent that it has any bearing on this case at all,

22   as you discussed with Plaintiff's counsel, those -- that

23   allegation has nothing to do with any encroachment upon

24   the Plaintiff's copyrighted material.  In other words, his

25   copyrighted material was not used.  The point was made

1    that it was an effort to get somebody else to create the

2    video.  So, it's a completely different issue, and does not

3    fall under any of the allegations that are raised in this

4    lawsuit.

5                THE COURT:  All right.  Thank you all very much.

6    I appreciate your being here today, and your preparation and

7    arguments I will take under advisement and give you a written

8    order as soon as possible.  Thank you.

9                ALL:  Thank you, Your Honor.

10

11                                (Time Noted: 12:30 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2  STATE OF NORTH CAROLINA      )

3                              )    C-E-R-T-I-F-I-C-A-T-I-O-N

4  COUNTY OF PITT           )

5

6         I, LINDA W. LITTLE, A COURT REPORTER AND NOTARY

7  PUBLIC IN AND FOR THE AFORESAID COUNTY AND STATE, DO HEREBY

8  CERTIFY THAT THE FOREGOING PAGES ARE AN ACCURATE TRANSCRIPT

9  OF THE PLEA TO CRIMINAL INFORMATION HEARING IN THE MATTER OF

10  FREDERICK ALLEN VS PATRICK LLOYD MCCRORY, WHICH WAS TAKEN BY

11  ME BY STENOMASK, AND TRANSCRIBED BY ME.

12         I FURTHER CERTIFY THAT I AM NOT FINANCIALLY

13  INTERESTED IN THE OUTCOME OF THIS ACTION, A RELATIVE,

14  EMPLOYEE, ATTORNEY OR COUNSEL OF ANY OF THE PARTIES, NOR A

15  RELATIVE OR EMPLOYEE OF SUCH ATTORNEY OR COUNSEL.

16         THIS THE 10TH DAY OF JULY, 2017.

17         NOTARY PUBLIC NUMBER 200824100039.

18

19

20                        S/S LINDA W. LITTLE
                              COURT REPORTER AND NOTARY PUBLIC

21                        CAROLINA COURT REPORTERS, INC.
                              105 OAKMONT DRIVE, SUITE A

22                        GREENVILLE, NC 27858

23

24

25