FREDERICK L. ALLEN and
NAUTILUS PRODUCTIONS, LLC
      Plaintiffs

           v.

ROY COOPER, Governor of the State of North
Carolina, *in his official capacity*, JOSH STEIN,
Attorney General of North Carolina of North
Carolina, *in his official capacity*, D. REID
WILSON, *in his individual and official capacity*,
DR. KEVIN B. CHERRY, *in his individual and
official capacity*, SARAH KOONTS, *in her
individual and official capacity*, JOSEPH K.
SCHWARZER II, *in his individual and official
capacity*, MIKE CARRAWAY, *in his individual
and official capacity*, and the STATE OF
NORTH CAROLINA, *a body politic*,
      Defendants

**PLAINTIFFS' SECOND
AMENDED COMPLAINT**

## INTRODUCTION

1. This lawsuit is about Piracy, Greed, and Revenge.

2. The Plaintiffs in this case are Frederick Allen and his company, Nautilus Productions LLC (collectively, "Allen"; the Complaint uses the term "Rick Allen" to refer to Rick Allen individually). Allen is an underwater videographer and documentarian. Over the last three decades, Allen has spent thousands of hours and hundreds of thousands of dollars documenting the excavation and recovery of *Queen Anne's Revenge* ("QAR"), Blackbeard's flagship.

3. Allen's footage has immense value and represents the pinnacle of underwater photography.

4. Defendants recognized the value of Allen's work and sought to use Allen's footage to earn millions of dollars, enhance their personal and political reputations, promote North Carolina tourism, and bring much needed support to the state's maritime museums. Yet, like Blackbeard himself, Defendants refused to pay for the treasure, choosing instead to steal it.

1

5. Over the last two and a half decades, Defendants have used, copied, distributed, and performed Allen's footage without permission or payment, and often without attribution.

6. Defendants have also taken, and have retained, without Allen's consent, Allen's physical media and have refused to return it.

7. In 2013, Defendant North Carolina ("the State"), through the North Carolina Department of Natural and Cultural Resources ("DNCR"), entered into a settlement agreement ("the Agreement") whereby it agreed to stop infringing Allen's copyrights and to return Allen's physical media.

8. The State did not honor the Agreement. It did not return all of Allen's physical media, continued to infringe Allen's copyrights, and violated numerous other terms of the settlement.

9. When Allen brought these deficiencies to the State's attention, the State retaliated by passing "Blackbeard's Law," N.C. Gen. § 121-25(b), which purports to place the vast majority of Allen's work—including *all* of Allen's work on the QAR—***into the public domain***. The statute states:

> All photographs, video recordings, or other documentary materials of a derelict vessel or shipwreck or its contents, relics, artifacts, or historic materials in the custody of any agency of North Carolina government or its subdivisions shall be a public record pursuant to G.S. 132-1. There shall be no limitation on the use of or no requirement to alter any such photograph, video recordings, or other documentary material, and any such provision in any agreement, permit, or license shall be void and unenforceable as a matter of public policy.

10. Blackbeard's Law does not provide any compensation to Allen. Adding insult to the no compensation injury, Defendants passed Blackbeard's Law without a modicum of notice or opportunity to be heard. It is a garish trespass on the Takings Clause of the Fifth Amendment to the United States Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

11. Blackbeard's Law is an unconstitutional Bill of Attainder and *ex post facto* law. Blackbeard's Law specifically targets Allen and seeks to punish Allen for asserting his rights and for Allen's perceived role in an ongoing and contentious feud between archaeologists

and treasure hunters.  In addition to taking Allen's past work, the statute functionally prevents Allen from engaging in any future work in his chosen profession.

12. Blackbeard's Law also purports to "void" any agreement that restricts Defendants' ability to use Allen's footage, and so violates the United States Constitution's prohibition on laws "impairing the Obligation of Contracts."  U.S. Const. art. I, § 10.

13. Since passing Blackbeard's Law, Defendants have claimed they are free to use Allen's life work however they want, as much as they want, without providing any compensation.  In keeping with that policy, Defendants have copied, distributed, sold, and publicly performed Allen's work *thousands* of times since passage of Blackbeard's Law, all without permission or compensation.

14. Allen brings this lawsuit to fight back against Defendants' piracy of his life's work. Blackbeard was an outlaw, not a role model.

15. Allen seeks a declaratory judgment that Blackbeard's Law is and has always been unconstitutional.

16. Allen also seeks just compensation for the state's takings of his property, both physical and intellectual, and for the state's takings of his livelihood.

17. Allen also seeks an order to enjoin state actors from engaging in further copyright infringements or takings, and an order enjoining the state's ongoing policy to treat Allen's work as belonging to the public domain.

18. Allen also seeks to hold several Defendants responsible under 28 U.S.C. § 1983, for their personal involvement in the misappropriation of his intellectual property.

**PARTIES, JURISDICTION, AND VENUE**

19. Plaintiff Frederick Allen is a resident of Fayetteville, North Carolina.  He has been a videographer since 1983.  Allen is one of the world's leading underwater videographers. Over the years, Allen has collaborated with and licensed his work to several of the world's most prestigious networks, including ABC, A&E, BBC, CBS, Discovery, National Geographic, and TBS.  For nearly two decades, Allen was the project videographer on the *Queen Anne's Revenge* Shipwreck Project.

20. Plaintiff Nautilus Productions LLC ("Nautilus") is a North Carolina company located in Cumberland County.  Allen organized Nautilus and uses Nautilus to license and monetize his work.  Nautilus specializes in marine video footage, photography, and documentary production.

3

21. Defendant Roy Cooper III ("Governor Cooper") is the Governor of the State of North Carolina. Governor Cooper is a domiciled resident of Wake County. Governor Cooper is sued in his official capacity. Governor Cooper was the North Carolina Attorney General when "Blackbeard's Law" was passed. Governor Cooper now has overarching control over the actions of the State and its agencies, and is responsible for those actions as a part of his official duties.

22. Defendant Joshua Stein ("Attorney General Stein") is North Carolina's Attorney General. He is North Carolina's chief law enforcement officer. Attorney General Stein is a domiciled resident of Wake County. He is sued in his official capacity. By North Carolina statute, he is authorized to enforce all North Carolina laws, including Blackbeard's Law.

23. The North Carolina Department of Cultural and Natural Resources ("DNCR") is a state agency and a subdivision of North Carolina. It is currently led by D. Reid Wilson (another Defendant), and it is the statutory designee of North Carolina's public records. At all times, it has benefited and profited from Allen's works. DNCR has the authority to control public records in North Carolina, and it has authorized, controlled, and directed those within its control to take and infringe Allen's works. DNCR and those acting within its control spearheaded the effort to enact Blackbeard's Law.

24. Defendant Susan Kluttz ("Secretary Kluttz") is a North Carolina citizen domiciled in Rowan County. Secretary Kluttz was the former Secretary of the DNCR and supervised and controlled the actions of that agency. Secretary Kluttz signed the Settlement Agreement (attached as Exhibit 1) and was responsible for implementing and enforcing the Settlement Agreement. Secretary Kluttz controlled or had the ability to control DNCR's use of Allen's QAR footage. Secretary Kluttz authorized, controlled, and directed DNCR and DNCR's agents' use of "public records," including their use of materials that were classified as public records pursuant to Blackbeard's Law. Secretary Kluttz was instrumental in seeking and implementing Blackbeard's Law. She is sued in her individual and official capacities.

25. Defendant Cary Cox is an individual North Carolina citizen residing in Cabarrus County, North Carolina. Cox served as Assistant Secretary, Marketing and Communications of the North Carolina Department of Natural and Cultural Resources and supervised and controlled the actions of that agency. She at all times controlled or had the right and obligation to control use of the copyrighted works of Plaintiffs by the North Carolina Department of Natural and Cultural Resources in its marketing and communications, and controlled or had the right and obligation to control dissemination of Plaintiffs' copyrighted works to third parties. She is sued in her individual and official capacities.

26. Defendant D. Reid Wilson ("Secretary Wilson") is a North Carolina citizen residing in Wake County. Secretary Wilson is the current DNCR Secretary. Defendant Wilson supervises and

4

controls DNCR and the actions of DNCR. Secretary Wilson is responsible for implementing and enforcing the Settlement Agreement. Secretary Wilson controls and has the ability to control DNCR's use of Allen's QAR footage. Mr. Wilson is sued in his individual and official capacities.

27. Defendant Sarah Koonts is a North Carolina citizen residing in Wake County. Ms. Koonts serves as North Carolina's chief State Archivist, and as such she substantially responsible for all public records in North Carolina. She is responsible for managing State public records, including over 190,000 cubic feet of public records, private manuscripts, organizational records, and non-textual materials, as well as all of Allen's property that falls under the ambit of Blackbeard's Law. She is sued in her individual and official capacities.

28. Defendant Stephen R. Claggett (also known as "Steve Claggett") is an individual North Carolina citizen, resides in Wake County, North Carolina. Claggett served as the State Archaeologist of the State of North Carolina, within the DNCR. He participated in the negotiations leading to the Settlement Agreement, was present when it was signed, and knew its provisions. He controlled or had the right and obligation to control use of Allen's copyrighted works by the North Carolina Department of Natural and Cultural Resources. He is sued in his individual and official capacities. Claggett was the State *Archaeologist* at North Carolina Office of State *Archaeology (OAH)* and had supervisory responsibility over all *Queen Anne's Revenge* Project activities.

29. Defendant Kevin Cherry ("Dr. Cherry") is a North Carolina citizen. Dr. Cherry previously served as DNCR's Deputy Secretary. Dr. Cherry oversaw DNCR's content archival methods, including methods that infringed Allen's copyrights and took his property without compensation. He had the ability to control DNCR's use of Allen's property, including the posting of Allen's materials to the Internet. Dr. Cherry personally participated in the negotiations that led to the Settlement Agreement. He at all times controlled or had the right and obligation to control use of the copyrighted works of Plaintiffs by those offices and divisions of the North Carolina Department of Natural and Cultural Resources supervised by him, including the posting of Plaintiffs' materials to DNCR's YouTube channel without Plaintiffs' consent as hereafter set out. He is sued in his individual and official capacities.

30. Defendant Joseph K. Schwarzer II is a North Carolina citizen residing in Orange County. He is the director of the North Carolina Maritime Museum system. He controls or has the ability to control video footage and images being displayed in all three of North Carolina's Maritime Museums. Mr. Schwarzer has allowed Allen's property to be displayed and performed at the North Carolina Maritime Museum in Beaufort. He is sued in his individual and official capacities.

31. Defendant Mike Carraway is a North Carolina citizen residing in Carteret County. As the Exhibits Curator at the North Carolina Maritime Museum in Beaufort, he is responsible for posting Allen's underwater documentary footage of the *Queen Anne's Revenge* without Allen's permission, in violation of the Settlement Agreement, and without just compensation. Mr. Carraway is sued in his individual and official capacities.

32. Defendant(s) Jane Doe is a North Carolina citizen of unknown gender(s) who works at the North Carolina Maritime Museum in Beaufort, North Carolina. Jane Doe was and is responsible for publicly performing Allen's underwater documentary footage of the *Queen Anne's Revenge* without Allen's permission, in violation of the Settlement Agreement, and without just compensation. Jane is sued in their individual and official capacities.

33. Defendant(s) John Doe is a North Carolina citizen of unknown gender(s) who works for DNCR. John took, copied, and publicly performed Allen's copyrighted works by uploading Allen's video footage and images to the DNCR social media website and to various other sites on the Internet. John Doe is sued in their individual and official capacities.

34. Defendant(s) Jill Doe is a North Carolina citizen of unknown gender(s) who works for DNCR. Jill took, copied, and distributed Allen's copyrighted work, including by sending Allen's work to the *Friends of Queen Anne's Revenge*. Jill Doe is sued in their individual and official capacities.

35. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims arising under the Constitution and laws of the United States and claims relating to constitutional torts set out in 28 U.S.C. § 1983. The Court has subject matter jurisdiction under 28 U.S.C. § 1338 over the claims relating to and arising from the Copyright Act.

36. This Court is authorized to declare under 28 U.S.C. §§ 2201-02 that Blackbeard's Law is invalid, unconstitutional, and unenforceable as preempted by federal law, 17 U.S.C. §301, as a violation of the Takings Clause and Due Process Clause of the United States Constitution, Amends. V and XIV, and as an illegal Bill of Attainder, ex post facto law, and law impairing the obligation of contracts under Article I, § 10 of the United States Constitution.

37. This Court has personal jurisdiction over all parties under N.C. Gen. Stat. § 1-75.4.

38. Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendants are located within the Eastern District of North Carolina and because a substantial part of the acts giving rise to this Complaint arose from events occurring within this judicial district.

## FACTS COMMON TO ALL CAUSES OF ACTION

**A.** ***Queen Anne's Revenge* and Blackbeard's Legacy**

39. In November 1717, Edwin Teach, better known as Blackbeard, captured the *La Concorde* in the Caribbean and transformed her into a fear-inspiring warship with 40 cannons and over 300 crewmen. After transformation, Blackbeard renamed the *La Concorde* the *Queen Anne's Revenge*.

40. Blackbeard used the *Queen Anne's Revenge* to build a fearsome reputation and plunder vessels on the high seas. In late May 1718, in an act of sheer audaciousness, Blackbeard used the *Queen Anne's Revenge* to blockade Charleston Harbor and hold its inhabitants for ransom. Weeks later, the *Queen Anne's Revenge* was destroyed when Blackbeard ran it aground near Beaufort Inlet, North Carolina. The prevailing view is that Blackbeard *intentionally* destroyed his ship to create a diversion that allowed him to abscond with invaluable treasure, leaving his crew uncompensated.

41. Blackbeard is the most (in)famous pirate of all time. The *Queen Anne's Revenge* is likewise the most famous pirate vessel of all time. Hundreds of thousands of people from all over the world come to Beaufort to learn about both.

**B. Discovery of the *Queen Anne's Revenge***

42. After the grounding of *Queen Anne's Revenge* tides, winds and waves quickly took over and the ship was soon lost to the depths where she remained untouched at the bottom of the ocean.

43. In the centuries that followed, the ship was lost to the vicissitudes of time—pummeled by hurricanes, buried in sand, and obscured from view. The ship that had once *carried* priceless treasure had *become* priceless treasure.

44. But while the ship was lost, it was not forgotten. Starting in the 1980s, archaeologists and treasure hunters from around the world began searching for the remains of *Queen Anne's Revenge*, all hoping to find and recover valuable historical artifacts.

45. One such treasure hunter was Philip Masters, the owner and operator of Intersal, Inc. Intersal was founded in 1988 with the goals to find the Spanish galleon *El Salvador* and Blackbeard's *Queen Anne's Revenge* and to increase knowledge and awareness of America's rich maritime heritage by researching, locating, and excavating valuable historic shipwrecks.

46. Intersal spent years searching for both the *El Salvador* and *Queen Anne's Revenge* until finally, in November 1996, Intersal found the *Queen Anne's Revenge* remains just over a

mile off Bogue Banks, at a depth of just over twenty feet, and almost due south of Ft. Macon State Park, N.C.

## C. A Historic Feud and A Bold New Partnership

47. Intersal's discovery of *Queen Anne's Revenge* exacerbated a deep and longstanding feud between treasure hunters and archaeologists.

48. Archaeologists are academics who study human history and prehistory through the excavation of sites and the analysis of artifacts and other physical remains.

49. Treasure hunters (also referred to as salvagers) search for sunken shipwrecks and retrieve artifacts with market value in the hopes of monetary gain.

50. Archaeologists believe treasure hunters are driven by greed, with little or no respect for history or preservation protocols. According to the former President of the Society for Historical Archaeology, the prevailing view among archaeologists is that treasure hunters engage in "indiscriminate looting of our cultural heritage."[1] The Advisory Council on Underwater Archaeology has similarly accused treasure hunters of "engag[ing] in the destruction of our heritage for commercial reward," and of "exploit[ing] [] underwater cultural heritage."[2]

51. Treasure hunters, on the other hand, believe archaeologists lack the funding and resources needed for large scale recovery and excavation operations, and that, without the ability to profit, many historical artifacts would never be found. The prevailing view among treasure hunters is that archaeologists favor formalities and status over pragmatism, without any regard for the economics that drive recovery operations.

52. The feud between archaeologists and treasure hunters is well-known in the industry, including in North Carolina. One article explained:

> Talk to most treasure hunters and archaeologists and they're likely to bring up a fundamental problem souring the hunt for marine history: they don't particularly like each other.

> "The underwater archaeologists and the treasure salvors are like oil and water," [Dr. Charles] Ewen said. "There is very little common ground."

---

[1] https://sha.org/blog/2012/02/the-ethics-of-historical-archaeology/.
[2] https://acuaonline.org/deep-thoughts/a-matter-of-ethics-by-della-scott-ireton/.

It's not a problem limited to North Carolina.

"I think there's an unbridgeable gap between the archaeological community and the salvaging community," said Paul Johnston, a curator at the Smithsonian's National Museum of American History in Washington, D.C. "They're going after the same resources, but they have different plans for how to use it."

Ewen said he realized just how bad it was when he tried to plan a panel with both groups at a recent archaeology meeting in Quebec.

"There's that much bad blood that they would not be seen on the same panel," Ewen said. "It is a very sincerely, deeply held belief, I think, on both sides."[3]

53. Intersal recognized that its discovery of *Queen Anne's Revenge* carried immense historical value, and wanted to make sure the wreckage and its artifacts were properly preserved. To facilitate this goal, Intersal sought to transcend the archaeology-treasure hunter feud by forging a partnership with North Carolina's archaeologists and North Carolina's Department of Cultural Resources (DNCR).

54. As part of that partnership, Intersal did something that had never been done before—it agreed to forgo its interest in treasure to facilitate historical preservation and to improve its relationship with DNCR and State archaeologists.

55. Under the terms of its search permit, Intersal was entitled to keep 75% of all treasure recovered from *Queen Anne's Revenge* (with the remaining 25% belonging to the State). Nevertheless, Intersal wanted all recovered artifacts to remain together, as part of one historical collection. Thus, Intersal agreed to let the State keep 100% of the treasure.[4]

56. In exchange, the State agreed to "work in partnership" with Intersal to research, recover, and promote *Queen Anne's Revenge* project. The State also agreed that Intersal would have exclusive rights to create, market, and sell all commercial narratives related to the project, including all commercial video and photography projects.[5]

---

[3] https://www.wral.com/off-north-carolina-s-coast-lure-of-sunken-treasure-fades/14660654/.
[4] *See* Exhibit 1, Attachment A at 2 ("Intersal and Michael E. Daniel are willing to forego entitlement to any coins and precious metals recovered from the QAR site in order that all QAR artifacts remain as one intact collection and in order to permit the Department to determine ultimate disposition of the artifacts[.]").
[5] *Id.* at 2 & 6 ¶ 16.

**D. Allen Joins the QAR Project and Invests Thousands of Hours and Hundreds of Thousands of Dollars To Create Valuable Images and Videos of *Queen Anne's Revenge* and Its Treasures.**

57. Intersal asked Allen to serve as the exclusive underwater videographer for the QAR project.

58. Allen was an easy choice for the job. Allen is and was one of the best underwater videographers in the world. And as a North Carolina native, Allen was already familiar with the history of QAR and with the rough waters that would serve as the project's film site. With decades of underwater experience already under his belt, Allen knew what it would take to get the best shots and most compelling footage.

59. For Allen, QAR was the project of a lifetime and the highlight of his career. Allen sought to do what no one had ever done before: document the recovery of a lost ship from beginning to end—from the first underwater survey to the opening of the final *Queen Anne's Revenge* exhibit. Allen spent the next two decades working to make his dream a reality.

60. Capturing underwater footage of QAR is treacherous. The ship's wreckage was roughly 25 feet below the ocean surface and required Allen to dive and film in full Scuba gear. Because of the work environment, even one mistake could lead to serious injury, or even death.

61. Allen also had to carry and operate his underwater video equipment. All told, Allen had to maneuver with nearly 100 pounds of equipment.

62. Shooting conditions were also challenging. Debris and silt from the Newport River, shifting sand from Shackleford Banks, and a fierce current meant visibility was limited to just a few feet in any direction. Capturing underwater footage of the QAR in those conditions is like capturing footage of a coffee can in a washing machine full of grinds.

63. It takes ample patience and hours of dive time to capture only seconds or minutes of footage of the *QAR* wreckage. And each hour of dive time requires dozens of hours of time waiting on a hot barge's steel deck for the right conditions to dive. Allen did all of this and more.

64. For almost two decades, Allen faithfully documented the recovery of artifacts from the *Queen Anne's Revenge*. Allen also documented the historic efforts of divers and underwater archaeologists as they studied the shipwreck and sought to put pieces of history back together. In total, Allen spent thousands of hours collecting the footage, and invested over $150,000 in the project.

65. Allen also implemented innovative methods to create a live transmission from the ocean floor so that archaeologists could see and contribute to the recovery operation in real time. Allen's system involved creating an entire video studio on deck, which was then used to

manage a complex relay system to decode, transmit, reencode, and retransmit his footage. *DiveLive* was one of the earliest livestream events in the world.

66. Through his efforts, Allen produced a small but extremely valuable archive of video and still images relating to the *QAR* project. This footage has allowed Allen and others to produce webcasts, promotional videos, and numerous documentaries.

67. Allen's video and still images are property that belong to Allen and Nautilus. The physical media on which they are stored are Allen's physical property. The contents of the videos and images are Allen's intellectual property.

68. While Allen was the only videographer for the QAR project, he was not the only documentarian who attempted to capture footage of *QAR*. Over the years, a handful of other divers have attempted to capture underwater footage of the wreckage, to only limited success.

69. Allen declined other videography projects because he believed that being the first and only videographer to film the *Queen Anne's Revenge* shipwreck would pay off in the form of property. To this end, he paid for his own video equipment, diving equipment, film, air fills, videotape, meals, lodging, and gas to and from the wreck site because he believed that it would pay off in the form of being able to license his property to the likes of Discovery, BBC, CNN, PBS, History Channel, and even the State of North Carolina.

70. The copyrights in all of Allen's footage belong exclusively to Allen and are licensed to and commercialized by Nautilus. In accordance with Intersal's agreement with the State, Allen provided copies of his footage to DNCR to facilitate its use for non-commercial research and educational purposes. Specifically, Allen sent copies of his footage to three DNCR facilities: the Department of Natural and Cultural Resources in Raleigh, the North Carolina Underwater Archaeology Branch at Fort Fisher, and the *Queen Annes Revenge* Lab in Greenville, N.C.

71. Allen timely and thoughtfully secured copyright registrations for his work with the United States Copyright Office. Allen owns the works and creative property covered by these copyright registrations, including:

| Registration # | Title |
|---|---|
| PA0001694134 | *Queen Anne's Revenge*/Blackbeard Shipwreck Underwater Footage |
| PA0001846427 | *Queen Anne's Revenge* Footage 1999 |

| PA0001846499 | *Queen Anne's Revenge* Footage 2000 |
|---|---|
| PA0001846497 | *Queen Anne's Revenge* Footage 2001 |
| PA0001846494 | *Queen Anne's Revenge* Footage 2004 |
| PA0001846473 | *Queen Anne's Revenge* Footage 2005 |
| PA0001846465 | *Queen Anne's Revenge* Footage 2006 |
| PA0001846461 | *Queen Anne's Revenge* Footage 2007 |
| PA0001846457 | *Queen Anne's Revenge* Footage 2008 |
| PA0001846462 | *Queen Anne's Revenge* Footage 2010 |
| PA0001846470 | *Queen Anne's Revenge* Footage 2012 |
| PA0001872852 | *Queen Anne's Revenge* Footage 2013 |
| VA0001872055 | *QAR Anchor* Image 2013 |
| VA0001872054 | *Ballast1 (pile)* 2013 |
| PA0001919638 | *Queen Anne's Revenge* Footage 2014 |

72. Allen's copyrights have immense commercial value, as the works are the only high-quality imagery of *QAR* in existence. Given the high demand for and use of his footage over the years, conservative estimates place the value of Allen's property at over $1 million. In the first decade of the project, Allen licensed small portions of his work for use in over two dozen projects, including on BBC, National Geographic, PBS, the History Channel, the Discovery Channel, several international programs in Germany and Italy, and several cable television programs.

**E. Allen, Intersal, and DNCR Develop a Strong Relationship and Build Mutual Respect.**

73. For over a decade, from 1998-2010, the bold partnership between treasure hunters (Intersal) and archaeologists (DNCR and associated staff) proved to be a rousing success. The success of the project is best illustrated from an article published in *Tributaries*, a magazine

published by the North Carolina Maritime History Council. The article, written by noted North Carolina historian, Dr. Lindley S. Butler, explains:

> The state of North Carolina was fortunate in 1996 that the Beaufort Inlet wreck was discovered by a salvor who understood and was deeply interested in history. Unlike underwater treasure projects in other states where clashes between governmental and private interests have led to long and bitter legal battles, in North Carolina there has been cooperation rather than conflict between Intersal, the discoverer of the wreck, and the state, represented by the Department of Cultural Resources. Crucial to this rare, almost unprecedented, partnership has been the understanding and concern that Phil Masters for Intersal and Mike Daniel for Maritime Research Institute, have shown for the importance of the state's history and artifacts.

74. Allen was an indispensable part of the QAR project, and was held in high esteem by everyone involved, archaeologists and treasure hunters alike.

75. With the growing popularity of Internet streaming, Allen recognized that unfettered distribution of his work on the Internet could eviscerate the value of his footage. Because DNCR had access to Allen's work, Allen wrote to the director of the QAR project, Mark Wilde-Ramsing, and the State's head archaeologist, Claggett, to caution them not to use Allen's footage in a way that would infringe his copyrights or destroy the value of his work.

76. Allen's letter included specific rules to govern the State's use of Allen's footage, including rules that limited the State's ability to post or distribute Allen's work on YouTube and other social media sites. Specifically, Allen instructed that the State should only post his videos on State websites, at low resolution, and with a "burned-in" URL located "at least 50 lines from the bottom" of the frame. The State acknowledged and did not dispute Allen's use guidelines.

77. Allen's instructions expressly placed Defendants on notice of their copyright obligations.

**F. Allen Sustains Life-Threatening Injuries; Defendants Infringe Allen's Copyrights.**

78. In January 2011, Rick Allen sustained life threatening injuries resulting from the explosion of a defective oxygen tank. He was in a coma for two months and lost his left arm.

79. While Rick Allen was recovering, one or more Jane Doe DNCR employees copied and uploaded several of Allen's copyrighted images and videos to several websites on the

13

Internet, including DNCR's social media website, YouTube, and Flickr. The videos were uploaded in their full original resolution, without watermarks, and in violation of each of the usage guidelines Allen had provided. Allen did not discover these violations until mid-2013.

80. At around the same time, one or more Jane Doe DNCR employees copied and distributed several of Allen's copyrighted images to persons outside of the government, with the understanding and intention that the materials be uploaded to the Internet. This included at least two Eastern North Carolina commercial entities.

**G. DNCR Installs a New QAR Project Director and Orchestrates an Extensive, Multi-Faceted Campaign to Oust Allen and Intersal from the QAR Project.**

81. In 2012, DNCR and the State's archaeologists decided they no longer wanted to work with treasure hunters and took steps to end the State's partnership with Intersal and Allen. The bold partnership between archaeologists and treasure hunters was over.

82. Claggett (the State's head archaeologist) hired John "Billy Ray" Morris to serve as the new director for the QAR project. Morris, who was deeply skeptical of treasure hunters, orchestrated a campaign to exclude Intersal and Allen from all QAR activities. This campaign was multi-faceted and included at least the following:

   a. Purging and isolating state employees who were viewed as allies of Allen and Intersal, and who believed treasure hunters and archaeologists should collaborate. For example, QAR Field Director Wendy Welsh was forced off the project for failing to "play politics" with Billy Ray Morris and other archaeologist hard-liners. Other ousted team members include Richard Lawrence (who had served as the Director of North Carolina's Underwater Archaeology Branch), Chris Southerly, and Nathan Henry, among others.

   **b. Attempting to reduce or eliminate Allen's ability to monetize his work by copying, posting, and distributing copies of Allen's work to the public.**

   c. Creating a new set of safety and insurance rules, but only enforcing those rules as to Allen. The rules were not enforced with respect to other team members, creating significant safety risks.

   d. Shifting responsibility for significant aspects of the QAR project from DNCR to a separate, independent organization ("Friends of Queen Anne's Revenge") that was not subject to any state oversight or compliance requirements. That organization also began a $2M fundraising campaign for the *Queen Anne's Revenge* Project in partnership with DCR but excluding Nautilus and Intersal.

14

    e.   Hiring new video production companies to replace Nautilus and Allen.

    f.   Threatening to exclude Allen from all state vessels, thus requiring Allen and Intersal to incur thousands of dollars in additional expenses to reach the QAR site.

    g.   Systematically ignoring and violating the media and notification terms of the 1998 contract between Intersal and DNCR.

    h.   Creating several media campaigns that sought to promote the QAR project while downplaying Allen's and Intersal's contributions to the project.

    i.   Seeking early termination of the 1998 contract between the State and Intersal.

83. Morris's campaign unfolded gradually and in secret. Allen did not discover the full extent of the operation until mid-2013, when a DNCR employee told Allen about Morris's changes. This was by design—Morris had instructed DNCR employees not to inform Allen about the changes to the project.

84. One of the marginalized state archaeologists explained how Morris's hostility towards Allen and Intersal impacted the QAR project: "Formerly, the [Underwater Archaeology Branch] was a highly cohesive, efficient, and effective team, working together to accomplish tasks and goals often with minimal funding or outside support. As you are undoubtedly aware, any illusion of team, cohesiveness, or even morale is just that: an illusion."

85. The State's infringement of Allen's copyrights was especially egregious. The following table summarizes DNCR's known copyright infringements through 2013:

**Table 1: DNCR's Infringements of Plaintiffs' Copyrights Through 2013 (to the best of Plaintiffs' knowledge)**

| Title Of Copyrighted Work | Registration # | Description of Infringing Material | Location of Infringing Material | Estimated Dates of Infringement |
|---|---|---|---|---|
| Queen Anne's Revenge Footage 2008 | PA0001846457 | David Moore On Capturing Blackbeard's 13th Cannon | YouTube DNCR Website | Unknown - June 2013 (Reposted 9/15-12/16 after Blackbeard's Law) |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | Raising Blackbeard's Anchor, May 27, 2011 | YouTube DNCR Website | Unknown - June 2013 (Reposted 9/15-12/16 after Blackbeard's Law) |
| Ballast1 | VA0001872054 | Blackbeard's *Queen Anne's Revenge* 1718 | YouTube DNCR Website | Unknown - June 2013 (Reposted 9/15-12/16 after Blackbeard's Law) |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | Raising Blackbeard's Cannon From a Conservators Point of View | YouTube DNCR Website | Unknown - June 2013 (Reposted 9/15-12/16 after Blackbeard's Law) |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | What's New At QAR Lab | YouTube DNCR Website | Unknown - June 2013 (Reposted 9/15-12/16 after Blackbeard's Law) |
| Queen Anne's Revenge Footage 2012 | PA0001846470 | *Maritimes*, Winter/Spring 2013, p. 13 | *Maritimes* Magazine Winter/Spring 2013, DNCR Website | Magazine published in Spring/Smmer 2013 (Posted online Sept. 2015 - August 2016 after Blackbeard's Law) |

86. In addition to the above infringements, from approximately 2009 to 2015, DNCR sold copies of a documentary containing Allen's footage in the gift shop of the North Carolina Maritime Museum at Beaufort, without license or permission from either Allen or the company that produced the film.

87. Allen discovered the State's copyright infringement in 2013, during June recovery operations on the wrecksite.

88. Upon learning of the infringement, Allen sent takedown notices to YouTube, East Carolina University, and North Carolina Public Television. Allen also wrote to the State, through Defendant Kluttz, to express his concerns. The State failed to address Allen's concerns. Thus, on August 2, 2013, Allen wrote to Defendant Kluttz and "revok[ed] any and all rights, licenses and sub licenses" to his copyrighted materials. Allen also demanded that the State return or destroy all physical copies of his footage in its possession.

89. On August 9, 2013, DNCR assured Allen that it had secured all physical copies of Allen's work so that none would be used without Allen's express permission. Allen's work was posted online *again* on that very same day.

**H. Allen, Intersal, and DNCR Enter a Settlement Agreement; The State Immediately Changes Its Mind and Continues Infringement.**

90. On October 24, 2013, the State, through Defendant Kluttz, entered into a settlement agreement with Allen and Intersal ("the Agreement," attached as Exhibit 1).

91. In the Agreement, the State expressly acknowledged that Allen's copyrights, video footage, and still images from the *Queen Anne's Revenge* were his property, and that North Carolina had taken it:

> **Copyright Violations.** DNCR agrees to compensate Nautilus Productions by payment of the cash sum of $15,000 for any copyright infringements by DNCR or its support groups occurring through the date of the signing of this contract, including Friends of the Maritime Museum display photograph of the pile (central portion of the QAR shipwreck), DNCR's Flickr account showing anchor A1 on the pile, DNCR's website showing anchor A1 on the pile, DNCR's News website showing anchor A2, and Friends of the QAR website showing mapping dividers (artifact). DNCR shall pay Nautilus Productions $15,000 by 31 January 2014.

17

Ex. 1 ¶ 22.

92. The Agreement required the State to adhere to a strict set of rules regarding when and how it could use Allen's property.

93. Most importantly, the State was not allowed to use Allen's footage for any commercial or promotional purposes without Allen's express permission.

94. The Agreement also required North Carolina to return all of Allen's videos and images that did not bear a Nautilus watermark, or "a bug," or that otherwise did not bear a timecode stamp. This property was and remains one-of-a-kind and tremendously valuable underwater footage on videotape.

95. The Agreement also provided Allen with a right of first refusal with respect to all media opportunities (commercial and noncommercial) relating to the QAR project.

**I. The State Regrets the Agreement and Turns to Legislation to Secure Access to Allen's Valuable Footage.**

96. The State had buyer's remorse and refused to comply with the terms of the Agreement.

97. On October 25, 2013—less than a week after signing the Agreement—the State scheduled a media day at the QAR site. The State did not notify Allen or provide him an opportunity to participate, as required by the Agreement.

98. The State also failed to comply with the provisions of the Agreement requiring it to return Allen's physical media. In December, 2013, DNCR returned some of Allen's works, but withheld 22 videotapes containing Allen's most valuable footage. To this day, North Carolina has yet to return those tapes.

99. The State also violated several provisions of the Agreement relating to Intersal. On July 27, 2015, Intersal filed suit against Defendants in North Carolina state court, asserting claims for breach of contract, and claiming damages for Defendants' unauthorized use of QAR photographs.

100. Defendants resented Allen for asserting his rights and believed he was improperly attempting to cash-in on history. After Allen asserted his rights, the State requested a meeting with Allen. At that meeting, Defendant Claggett—the State's lead archaeologist— confirmed that DNCR and the State resented Allen for what a perceived treasure hunter mentality. Claggett and Deputy Secretary Cochran claimed that the source of "friction" on the QAR project was Allen's desire to monetize his "hobby" and Allen's refusal to "volunteer" his time and services.

18

101.    Just a few months after ratifying the contract, the State sought to change the terms of the Agreement to allow DNCR to use Allen's footage for commercial purposes. Neither Allen nor Intersal agreed to the State's proposed amendments.

102.    Defendants devised a plan to punish Allen for what they viewed as his obstruction of the QAR Project and to secure the ability to use Allen's copyrighted works for free in perpetuity, including for commercial purposes. This plan became Blackbeard's Law.

103.    Blackbeard's Law was introduced as part of "H184." The relevant portion states:

> All photographs, video recordings, or other documentary materials of a derelict vessel or shipwreck or its contents, relics, artifacts, or historic materials in the custody of any agency of North Carolina government or its subdivisions shall be a public record pursuant to G.S. 132-1. There shall be no limitation on the use of or no requirement to alter any such photograph, video recordings, or other documentary material, and any such provision in any agreement, permit, or license shall be void and unenforceable as a matter of public policy.

104.    Under North Carolina law, North Carolina owns, controls, and has exclusive custody over "***all*** shipwrecks ... and underwater archaeological artifacts which have remained unclaimed for more than 10 years" in any navigable State waters of the State." N.C. Gen. § 121-22. Thus, Blackbeard's Law purports to place *all* North Carolina historical underwater videography projects in the public domain.

105.    Blackbeard's Law was devised for, directed to, and targeted at Rick Allen and Intersal. Rick Allen and Intersal are the *only* persons on the planet with an extensive corpus of photography and video work depicting "a derelict vessel or shipwreck or its contents, relicts, artifacts, or historical materials in the custody of [North Carolina]."

106.    Allen's work is incredibly specialized. As a North Carolina native, Rick Allen has dedicated his professional career to underwater videography projects of derelict vessels and shipwrecks in North Carolina waters. Blackbeard's Law targets *exactly* that set of documentary materials.

107.    Even nature-based projects are converted to the public domain, since shipwrecks serve as a natural home for the vast majority of marine life in North Carolina coastal waters. For example, Sand Tiger sharks frequently congregate in and around shipwrecks, since the wrecks provide shelter and serve an important role in the Sand Tiger shark food web.

108.   Blackbeard's Law impacts the vast majority of Allen's works and 100% of Allen's work relating to QAR.

109.   By placing Allen's work in the public domain, the State, through Blackbeard's Law, destroyed the commercial value of that work, as no one would pay money to purchase or license something that could be obtained for free.

110.   Blackbeard's Law does not incorporate any due process protections.  Allen did not have *any* opportunity to challenge or contest the placement of his work into the public domain.

111.   The State did not compensate Allen for the destruction of his property.

112.   Blackbeard's Law is self-executing and does not require any action by any state official to enforce.  Instead, the Law simply *declares* that Allen's images and videos are in the public domain.  Thus, the Law does not include any due process protections—it does not set forth procedures to allow affected individuals to challenge a public records classification, to seek reclassification, or to seek compensation.

113.   To the extent Blackbeard's Law is enforced by *anyone*, it would be Defendant Stein, who is North Carolina's attorney general, who is responsible for enforcing *all* North Carolina laws, Defendant Koonts, who is responsible for administering North Carolina's public records laws, and Defendants Cherry and Koonts who are or were responsible for DNCR's archival methods and use of public records.

114.   Blackbeard's Law was conceived, drafted, and promoted by DNCR staff, in furtherance of DNCR's agenda to exclude Allen and Nautilus from the QAR project.  DNCR staff described the law as a "bill[] for Cultural Resources."

115.   Blackbeard's Law was not covered by the media until after its passage and was not otherwise advertised or promoted to the public.  Instead, the Law was added as an amendment to a much larger bill at the last minute, with little fanfare or announcement.  There was no legislative debate relating to the Law, and no meaningful opportunity for Allen to object to or challenge the Law prior to its passage.

116.   Public reporting confirms that lawmakers supported Blackbeard's Law to support DNCR's punitive agenda and strengthen DNCR's litigation position with respect to both Allen and Intersal.  In an interview with the Associated Press, Senator Norman Sanderson, who introduced the bill, stated that Blackbeard's Law "was brought forth because of the lawsuit."[6]

---

[6] https://www.citizen-times.com/story/news/2015/07/29/lawmakers-enter-legal-battle-blackbeards-ship/30853857.

117.    The North Carolina House voted to pass Blackbeard's Law on August 11, 2015 by a vote of Yeah's – 107, Present/NV – 3 & Absent - 3.  The Senate ratified the Law on August 4, 2015 by a vote of Yeah's – 42 & Absent - 8.  Governor McCrory signed the bill into law on August 18, 2015.  Ironically, this act of piracy coincided with the 297th anniversary of a British order that pardoned certain acts of piracy.

**J.  Defendants Rely on Blackbeard's Law to Justify Shameless, Unapologetic Theft of Allen's Videos and Images, and Engage In Rampant Copyright Infringement.**

118.    Defendants resumed their infringement of Allen's copyrights almost immediately after Blackbeard's Law went into effect, despite having full knowledge that Allen opposed their use of his footage, that their actions constituted willful copyright infringement, and that their acts violated the Agreement.

119.    Defendants, acting through one or more Jane Does, infringed Allen's property and copyright rights by reposting several of Allen's copyrighted works on YouTube and on DNCR's social media website, less than three weeks after the passage of Blackbeard's Law.

120.    Several of the State's post-Blackbeard infringements were simply continuations of DNCR's previous infringements.  DNCR posted the videos in 2011, removed them in accordance with the 2013 Settlement Agreement, and then reposted the videos in 2015, after Blackbeard's Law purportedly nullified the use restrictions in the Agreement and placed Allen's content into the public domain.

121.    Allen is informed and believes that Dr. Cherry ordered the posting of Allen's property to the Internet, including YouTube and sites controlled by DNCR.

122.    The following table summarizes DNCR's copyright infringements that commenced after the passage of Blackbeard's Law (to the best of Plaintiffs' current knowledge):

21

**Table 2: DNCR's Infringements of Plaintiffs' Copyrights Commencing After the Passage of Blackbeard's Law (to the best of Plaintiffs' knowledge)**

| Title Of Copyrighted Work | Registration # | Description of Infringing Material | Location of Infringing Material | Estimated Dates of Infringement |
|---|---|---|---|---|
| Queen Anne's Revenge Footage 2008 | PA0001846457 | David Moore On Capturing Blackbeard's 13th Cannon | YouTube DNCR Website | 9/2015-12/2016 (Reposted after being taken down in 2013) |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | Raising Blackbeard's Anchor, May 27, 2011 | YouTube DNCR Website | 9/2015-12/2016 (Reposted after being taken down in 2013) |
| Ballast1 | VA0001872054 | Blackbeard's *Queen Anne's Revenge* 1718 | YouTube DNCR Website | 9/2015-12/2016 (Reposted after being taken down in 2013) |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | Raising Blackbeard's Cannon From a Conservators Point of View | YouTube DNCR Website | 9/2015-12/2016 (Reposted after being taken down in 2013) |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | What's New At QAR Lab | YouTube DNCR Website | 9/2015-12/2016 (Reposted after being taken down in 2013) |
| Queen Anne's Revenge Footage 2012 | PA0001846470 | *Maritimes*, Winter/Spring 2013, p. 13 | DNCR Website | 9/2015-12/2016 (Reposted online following initial publication) |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - North Anchor A3 | DNCR Website | Aug. 2016 - July 2018 |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-55.tif | DNCR Website | Aug. 2016 - July 2018 |

Case 5:15-cv-00627-BO    Document 134    Filed 02/08/23    Page 22 of 41

| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-56.tif | DNCR Website | Aug. 2016 - July 2018 |
|---|---|---|---|---|
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-56-2.tif | DNCR Website | Aug. 2016 - July 2018 |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-44.tif | DNCR Website | Aug. 2016 - July 2018 |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-60.tif | DNCR Website | Aug. 2016 - July 2018 |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-61.tif | DNCR Website | Aug. 2016 - July 2018 |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-68.tif | DNCR Website | Aug. 2016 - July 2018 |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - a3-anchor.jpg | DNCR Website | June 2021 - Present |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-55.tif | DNCR Website | June 2021 - Present |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-56.tif | DNCR Website | June 2021 - Present |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-56-2.tif | DNCR Website | June 2021 - Present |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-44.tif | DNCR Website | June 2021 - Present |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-60.tif | DNCR Website | June 2021 - Present |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-61.tif | DNCR Website | June 2021 - Present |
| Queen Anne's Revenge Footage 2008 | PA0001846457 | 2009.04 QAR Lab Report.pdf - In Situ-68.tif | DNCR Website | June 2021 - Present |

123.    Correspondence from shortly before the passage of the Law shows that Defendants sought to use the Law to earn millions of dollars from Allen's footage.  In a May 29, 2015 letter, DNCR General Counsel Kevin Howell informed Allen that DNCR intended to use "[i]mages of the shipwreck ... provided pursuant to North Carolina's Public Records Law," (i.e., Blackbeard's Law), "to raise an additional $2 million in funding by June 2018."

124.    In the ongoing Intersal litigation, the State declared open season on Allen's copyrights. The State claims that Blackbeard's Law operates as a complete defense to any assertion of intellectual property rights or claims for breach of contract relating to Allen's work:

> Regardless of whether the Department infringed upon Plaintiff's alleged intellectual property rights or breached the contract ... any relief for the alleged infringement and breach of contract should be denied because the purported contract forming the basis for Plaintiff's action…is <u>void, illegal and unenforceable</u>, in its entirety or in part, as being against … public policy… Therefore, the Department is not responsible for and has no liability to Plaintiff under the alleged contract and/or its parts.

(emphasis added).

125.    The "alleged intellectual property rights" North Carolina is referring to belong to Allen. The contract referenced by North Carolina is the Settlement Agreement.  According to North Carolina, Blackbeard's Law extinguished both.

**K. Defendants Continue to Infringe Allen's Copyrights, Even After Commencement of this Lawsuit.**

126.    Even after the initiation of this lawsuit, North Carolina continued to publish, display, and perform Allen's works and property.

127.    After this lawsuit was filed, but before this matter reached oral argument at the Fourth Circuit, the State took down the infringing videos specifically identified in Allen's First Amended Complaint.

128.    However, the State continued (and continues) to assert that it is entitled, under Blackbeard's Law, to take and use Allen's work, however it wants, without compensation.

129.    To this day, North Carolina continues to publish, display and perform many of Allen's works.  Indeed, it is DNCR's policy to post materials, such as those belonging to Allen, to the Internet Archive.  Furthermore, "DNCR uses the tool Archive-It, developed by the Internet Archive to collect, store, and provide access to these Web sites."  See generally,

24

https://archives.ncDNCR.gov/government/digital-records/digital-records-policies-and-guidelines.

130.    Indeed, Defendant Wilson (DNCR Secretary) and Defendant Koonts (acting DNCR Secretary), acting under color of law and through DNCR, continue to take and infringe Allen's property by posting the same to the Internet Archive, as shown in Table 2.

**E. North Carolina's Continued Takings of Allen's Property Part III -- North Carolina Maritime Museum, Beaufort, North Carolina**

131.    Beaufort, North Carolina is the center of North American pirate history. People come from all over the world to Beaufort to explore that history. As mentioned, Blackbeard's *Queen Anne's Revenge* lies there, and treasure hunters are still looking for *El Salvador* that is believed to have run aground near Beaufort Inlet.

132.    North Carolina's DNCR operates one of its three Maritime Museums in Beaufort. The Maritime Museum in Beaufort (MMB) has the most extensive exhibits on pirates and, especially, Blackbeard and his *Queen Anne's Revenge*.

133.    MMB currently welcomes well over 100,000 visitors a year. Prior to the COVID-19 pandemic, average attendance topped 300,000 visitors a year.

134.    MMB also has a theater that it uses to screen movies and documentaries to museum patrons. Most visitors enter the theater at some point during their visit.

135.    For the last decade, DNCR has shown Allen's footage to museum visitors multiple times a day, every day on which the museum is open. These displays continued until mid-January 2023, and stopped only after the District Court granted Allen leave to file an amended complaint. Under a modest estimate, Allen's footage was shown over 10,000 times, to at least 60,000 museum visitors.

136.    The footage on display is not being used for research purposes, nor does it contain a watermark or timestamp.

137.    North Carolina did not license Allen's footage. North Carolina did not compensate Allen for showing his footage at MMB. North Carolina did not seek or obtain Allen's permission to show his footage in Beaufort.

138.    The following images, captured in September 2021, show that Allen's footage was performed in the MMB theater:



*MMB presented Allen's videos in the museum theater without permission.*



*Allen's footage shows the QAR recovery in action.*

139.    Defendant Mike Carroway is the Exhibits Curator at the Maritime Museum in Beaufort. Allen is informed and believed that Carroway personally ordered the performance of his videos in the Maritime Museum's theater.  Defendant Schwarzer is the Director of the Maritime Museum in Beaufort.  Allen is informed and believes that Mr. Schwarzer controls or has the right to control what is performed at the Maritime Museum in Beaufort.  Allen is likewise informed and believes that Mr. Schwarzer was aware of this unlawful performance. Defendant Koonts oversees the use of content media by DNCR, including the performance of Allen's work at the Maritime Museum in Beaufort.  As a result, she too controls, or has the right to control, what is performed at the Maritime Museum in Beaufort.  Defendant Secretary Wilson is pictured next to Governor Cooper at the Maritime Museum.  Allen is informed and believes that Secretary Wilson controls or has the right to control what is performed at the Maritime Museum in Beaufort.  Allen is likewise informed and believes that Secretary Wilson is aware of this unlawful performance.  All have acted under color of law to take Allen's property by performing the same at the Maritime Museum in Beaufort.

**COUNT I**

**Copyright Infringement, 17 U.S.C. § 501** *et seq.*

*(Against North Carolina, DNCR, and individual defendants in their official capacities)*

140.     Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

141.     Allen owns valid copyrights in each of the works identified in Tables 1-3.

142.     Allen registered each of the photos and videos at issue in this action with the United States Copyright Office.

143.     Allen did not authorize Defendants to copy, display, distribute, or perform any of his work past 2013.  Allen has never authorized Defendants to copy, display, distribute, or perform any of his work for commercial purposes.

144.     Allen clearly and unambiguously revoked any and all authorization Defendants might have had to his work on August 2, 2013.

145.     Defendants have repeatedly infringed Allen's copyrights from 2011 through the present by copying, displaying, distributing, and performing Allen's works without permission, as shown in Tables 1-3 and described in paragraphs 86-88 and 118-123.  These actions were unlawful under 17 U.S.C. § 106 and 17 U.S.C. § 501.

146.     The release of claims in the Settlement Agreement does not absolve Defendants' infringement or otherwise preclude this Claim because the release was rendered void by Defendants' breach of the Agreement, because most of the alleged infringement took place after the Settlement Agreement was executed (and so was not covered by the release), and because Defendants are judicially estopped from relying on the terms of the Settlement Agreement, in view of the arguments they advanced in their ongoing litigation against Intersal.

147.     Defendants' infringement has been willful.  At all relevant times, Defendants knew they were using Allen's works without permission.  Defendants' willful intent is evidenced by the fact that Defendants continued to infringe Allen's copyrights even after Allen expressly notified Defendants of their infringement and demanded that Defendants cease their infringement and return all copies of his work.

148.     Defendants' willfulness can also be inferred from the timing and patterns associated with Defendants' infringement.  For instance, Defendants have repeatedly paused or suspended their infringing behavior when their conduct was subject to judicial scrutiny, only to resume their infringement once judicial attention has dissipated.

149.    Each of the alleged infringements was carried out by DNCR, who was acting on behalf of and under the supervision of North Carolina.

150.    Plaintiffs are entitled to injunctive relief enjoining Defendants from infringing Allen's copyrights.  Plaintiffs are also entitled to the full scope of damages allowed by the Copyright Act.

## COUNT II
### Violations of the DMCA for Alteration or Removal of  Copyright Management Information, 17 U.S.C. § 1202
*(Against North Carolina, DNCR, and individual defendants in their official capacities)*

151.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

152.    Allen embedded copyright management information in his works, including through file names, metadata, labeling, and through the use of watermarks that identified Plaintiff Nautilus Productions as the production company and rights-holder.

153.    The metadata in each of Allen's video files contained a copyright notice specifically identifying the work's title and stating: "© [year] Nautilus Productions LLC, All Rights Reserved courtesy; Nautilus Productions."  Each video also contains a title card with similar information as well as a URL to Plaintiffs' website, Plaintiffs' e-mail address, and phone number.

154.    Each item of Plaintiffs' physical media was accompanied with a file setting forth the terms and conditions under which the work could be used.  *See* 17 U.S.C. § 1202(c)(3). Additional terms and conditions were set forth in the 2013 Settlement Agreement.

155.    Defendants altered or removed Plaintiffs' copyright management information when copying, distributing, reproducing, and performing Plaintiffs' works in connection with each of the infringements shown in Tables 1-3 and described in paragraphs 86-88 and 118-123, including by removing file metadata and altering or removing the terms of use in and accompanying the works.

156.    Defendants altered Plaintiffs' physical media by relabeling them with the phrase "DNCR Marketing & Communications."

157.    These actions were unlawful under 17 U.S.C. § 1202, which prohibits the alteration or removal of copyright management information.

158.    Plaintiffs are entitled to injunctive relief enjoining Defendants from violating the copyright management information provisions of the DMCA.  Plaintiffs are also entitled to the full scope of damages allowed by statute.

## COUNT III
### Takings Claim Under the Fifth and Fourteenth Amendments to the United States Constitution, Both Directly and Through the Copyright Act
#### (*Against North Carolina and DNCR*)

159.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

160.    North Carolina and DNCR's infringements of Plaintiffs' copyrights effectuated a Takings of Allen's property, in violation of the Fifth Amendment to the United States Constitution.

161.    Plaintiffs have a property interest in Allen's copyrights.

162.    The State Defendants effectuated a taking of Allen's property by engaging in wide-scale, willful, and indiscriminate infringement of Allen's copyrights, as shown in Tables 1-3 and described in paragraphs 86-88 and 118-123.

163.    The State Defendants also effectuated a physical taking of Allen's property by withholding and refusing to return Allen's physical media containing copies of his works.

164.    The State Defendants' infringements caused the loss of all economically beneficial and productive uses of Allen's copyrights.  The only economically beneficial use of Allen's copyrights was to monetize the rights through license or sale.  The State Defendants' wide-scale infringement precluded such monetization, as there is no reason to license what can be used for free.

165.    The State Defendants' infringements interfered with Plaintiffs' reasonable investment-backed expectations for the use of Allen's copyrights.

166.    Allen invested thousands of hours, most of his life savings, and the prime years of his professional career into the QAR project.  Allen's work on the project came with a significant opportunity cost, as Allen turned down scores of other projects because he was fully committed to the QAR project.

167.    Allen made those investments with the reasonable expectation—based on decades of experience—that they would pay off in the form of profitable licensing arrangements.  One of the central components of Allen's licensing and monetization strategy was his expectation—again, based on decades of experience—that he would be able to license his footage to State Defendants for use in state museums.

30

168.    The State Defendants' takings has caused significant economic harm to Allen.  The
        State's infringement has resulted in a loss of at least $150,000 in potential licensing fees.
        The number would be even higher if one accounts for the fact that the State Defendants sent
        Allen's footage to third parties who engaged in additional infringement.

169.    The State Defendants did not afford Allen even a modicum of due process in connection
        with their takings.  Allen did not have an opportunity to be heard and had no means to
        challenge the infringements, other than through this litigation.

170.    The State Defendants have not provided Allen with just compensation for their takings.
        Indeed, Allen has not received *any* compensation in connection with any of the post-
        Settlement Agreement infringements.  The money Allen received in connection with 2013
        Settlement Agreement was inextricably tied to other provisions in that Agreement that were
        violated before the ink had even dried.  Thus, that, money, too, does not constitute "just
        compensation."

171.    Plaintiffs are entitled to compensation for the State's takings and infringement of his
        work, with the appropriate amount of compensation set forth by the damages provisions of
        the Copyright Act.  Plaintiffs are also entitled to an order enjoining Defendants from taking
        Plaintiffs' property or infringing Plaintiffs' copyrights, and requiring Defendants to return
        Plaintiffs' physical media.

172.    The Copyright Act expressly abrogates sovereign immunity and authorizes plaintiffs to
        pursue copyright infringement claims against states when those infringements constitute
        "*actual* violations" of a plaintiff's Fourteenth Amendment rights.  *United States v. Georgia*,
        546 U.S. 151, 158-59 (2006).  The State Defendants are not immune from suit.

173.    Allen cannot pursue this claim in state court, as any claim would be preempted by the
        Copyright Act.  North Carolina courts also would not have jurisdiction over Allen's claims,
        since the Copyright Act expressly prohibits state courts from adjudicating claims arising
        under the Copyright Act.  *See*  28 U.S.C. § 1338.  In related litigation against Intersal,
        Defendants have pointed to Blackbeard's Law to argue that  that neither Plaintiffs nor
        Intersal can pursue any copyright, takings, or contract claims in North Carolina courts.  Thus,
        Defendants are judicially estopped from making any claim that Allen could or should pursue
        his claims in state court.

## COUNT IV
### Takings Claim Under the Fifth and Fourteenth Amendments to the United States Constitution, Both Directly and Through the Copyright Act
### (*Against North Carolina and DNCR*)

174.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

175.    North Carolina's passage and use of Blackbeard's Law constitutes one of the most, if not *the* most expansive unlawful takings ever seen under the Fifth Amendment of the United States Constitution.

176.    Blackbeard's Law effectuates a complete taking of each work that falls within its wide ambit.  Under the Copyright Act, Allen has a right to exclude others from using his work.  Blackbeard's Law says the opposite, and provides that "there shall be **no** limitation on the use of" Allen's materials.

177.    The scope and number of Allen's works affected by Blackbeard's Law is expansive, and is not limited to the QAR Project.  Because Allen specializes in historical and natural underwater videography in North Carolina, Blackbeard's Law places the vast majority of Allen's portfolio into the public domain.  In total, this amounts to several *hundred* works—roughly 75% of Allen's entire portfolio and life's work.

178.    Blackbeard's Law destroys all economically beneficial and productive use of Allen's copyrights.  Allen cannot license or monetize "public records" or works in the public domain.

179.    Blackbeard's Law has interfered with Allen's reasonable, investment-backed expectations relating to the creation of his work.  As described in paragraphs 64 and 166-167, Allen invested substantial resources in the creation of images and videos relating to the QAR project.  Allen made similar investments with respect to the rest of his portfolio.  All of these investments were made with the expectation that Allen would be able to recoup his costs through licensing.  Blackbeard's law obliterated those expectations.

180.    The State Defendants' reaction to Blackbeard's Law demonstrates the effect of the taking.  Prior to Blackbeard's Law, the State Defendants had taken down several of Allen's works they had posted on the DNCR website and on YouTube, implicitly acknowledging they would only be able to use those works if they paid for a license.  Immediately after Blackbeard's Law went into effect, the State Defendants reposted those same infringing works, since they no longer needed to pay for a license to use the works.

181.    The State has expressly claimed that Blackbeard's Law eliminates any obligations the state might have to respect Allen's intellectual property, including obligations imposed by

the Copyright Act and obligations contained in the 2013 Settlement Agreement. Indeed, the State has argued that the provisions of Blackbeard's Law apply "[r]egardless of whether the Department infringed upon Plaintiff's ... intellectual property rights or breached the contract."

182.    Blackbeard's Law has made it more difficult for Allen to license his work, as potential licensees have expressed concern regarding the status of Blackbeard's Law and how the Law might impact their license.

183.    The State Defendants did not afford Allen even a modicum of due process in connection with their takings. Blackbeard's Law is self-enforcing, and so did not provide Allen with any opportunity to oppose the entry of his work into the public domain, or to seek reclassification once the work was added to the public domain.

184.    The State Defendants have not provided Allen with just compensation for their takings. Indeed, Allen has not received *any* compensation in connection with the taking and destruction of his property under Blackbeard's Law.

185.    Plaintiffs are entitled to just compensation for the State's takings of his works, an order enjoining Defendants from taking Plaintiffs' work, and an order enjoining Defendants from treating Plaintiffs' works as a "public record" or from using Allen's work without permission or just compensation.

186.    Even if Allen's exclusive rights were restored, Plaintiffs would still be entitled to compensation for the complete takings brought into effect for the periods in which it was active.

187.    The Copyright Act expressly abrogates sovereign immunity and authorizes plaintiffs to pursue copyright infringement claims against states when those infringements constitute "*actual* violations" of a plaintiff's Fourteenth Amendment rights. *United States v. Georgia*, 546 U.S. 151, 158-59 (2006). The State Defendants are not immune from suit.

188.    Allen cannot pursue this claim in state court, as any claim would be preempted by the Copyright Act. North Carolina courts also would not have jurisdiction over Allen's claims, since the Copyright Act expressly prohibits state courts from adjudicating claims arising under the Copyright Act. *See* 28 U.S.C. § 1338.

### COUNT V
### Bill of Attainder Under Article I, § 10 of the United States Constitution
### (*Against North Carolina and DNCR*)

189.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

190. Article I, § 10 of the United States Constitution states, in relevant part: "No State shall ... pass any Bill of Attainder[.]"  A bill of attainder is a statute or legislative act that inflicts punishment on specific individuals.  *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 473-74 (1977).

191. Blackbeard's Law is an unlawful Bill of Attainder.

192. Blackbeard's Law is a punitive in both motivation and effect.

193. Blackbeard's Law was conceived, drafted, promoted, and passed with punitive intent.  The Law is the culmination of a years-long battle between DNCR, Allen, and Intersal.  Blackbeard's Law seeks to punish Allen for his perceived alignment with treasure hunters, for Allen's perceived lack of loyalty to archaeological interests, for Allen's attempt to monetize his work, and for Allen's repeated assertions of his contractual and intellectual property rights.

194. The fact that Blackbeard's Law is targeted specifically at Allen is evident from the fact that the provisions of Blackbeard's Law perfectly mirror the provisions of the 2013 Settlement Agreement.  The Agreement includes an express carve-out for public records, Ex. 1 ¶ 17, so Blackbeard's Law reclassifies Plaintiffs' work as public records.  The Agreement expressly required DNCR to add a "time code stamp, and watermark" to Plaintiffs' work, *id.* ¶ 16(b), so Blackbeard's Law expressly eliminates and invalidates that requirement.  The Agreement prohibited Defendants from using Allen's work for non-commercial purposes, so Blackbeard's Law expressly states that "[t]here shall be no limitation" on the use of the materials.  The clause-for-clause similarities between the Agreement and Blackbeard's Law definitively demonstrates that the Law was targeted Allen and arose from Defendants' grievances with Allen.

195. Blackbeard's Law imposes penalties that are historically associated with punishment and that have frequently been deemed improper under the prohibition on bills of attainder.  At common law, bills of attainder proscribed "the punitive confiscation of property by the sovereign."  *Nixon*, 433 U.S. at 474.  Blackbeard's law does just that by confiscating Plaintiffs' property rights, converting Plaintiffs' property to the public domain, and preventing Plaintiffs from entering into contracts to govern the use and disposition of their property.

196. The punitive nature of Blackbeard's Law is further evidenced by the fact that the Law bars Allen "from participation in specified employments or vocations."  Allen's vocation is incredibly specific: Allen is an underwater videographer who specializes in documenting derelict vessels and shipwrecks in North Carolina waters, including the marine wildlife that frequently accompanies those vessels.  Blackbeard's Law targets Allen's chosen vocation

with pinpoint precision, and functionally bars Allen from participation in that vocation by legislating away Allen's ability to obtain compensation for his work. The Supreme Court specifically identified this kind of law as "a mode of punishment commonly employed against those legislatively branded as disloyal." *Id.*

197.    The impact of Blackbeard's Law on Allen's vocational opportunities is especially significant in light of the injuries Allen sustained in 2011. After losing his arm, Allen no longer had the ability to shoot footage above water. Thus, the only job within Allen's chosen profession that he can perform is underwater photography. And because Allen lives in North Carolina and specializes in North Carolina maritime environments, Allen is primarily limited to shooting subjects in North Carolina waters, almost all of which fall under the ambit of Blackbeard's Law.

198.    Blackbeard's Law specifically targets Plaintiffs and Intersal, as they are the only persons on the planet with a corpus of photography and video work falling within the ambit of Blackbeard's Law.

199.    Blackbeard's Law does not advance any non-punitive purpose. There is no legitimate reason to place large swaths of privately-owned copyrights into the public domain, and no reason to prevent copyright holders from entering into contracts that govern the use of their copyrights.

200.    Blackbeard's Law seeks to do legislatively what cannot be done through other means. Absent Blackbeard's Law, Allen and Intersal would have the ability to obtain judicial relief for state infringements of their copyrights or breaches of contract. Blackbeard's Law usurps the role of the judiciary by purporting to foreclose Plaintiffs from enforcing their contract and copyright rights through normal judicial means. Blackbeard's Law is thus squarely at odds with core separation of powers principles.

201.    Plaintiffs are entitled to a full revocation of Blackbeard's Law and just compensation for the punishment unjustly imposed upon them because of the Law. This includes compensation for each of Allen's works that was subject to Blackbeard's Law, as well as compensation for DNCR and North Carolina's unauthorized use of Allen's property. Plaintiffs are also entitled to an order enjoining the State from treating Allen's works as a public record, from using Allen's work without permission, and from punishing or retaliating against Allen for his assertion of rights.

## COUNT VI
## Ex Post Facto Law Under Article I, § 10 of the United States Constitution
### (*Against North Carolina and DNCR*)

202.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

203.    Article I, § 10 of the United States Constitution states, in relevant part: "No State shall ... pass any ... ex post facto Law[.]"

204.    Blackbeard's Law is an unlawful *ex post facto* law.

205.    As explained above, Blackbeard's Law is punitive by motivation, design, and effect.

206.    Blackbeard's Law has retroactive effect.  The Law seeks to punish Plaintiffs for conduct that predated the Act.

207.    Blackbeard's Law places *pre-existing* works in the public domain, and renders "void and unenforceable" all pre-existing contracts and licenses relating to those works.

208.    Plaintiffs are entitled to a full revocation of Blackbeard's Law and compensation for the punishment unjustly imposed upon them because of the Law.  This includes compensation for each of Allen's works that was subject to Blackbeard's Law, as well as compensation for DNCR and North Carolina's unauthorized use of Allen's property.  Plaintiffs are also entitled to an order enjoining Defendants from using Allen's work without Plaintiffs' permission.

## COUNT VII
## Impairment of the Obligation of Contracts Under Article I, § 10 of the United States Constitution
### (*Against North Carolina and DNCR*)

209.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

210.    Article I, § 10 of the United States Constitution states, in relevant part: "No State shall ... pass any  ... Law impairing the Obligation of Contracts[.]"

211.    Blackbeard's Law impairs the Obligation of Contracts, including, in particular, the State's 2013 contract with Plaintiffs (the 2013 Settlement Agreement).  The Law expressly states that any "agreement, permit, or license," (i.e., any contract) that limits the use of covered works (including Plaintiffs' works) "shall be void and unenforceable."

212.    The State's litigation positions (described above) confirm that Blackbeard's Law "impairs" the 2013 Settlement Agreement, as described above.

36

213.    Plaintiffs are entitled to a full revocation of Blackbeard's Law and compensation for the harms Plaintiff suffered from the temporary abrogation of the 2013 Agreement, which includes compensation for Defendants' unauthorized use of Plaintiffs' work that purportedly was authorized by Blackbeard's Law. Plaintiffs are also entitled to an order requiring Defendants to honor the terms of the 2013 Agreement.

## COUNT VIII
## VIOLATION OF 42 U.S.C. § 1983
*(Defendants Schwarzer, Wilson, Carraway, Koonts, Kluttz, Cherry, Cochran, in their personal capacities)*

214.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

215.    Each of the individually named Defendants have, under color of law, deprived Plaintiffs of rights guaranteed by the United States Constitution.

216.    Defendants Koonts and Cherry are and were (respectively) responsible for managing North Carolina's archival records, including all of Allen's works that were deemed public records by Blackbeard's Law. Koonts and Cherry violated Plaintiffs' constitutional rights by effectuating a taking of Plaintiffs' property under Blackbeard's Law, in violation of the 5th and 14th amendments to the United States Constitution, and by implementing, promoting, and using an unlawful bill of attainder and ex post facto law, in violation of Article I, § 10 of the United States Constitution. Defendant Koonts' violation of Plaintiffs' rights is ongoing, and will continue unless specifically enjoined.

217.    Defendants Kluttz, Wilson, Claggett, Cochran, and Cherry were responsible for setting DNCR policy, and were personally responsible for DNCR's policies to take Plaintiffs' property and infringe Plaintiffs' copyrights. Each of these defendants personally participated in and contributed to the multi-faceted campaign to punish Allen, including through the passage of Blackbeard's Law. Each of these defendants also participated in the development, implementation, and administration of DNCR's policies after the passage of Blackbeard's Law, including the decision to resume infringing Allen's property and copyrights and to disregard the requirements of the 2013 Settlement Agreement. Kluttz, Wilson, Claggett, Cocrhan, and Cherry were thus personally responsible for the violation of Plaintiffs' rights under the 5th and 14th Amendments to the United States Constitution, as well as the Constitution's prohibition on bills of attainder and ex post facto laws. Defendant Wilson's violation of Plaintiffs' rights is ongoing, and will continue unless specifically enjoined.

218.    Each of the above-named Defendants are sophisticated actors, and each has access to legal counsel. The actions that gave rise to this claim were not made in the heat of the

moment or in the face of any exigent circumstances. Defendants knew or should have known that their actions were contrary to law and that the policies they created and administered would violate Plaintiffs' constitutional rights.

219.    Under 42 U.S.C. § 1983, Plaintiffs are entitled to entitled to compensation for constitutional violations. Plaintiffs are also entitled to an order enjoining Defendants Koonts and Wilson from taking Plaintiffs' property, infringing Plaintiffs' copyrights, or relying on any provision of Blackbeard's Law.

## COUNT IX
### Claim for Injunctive Relief Under *Ex Parte Young*
### *(Defendants North Carolina, DNCR)*

220.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

221.    Defendants have violated Plaintiffs' constitutional rights and continue to violate Plaintiffs' constitutional rights, as alleged in Counts III-VII of this Complaint. Defendants continue to operate under a policy through which DNCR and North Carolina expressly claim the right and ability to use Plaintiffs' copyrighted works for any purpose without permission or compensation. This policy is unconstitutional. Nevertheless, the policy will remain in place and in effect unless specifically enjoined.

222.    Under the Supreme Court decision in *Ex Parte Young*, 209 U.S. 123 (1908), Plaintiffs are entitled to assert a direct action under the Constitution to obtain injunctive relief for constitutional violations.

223.    Plaintiffs expressly seek an injunction that requires Defendants to cease all infringement of Plaintiffs' copyrighted works, to return all of Plaintiffs' property, and to cease their use, implementation, administration, and enforcement of Blackbeard's Law.

224.    Plaintiffs further seek an order enjoining Defendants' current policy regarding Plaintiffs' copyrights. Plaintiffs further seek an injunction requiring Defendants to

## COUNT X
### Claim for Declaratory Relief Under the Declaratory Judgments Act, 28 U.S.C. § 2201
### *(All Defendants)*

225.    Plaintiffs incorporate and reallege the foregoing paragraphs of this Complaint.

226.    Under the Declaratory Judgments Act, a party may seek declaratory relief in connection with any case of "actual controversy" that falls within the jurisdiction of federal courts.

227.    In view of the above constitutional and statutory causes of action, Plaintiffs seek a judicial declaration stating:

        a.  Defendants have engaged in widespread and willful infringement of Plaintiffs' copyrights.

        b.  Defendants have violated 17 U.S.C. § 1202 by removing or altering copyright management information from Plaintiffs' worls.

        c.  Defendants' have effectuated a taking of Plaintiffs' property without compensation or due process, in violation of the 5th and 14th Amendments to the United States Constitution.

        d.  Blackbeard's Law is unconstitutional, as it violates the 5th and 14th Amendments to the United States Constitution, as well as the Constitution's prohibition on bills of attainder, ex post facto laws, and laws impairing the obligations of contracts.

        e.  Federal courts have jurisdiction to resolve federal constitutional claims, and North Carolina cannot claim sovereign immunity with impunity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Frederick Allen and Nautilus Production LLC respectfully pray:

1.  That the actions of Defendants be declared to be in violation of the United States Constitution.

2.  That an injunction be issued restraining Attorney General Stein from enforcing Blackbeard's Law.

3.  That an injunction be issued against D. Reid Wilson enjoining him from relying on, using or enforcing Blackbeard's Law, including in connection with Plaintiffs' property.

4.  That an injunction be issued against Sarah Koonts enjoining her from relying on Blackbeard's Law or enforcing it to continue to take Plaintiffs' property, including by posting Plaintiffs' works on the Internet.

5.  That an injunction be issued against Joseph Schwarzer, as Director of the Maritime Museum Deputy Secretary, and Mike Carraway, as Exhibit Curator, from relying on Blackbeard's Law or enforcing it to continue to take Allen's property, and to further enjoin them from performing Allen's property at the Maritime Museum in Beaufort.

39

6. That Defendants be ordered to compensate Plaintiffs for the damages Plaintiffs have suffered as a result of Defendants' takings, including through the use of the damages provisions of the Copyright Act.

7. That Allen have and recover of the individual Defendants compensatory and punitive damages from the individual Defendants for violation of his rights under the United States Constitution, pursuant to 28 U.S.C § 1983.

8. That Allen recover his attorneys' fees under 28 U.S.C § 1988 and 17 U.S.C. § 505.

9. For such other relief as the Court finds just, equitable and proper.

Respectfully submitted this 8th day of February, 2023.

/s/ David McKenzie
**David McKenzie**
NC State Bar No. 36376
/s/ Susan Freya Olive
**Susan Freya Olive**
NC State Bar No. 7222
P.O. Box 2049
Durham, North Carolina 27702
Telephone: (919) 683-5514
Email: emailboxEDNC@oliveandolive.com

/s/ Adam Adler
**Adam Adler**
Reichman Jorgensen Lehman& Feldberg LLP
Member in good standing of the Bar of New York
(Bar No. 5470174), and appearing as EDNC LR
83.1 Counsel

40

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and complete copy of the foregoing document, together with any and all attachments thereto, has been electronically filed with the Clerk of Court using CM/ECF, which will provide notice to all Defendants through their counsel of record:

Olga E. Vysotskaya de Brito
Amar Majmundar
ovysotskaya@ncdoj.gov
amajmundar@ncdoj.gov
*Counsel for State Defendants*

on this the 8th day of February 2023.

/s/ David McKenzie
**David Loar McKenzie**