IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CV-00627-BO

FREDERICK L. ALLEN and NAUTILUS  )
PRODUCTIONS, LLC,  )
  )
      Plaintiffs,  )
  )
v.  )      O R D E R
  )
ROY A. COOPER, Governor of North  )
Carolina, *et al.*,  )
  )
      Defendants.  )

Before the Court is the second attempt of Frederick Allen and his company, Nautilus Productions, LLC, (collectively "Allen") to abrogate North Carolina's sovereign immunity. Allen's first attempt to sue the North Carolina, its Department of Natural and Cultural Resources, and various state officials (collectively, "North Carolina" or "the State") foundered when the Supreme Court held the Copyright Remedy Clarification Act of 1990 ("CRCA"). 17 U.S.C. § 501, *et seq.*, was an invalid prophylactic abrogation of state sovereign immunity under § 5 of the Fourteenth Amendment. Allen now asserts that two other theories of abrogation—as-applied abrogation under § 5 of the Fourteenth Amendment and the "self-executing" Fifth Amendment— allow this Court to hear his claims.

North Carolina disagrees. The State moves to strike much of Allen's Second Amended Complaint for exceeding this Court's order granting reconsideration and giving leave to amend. For the remaining claims, the State moves to dismiss, arguing that sovereign immunity precludes jurisdiction here because Allen cannot show a valid abrogation under either theory.

This Court agrees with the State on some issues and Allen on others. Much of the Second Amended Complaint goes far beyond the Court's instructions; and much of what remains is outside this Court's subject-matter jurisdiction, but not everything. The Court, therefore, grants in part and denies in part North Carolina's motions.

## BACKGROUND

By this stage in the proceedings, the story of this case has been told and retold.[1] Another extensive retelling is unnecessary; a primer on the key facts will suffice. Still, a thorough recounting of the procedural history—which is admittedly dense—is necessary to understand the dispute as it currently stands.

## I. The Origins of Allen's Copyrights

In 1996, Intersal, a marine salvager, discovered Blackbeard's flagship the *Queen Anne's Revenge* ("the *QAR*") in North Carolina's coastal waters near the Beaufort Inlet. Under North Carolina law, the *QAR* and its artifacts are state property. N.C. Gen. Stat. § 122-22. Intersal and the North Carolina Department of Natural and Cultural Resources ("DNCR" or "the Department") entered into a fifteen-year salvage agreement. That agreement gave Intersal, among other things, the exclusive right to make and market all commercial media of the salvage efforts. The agreement, however, contained exceptions for public records and non-commercial and educational uses. Intersal then retained Allen and his company, Nautilus Productions, LLC, to document the salvage efforts. Allen registered 13 copyrights with the U.S. Copyright Office, each copyright covering a year's worth of video and still images of the *QAR*'s preservation.

---

[1] For a more detailed account of the factual background *see Allen v. Cooper*, 244 F. Supp. 3d 525, 530–31 (E.D.N.C. 2017); *Allen v. Cooper*, 895 F.3d 337, 342–45 (4th Cir. 2018); *Allen v. Cooper*, 589 U.S. 248, 251–54 (2020); *Allen v. Cooper*, 555 F. Supp. 3d 226, 230–32 (E.D.N.C. 2021).

The relationship between Allen and the Department soured around 2013. At that time, Allen learned that the Department had uploaded copyrighted still images and video-footage to the internet without his consent. Allen, Intersal, and the Department reached a written settlement agreement resolving that dispute. Without admitting to any wrongdoing, the State and the Department compensated Allen for the alleged infringement. The agreement also clarified the parties' rights to the videos and photographs.[2]

Not long after the settlement agreement, Allen alleges the Department resumed its copyright infringement by publishing, performing, and displaying copyrighted videos and still images on the internet. To make matters worse for Allen, in 2015 the North Carolina General Assembly passed Session Law 2015-218. 2015 N.C. Sess. Laws 218, § 4(a). That law, codified as N.C. Gen. Stat. § 121-25(b)[3], amended a provision of North Carolina public records law, by adding the following language:

> (b) All photographs, video records, or other documentary materials of a derelict vessel or shipwreck or its contents, relics, artifacts, or historic materials in the custody of any agency of North Carolina government or its subdivisions shall be public records pursuant to G.S. 132-1. There shall be no limitation on the use of or no requirement to alter any such photograph, video recording, or other documentary material, and any such provision in any agreement, permit or license shall be void and unenforceable as a matter of public policy.

2015 N.C. Sess. Laws 218, § 4.(a).

---

[2] Intersal and the State are in protracted litigation over the Settlement Agreement in the North Carolina Business Court. *See Intersal, Inc. v. Wilson*, 2024 NCBC LEXIS 51, at *1 (N.C. Super. Ct. Mar. 15, 2024).

[3] On 1 July 2016, the General Assembly amended § 121-25(b) to remove the last sentence detailing the absence of limitations on the use of the documentary materials. The amended version read as follows:

> All photographs, video recordings, or other documentary materials of a derelict vessel or shipwreck or its contents, relics, artifacts, or historical materials, in the custody of any agency of North Carolina government or its subdivisions shall be a public record pursuant to Chapter 132 of the General Statutes.

2016 N.C. Sess. Laws 94, § 16.2.

## II.    Allen's First Attempt to Sue the State

On 1 December 2015, Allen commenced this action. He alleged the State, the Department, and various state officials, violated federal law—namely, the Takings Clause of the Fifth Amendment, Due Process Clause of the Fourteenth Amendment, the Copyright Act, and 42 U.S.C. § 1983—through direct copyright infringement and the passage of § 121-25(b). Allen sought declaratory relief that § 121-25(b) was void and unenforceable not only as preempted by the Copyright Act but also under the Fifth and Fourteenth Amendments. For the ongoing constitutional violations, Allen sought injunctive relief under *Ex Parte Young*, 209 U.S. 213 (1908). In addition to these federal claims, Allen asserted claims under North Carolina law.

The State moved to dismiss Allen's amended complaint, arguing, among other things, that the CRCA was an invalid abrogation of state sovereign immunity under § 5 of the Fourteenth Amendment. On 23 March 2017, this Court denied in part and granted in part Defendants' motion to dismiss. *Allen*, 244 F. Supp. 3d at 546. Because this Court concluded that the CRCA abrogated North Carolina's sovereign immunity, it allowed plaintiffs' claims for copyright infringement and injunctive and declaratory relief to proceed. *Id.* at 535, 544.

Not all of Allen's claims survived. The Court granted the State's motion to dismiss Allen's § 1983 claims for unconstitutional takings and violations of due process as well as Allen's state-law claims because of the State's sovereign immunity. *Id.* at 540. The Court dismissed Allen's § 1983 claims on sovereign immunity grounds per the Fourth Circuit's decision in *Hutto v. South Carolina Retirement System*, 773 F.3d 526 (4th Cir. 2014), which held that state sovereign immunity bars taking claims in federal court when those claims can be brought in state court. *Allen*, 244 F. Supp. 3d at 540.

Because this Court did not dismiss all of Allen's claims on immunity grounds, North Carolina filed an interlocutory appeal. Regarding the CRCA's abrogation of sovereign immunity

under § 5 of the Fourteenth Amendment, the Fourth Circuit concluded that the CRCA satisfied neither element required for a valid abrogation. *Allen*, 895 F.3d at 348–54. The Circuit then took up (for the first time) Allen's claims for declaratory and injunctive relief for ongoing constitutional violations under *Ex Parte Young*. 895 F.3d at 354–55. It rejected that request on the grounds that Allen had failed to plausibly allege ongoing constitutional violations, citing the concession made by Allen's counsel at oral argument that ongoing infringements had stopped. *Id.* at 354. The Fourth Circuit also rejected prospective relief under *Ex Parte Young* against § 121-25(b) because of the lack of a meaningful relationship between that statute and the state officials Allen sought to enjoin. *Id.* at 355. Finally, the Fourth Circuit held that the state officials sued in their individual capacities were entitled to qualified and legislative immunity. *Id.* at 356–58.

Although the Fourth Circuit entered judgment on 10 July 2018, that judgment did not take effect until 17 August 2019 because the mandate was stayed under Federal Rule of Appellate Procedure 41(a)(1) pending a ruling on the petition for rehearing en banc, which was ultimately denied. [DE 88, 89, 91]. On remand, this Court lifted its stay and dismissed Allen's claims against the State, the Department, and the public officials in their official capacity without prejudice; the remaining claims against the public officials in their individual capacities were dismissed with prejudice. [DE 92].

Because the Fourth Circuit held provisions of the CRCA invalid, the Supreme Court granted certiorari. *Allen*, 598 U.S. at 254. On the contested issue—whether in enacting the CRCA Congress had validly exercised its constitutional authority to abrogate state sovereign immunity—the Court first rejected Allen's arguments that constitutional authorization could be found in Congress's power under Article I, Section 8, Clause 8. *Id.* at 256–260. The Court then concluded

the CRCA was an invalid prophylactic abrogation under § 5 of the Fourteenth Amendment. *Id.* at 260–66.

### III. Intervening Developments Prompt Allen's Motion for Reconsideration.

While this case worked its way through the higher courts, the Supreme Court decided *Knick v. Township of Scott*, 588 U.S. 180 (2019), a decision with considerable implications for the substantive requirements of Fifth Amendment takings claims in federal court. *Knick*'s most pronounced impact is that overruled *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985). *Williamson County* held that "if a state provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Takings Clause until it has used the procedure and been denied just compensation." *Id.* at 195. "*Williamson County*'s state-litigation rule . . . created some real anomalies," Chief Justice Rehnquist noted later, because it, combined with preclusion doctrines, effectively "ensur[ed] that litigants who [went] to state court to seek compensation [were] likely. . . unable later to assert their federal takings claims in federal court." *San Remo Hotel, L.P. v. City and County of San Francisco*, 545 U.S. 323, 351 (2005) (Rehnquist, C.J., concurring in the judgment). Ultimately, the Court jettisoned *Williamson County* in *Knick* because the "state-litigation requirement relegate[d] the Takings clause to the status of a poor relation among the provisions of the Bill of Rights." *Knick*, 588 U.S. at 189 (quotation marks omitted). The Court explained that "a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it." *Id.* Thus, the moment a government takes without payment, the government violates the Fifth Amendment, which—because it is "self-executing" as to compensation—gives the plaintiff the ability to bring a federal suit without exhausting state remedies. *Id.* at 194.

Seizing on *Knick,* Allen filed a motion for reconsideration. [DE 105]. Allen asked this Court to reconsider its dismissal of Count III of his Amended Complaint, which claimed Defendants acted "under color of state law to pass N.C. Gen. Stat. § 121-25(b) and to threaten Plaintiffs . . . with enforcement thereof." [DE 12 ¶ 76]. Count III elaborated that § 121-25(b) was not only an unconstitutional taking in violation of the Fifth Amendment itself, but also Defendants enforced it in disregard to Plaintiff's rights to notice and an opportunity to be heard under the Due Process Clause. *Id.* Additionally, Allen asked the Court to allow his Copyright Act and constitutional claims to proceed under the case-by-case abrogation framework set forth in *United States v. Georgia*, 546 U.S. 151 (2006).

On 18 August 2021, the Court granted Allen's motion for reconsideration. While the Court was aware that sovereign immunity was not at issue in *Knick, Knick*'s discussion of the Fifth Amendment's substantive requirements persuaded this Court that *Hutto*'s holding was fatally undermined. *Allen*, 555 F. Supp. 3d at 239–40. Specifically, the Court was persuaded that *Hutto* had been implicitly overturned by three aspects of *Knick*. First, *Knick*'s recognition that the Fifth Amendment right to just compensation arises at the time of the taking and is not susceptible to qualification by state remedies; second, its dismantling of *Williamson County*'s preclusion trap signaled that the similar trap created by *Hutto* was likewise constitutionally improper; and third, Hutto's delegation of responsibility to state courts for federal takings litigation was contrary to the fundamental promise of the Fourteenth Amendment. *Id.* at 235–37.

On Allen's second ground for reconsideration, the Court concluded that Allen could proceed on his copyright infringement and constitutional claims under *Georgia*'s as-applied framework. *Id.* at 242–43. Allen's first attempt to sue the State focused on the CRCA as prophylactic abrogation. This Court, the Fourth Circuit, and the Supreme Court viewed Allen's

claims only through that lens. What's more, counsel for the State acknowledged the theoretical viability of a *Georgia* claim during oral argument before the Supreme Court. Additionally, the CRCA remains available to abrogate state sovereign immunity provided a plaintiff can show a constitutional violation as well as a violation of the Copyright Act.

Finally, the Court granted Allen leave to file an amended complaint to allege additional facts, buttressing their allegation of intentional infringements, unconstitutional takings, and that those taking were without due process of law. *Id.* at 243.

Allen's second amended complaint did not manifest for some time because of motions and appeals. On 03 September 2021, the State moved this Court to reconsider its order granting Allen's motion for reconsideration, arguing that the Fourth Circuit's post-*Knick* decision in *Zito v. North Carolina Coastal Resources Commission*, 8 F.4th 281 (4th Cir. 2021), reaffirmed *Hutto*'s holding that sovereign immunity bars a direct taking claim in federal court when a state's courts remain open to such claims. [DE 119, 120]. Before this Court could rule on that motion, however, the State filed an interlocutory appeal of the Court's 18 August Order on reconsideration. [DE 122]. The Court then granted a consent motion to stay proceedings pending a final determination of the State's interlocutory appeal. [DE 126]. On 14 October 2022, the Fourth Circuit granted Allen's motion to dismiss the interlocutory appeal for lack of jurisdiction with the mandate effecting the judgment on 7 November 2022. *See* [DE 128, 129, 130].

In January 2023, this Court issued an order following a conference that accomplished three case-management goals. [DE 133]. First, the Court lifted the stay; second, the Court ordered Allen to file their amended complaint within 21 days "[i]n accordance with the Court's August 18, 2021, order"; and third, the Court denied the State's motion to reconsider, [DE 119], without prejudice

as premature, allowing the State to renew its arguments in a response to the second amended complaint.

## IV.  Allen's Second Amended Complaint

On 8 February 2023, Allen filed his Second Amended Complaint, naming as defendants North Carolina, the Department, the Governor, the Attorney General, and seven Department officials. [DE 134]. Of the individual defendants, Allen sued only the Governor and Attorney General in their official capacity; the rest Allen sued in both their official and individual capacities. The Second Amended Complaint contains ten counts alleging violations under a wide range of federal statutes and constitutional provisions:

- **Count I.** North Carolina, the DNCR, and the individual defendants, in their official capacities, willfully infringed on Allen's copyrights by using his works without permission in violation of 17 U.S.C. §§ 106 and 501. [DE 134 ¶¶ 140–150].

- **Count II**. North Carolina, the DNCR and the individual defendant, in their official capacities, altered or removed copyright management information, violating 17 U.S.C. § 1202. [DE 134 ¶¶ 151–158].

- **Count III.** North Carolina and the DNCR violated the Fifth and Fourteenth Amendments, directly and through the Copyright Act, when they infringed on Allen's copyrights and took possession of physical media, effecting a takings. Allen claims those takings, occurred without notice or an opportunity to be heard, violating due process. [DE 134 ¶¶ 159–173].

- **Count IV**. North Carolina and the DNCR violated the Fifth and Fourteenth Amendments, directly and through the Copyright Act, by enacting § 121-125(b), which effected a taking by eliminating Allen's right to exclude others from using his work by placing that work in the public domain without due process. [DE 134 ¶¶ 174–188].

- **Count V**. North Carolina and the DNCR violated the Bill of Attainder Clause of Article I, Section 10, Clause 1 of the Constitution through the passage of § 121-125(b). [DE 134 ¶¶ 189–201].

- **Count VI**. North Carolina and the DNCR violated the Ex Post Facto Clause of Article I, Section 10, Clause 1 of the Constitution through the passage of § 121-125(b). [DE 134 ¶¶ 202–208].

9

- **Count** VII. North Carolina and the DNCR violated the Contracts Clause of Art. I, Section 10, Clause 1 of the Constitution by passing 121-125(b), which unlawfully impairs the obligations set forth in the 2013 settlement agreement. [DE 134 ¶¶ 209–213].

- **Count VIII**. Seven Department Officials violated 42 U.S.C. § 1983 by unconstitutionally effecting a taking his copyrights through the passage of § 121-25(b) and promoting, implementing, and administering the DNCR's policy to infringe on his copyright works and disregard the 2013 settlement agreement. [DE 134 ¶¶ 214–219].

- **Count IX**. Allen requests injunctive relief against ongoing constitutional violations under *Ex Parte Young.* [DE 134 ¶¶ 220–224].

- **Count X**. Allen requests declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §2201. [DE 134 ¶¶ 225–227].

The State challenges the Second Amended Complaint through several Rule 12 motions. It moves to strike the Second Amended Complaint, contending that almost all of the counts in the Second Amended Complaint exceed the scope of the Court's order on reconsideration. [DE 144]. Next the State moves to dismiss what remains of the Second Amended Complaint under Rule 12(b)(1) for the lack of subject-matter jurisdiction and under Rule 12(b)(6) for failure to state a claim for relief. [DE 146]. As to the Motion to Strike, Allen responds the Court imposed no limitations on his ability amend the complaint. [DE 153]. As to the Motion to Dismiss, Allen responds that he has adequately alleged claims that abrogate North Carolina's sovereign immunity. [DE 153].

While the parties briefed these motions, the North Carolina General Assembly enacted Session Law 2023-70. That law amended § 121-25 by removing subsection (b) entirely, erasing all reference to documentary photographs, recordings, or other materials in the custody of the State or its subdivisions. 2023 N.C. Sess. Law. 70, § 11. Deleting § 121-25(b) reverberated immediately in these proceedings. Two days after Session Law 2023-70 was enacted, the State filed its reply

brief, raising new arguments. [DE 155]. Allen moved for leave to file a surreply. [DE 157]. The Court held a hearing on the State's motions on 25 August 2023. [DE 164]. At the hearing, the State stated that it does not oppose Allen's surreply.[4]

While the State's Rule 12 motions were under consideration, the Court, on its own motion, stayed the case in anticipation of a decision of the Supreme Court in *DeVillier v. Texas*, 601 U.S. 285 (2024). [DE 165]. The question presented in *Devillier* was whether a "property owner may sue for just compensation directly under the Takings Clause," which in turn is a question of "the procedural vehicle by which a property owner may seek to vindicate [his irrevocable] right" to just compensation. *Id.* at 289. The Court, however, left those questions for another case because "a state-law inverse-condemnation cause of action provides a vehicle" for the property owner's takings claims. *Id.* at 292, 294. Considering the range of potential outcomes for Allen's claims, *DeVillier* provided more of a restatement on the current state of the Takings Clause than a paradigm shift. Accordingly, the Court lifted the stay in a separate order filed contemporaneous with this order. All matters have been fully briefed and are ripe for decision.

## DISCUSSION

Throughout this case, the State's efforts to dismiss this case on sovereign immunity grounds has attracted the most attention. So too here. Before taking up sovereign immunity, however, the Court must address and resolve several preliminary matters: first, the State's Motion to Strike Allen's Second Amended Complaint for non-compliance with the Federal Rules of Civil Procedure, the Local Civil Rules, and this Court's order on the Motion for Reconsideration; second, Allen's argument in response that the second-filed Motion to Dismiss should be denied as procedurally improper for the State's failure to consolidate with its Motion to Strike.

---

[4] With no objection from the Defendants, the Court will grant the Motion.

## I. Motion to Strike

Under Federal Rule of Civil Procedure 12(f), the Court—under its own motion or on motion made by a party—may strike "from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P 12(f). Beyond the limits of Rule 12 are the district court's "inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of case." *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017); *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 150 (4th Cir. 2009) (concluding "district court acted well within its discretion" when it struck filing for noncompliance with local rule). Although Rule 12(f) motions to strike are generally disfavored, *Waste Mgmt. Holdings v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001), the decision to strike is committed to the discretion of the district court. *See United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 324 (4th Cir. 2018).

Courts routinely strike parts of amended complaints—including claims, parties, and legal theories—when the offending parts exceed the scope of the court's order granting leave to amend. *See*, *e.g.*, *Gerritsen v. Warner Bros. Entm't*, 116 F. Supp. 3d 1104, 1125 (C.D. Cal. 2015); *Patterson v. HG Ohio Emp. Holding Corp.*, 2024 U.S. Dist. LEXIS 892557, 2024 WL 2022088, at *2–4 (N.D. Ohio May 7, 2024); *Harris v. Louisiana*, 2024 U.S. Dist. LEXIS 76858, 2024 WL 1834370, at *2–3 (M.D. La. Apr. 26, 2024); *Nollen v. Fairshare Vacation Owners Ass'n*, 2021 U.S. Dist. LEXIS 138031, 2021 WL 3036371, at *3 (M.D. Fla. Apr. 9, 2021), *aff'd*, 2023 U.S. App. LEXIS 23181, 2023 WL 5622595 (11th Cir. Aug. 31, 2023); *Clements v. Austin*, 2022 U.S. Dist. LEXIS 152239, 2022 WL 3593621, at *1 (D.S.C. Aug. 19, 2022); *Whitehead v. Mgmt. & Training Corp.*, 2020 U.S. Dist. LEXIS 39297, 2020 WL 1078739, at *3 (D.N.M. Mar. 6, 2020); *Desouza v. Office of Children & Family Servs.*, 2019 U.S. Dist. LEXIS 99009, 2019 WL 2477796, at *5–6 (E.D.N.Y June 12, 2019).

When granting Allen's Motion for Reconsideration, the Court was clear in its instructions. Only certain claims were no longer dismissed. And the Court permitted Allen to file an amended complaint to allow him to allege additional facts in support of those claims. Plaintiffs are under the impression that "the Court did not impose any limitations when it granted [their] request to amend the complaint." [DE 153 at 7]. Not so. Allen is limited not only by the Court's order granting reconsideration but also the contours of his motion to reconsider. Allen moved to reconsider only Count III, which alleged a § 1983 claim a taking in violation of the Fifth Amendment and a related denial of procedural due process. Regarding the direct takings claim, the Court reconsidered its dismissal because it was persuaded that the Supreme Court's decision in *Knick* amounted to an intervening change in law. As to Allen's *Georgia* claim, the Court viewed it appropriate to consider case-by-case abrogation under the CRCA "[b]ecause this Court, the Fourth Circuit, and the Supreme Court all passed on the *Georgia* issue." 555 F. Supp. 3d at 242. Allen's direct takings claim and his *Georgia* claims are the only claims properly before this Court. And in the 18 January 2023 order lifting the stay, the Court reiterated that the amendment should be filed in accordance with its order granting reconsideration. [DE 133].

Allen maintains that striking certain claims would be improper because those claims are inextricably linked to the claims he is allowed to bring. The Court finds this concern warranted with respect to Allen's claim for copyright infringement in Count I of the Second Amended Complaint. To state a *Georgia* claim, a plaintiff must show that the same conduct that violates a federal statute that provides for damages against a State also works a constitutional violation. *Georgia*, 546 U.S. at 158–59. Allen claims that the Department's infringement on his copyrights resulted in a taking of his intellectual property and those infringement were deprivations without due process of law. The claims are linked inextricably. Striking Count I would frustrate Allen's

ability to proceed on the claims this Court has expressly permitted. Accordingly, the Court strikes Counts II, VI, and VIII–X from the Second Amended Complaint.[5] Allen may proceed on Counts I, III, and IV.

In addition to striking claims for exceeding this Court's orders, the State argues the Court should also strike allegations in the Second Amended Complaint the State deems immaterial, impertinent, scandalous, or otherwise irrelevant.[6] Having reviewed those allegations and the parties' submissions, the Court concludes that allegations do not rise to the level of "redundant, immaterial, impertinent, or scandalous" that clear Rule 12(f)'s high threshold for motions to strike.

Relatedly, Allen contends this Court should deny Defendants' Motion to Dismiss as an improper successive motion under the consolidation requirement set forth in Federal Rule of Civil Procedure 12(g).

Rule 12(g)(2) precludes a party from raising some defenses or objections in a subsequent motion if those defenses were available but not included in an earlier Rule 12 motion. That Rule, however, exempts the defenses of failure to state a claim for relief and lack of subject-matter jurisdiction. The former may be asserted in a subsequent responsive pleading, a motion for judgment on the pleadings, or at trial. Fed. R. Civ. P. 12(h)(2). The latter may be raised at any time. Fed. R. Civ. P. 12(h)(3).

To be sure, Defendants should have followed Rule 12 to the letter and filed one motion that joined all available defenses. But the second-filed motion is not as bad as Allen claims. For

---

[5] Defendants point to Allen's failure to follow Local Civil Rule 15.1 as an additional justification for striking the second amended complaint. That Rule, like all Local Civil Rules, is subject to the discretion of the presiding judge. *See* Local Civil Rule 1.1. The order granting the motion for reconsideration gave Plaintiffs leave to amend their complaint to add additional allegations, permitting them to deviate from the requirements of Rule 15.1.

[6] Specifically, Defendants move the Court to strike paragraphs 1, 4, 14, 47–52, 81, 83, 96, 100, 102, 114, and 175 in their entirety and paragraphs 10, 53, 82, 90, 117, 193, and 217 in part. [DE 145 at 14].

starters, the core of the State's motion challenges Court's subject-matter jurisdiction because of state sovereign immunity. As such, that challenge may be brought at any time. So the offending portions are essentially those sections where Defendants move to dismiss under Rule 12(b)(6) for failure to state a claim. But as with the subject-matter jurisdiction, the defense of failure to state a claim is not easily brushed aside. Rule 12(h)(2), for example, allows that defense to be raised on a motion for judgment on the pleadings, which would use the same standard. *See Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013).

Stepping back provides valuable perspective. Allen seeks to dismiss as improperly, successively filed a Rule 12 motion containing one defense that can be brought at any time and another that could be brought in a subsequent motion that would be evaluated under the same standard. Acceding to Allen's request would merely delay the inevitable. The Rules of Civil Procedure facilitate the "just, speedy, and inexpensive determination of every action and proceeding[]" and are to be construed accordingly. Fed. R. Civ. P. 1. To deny the second-filed motion would invert procedure from its subordinate role and frustrate these goals. The Court, therefore, rejects Allen's procedural opposition to the State's Motion to Dismiss.

## II. Motion to Dismiss

Now on to the central issue: Does this Court lack subject-matter jurisdiction? Or, to put it differently, Has Allen shown that North Carolina' sovereign immunity has been abrogated? In this section, the Court answers both. To that end, Court will first discuss background principles of sovereign immunity relevant to Allen's theories of abrogation. The Court will then turn to Allen's theories that (1) the takings clause is self-executing and abrogates sovereign immunity by its own force and (2) that as-applied abrogation under *Georgia* is permissible here.

15

### A. Legal Standards

#### 1. Rule 12(b)(1)

A Rule 12(b)(1) motion challenges the Court's subject-matter jurisdiction. "A defendant may challenge subject-matter jurisdiction in one of two ways: facially or factually" *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). A facial challenge occurs when a defendant argues that the complaint fails to allege facts sufficient to establish subject-matter jurisdiction. *Id.* A factual challenge occurs when a defendant argues that the allegations of jurisdiction in the complaint are not true. *Id.* A plaintiff's procedural protections vary depending on the type of jurisdictional challenge. With a facial challenge, the plaintiff is given the same protections as a Rule 12(b)(6) motion. *Id.* On the other hand, a factual challenge goes beyond the allegations in the complaint. As a result, the district court may decide disputed issues of fact relating to subject-matter jurisdiction. *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019). To that end, "the court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* (quoting *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004)).

Under Rule 12(b)(1), the Plaintiff typically has the burden of establishing, by a preponderance of evidence, subject-matter jurisdiction. *Demetres v. East West Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, (4th Cir. 1999) Because state sovereign immunity—unlike other limits on Article III jurisdiction—may be waived, the burden of establishing sovereign immunity is placed on the party asserting it. *Hutto*, 774 F.3d at 543; *Zito*, 8 F.4th at 284. Once a defendant has shown its entitled to sovereign immunity, the burden of proving abrogation or waiver falls to the plaintiff. *See Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019); *Allen*, 895 F.3d at 355 (discussing burden to show *Ex parte Young* exception); *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005) (noting

"[p]laintiff's burden to show that an unequivocal waiver of sovereign immunity exists"); *Cf. Blanco Ayala v. United States*, 982 F.3d 209, 214 (4th Cir. 2020) (noting plaintiff's burden to establish that exception to FTCA's immunity waiver does not apply).

### 2. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint may be dismissed for failure to state a claim upon which relief may be granted. This tests the complaint's legal and factual sufficiency. The focus is on the pleading requirements under the Federal Rules not the proof needed to succeed on a claim. "Federal Rules of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and grounds upon which it rests." *Bell Atl Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard does not require detailed factual allegations. *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019). But it "demands more than unadorned, the-defendant-unlawfully-harmed-me accusation." *Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). For a claim to be plausible, its factual content must allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Although the court accepts the factual allegations as true, the court does not accept the complaint's legal conclusions, so "simply reciting the cause of actions' elements and supporting them by conclusory statements does not meet the required standard." *ACA Fin. Guar. Corp.*, 917 F.3d at 212.

**B.    State sovereign immunity principles**

State immunity from suit is a structural component of our constitutional design. Before ratification, immunity from suit was a core aspect of the States' status as sovereign entities. *Alden v. Maine*, 527 U.S. 706, 713 (1999). Ratifying the Constitution created our federal system—"a system of dual sovereignty between the state and federal government," *Gregory v. Ashcroft,* 501 U.S. 452, 457 (1991). The States entered that system with their sovereignty, and their sovereign immunity, largely intact. *See Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779 (1991); *see also Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580, 597 ("The Constitution forged a Union, but it also protected the sovereign prerogatives of States within our government.").

The Courts of the United States must respect the fundamental aspects of the States' sovereignty. "The principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011) ("sovereign immunity principles enforce an important constitutional limitation on the power of the federal courts."). For a short moment in the Early Republic, it was thought that such limitations didn't apply to suits against the states by citizens of another state. *See Chisholm v. Georgia*, 2 U.S. 419, 2 Dall. 419 (1793). It is generally understood that the Eleventh Amendment—which "stands not so much for what it says but the presupposition of our constitutional structure which it confirms," *Blatchford*, 501 U.S. at 770—corrected this misunderstanding.[7] *See also Va. Off. for Prot. & Advoc. v. Stewart*,

---

[7] The text of the Eleventh Amendment "appear[s] to restrict only the Article III diversity jurisdiction of the federal courts, *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996). But "[the Supreme Court's] decision in *Hans v. Louisiana*, 134 U.S. 1 (1890), clarified that States retain their immunity from suit regardless of the citizenship of the plaintiff." *PennEast Pipeline Co., LLC v. New Jersey*, 594 U.S. 482, 499 (2021). The undersigned has discussed at-length both the text of the Eleventh Amendment and why *Hans* was poorly reasoned and wrongly decided. *See Allen*, 244 F. Supp. 3d at 535–40 ; *Allen*, 555 F. Supp. 3d at 238; *see also Richard Anderson Photography v Brown*, 852 F.2d 114, 124–25 (4th Cir. 1988) (Boyle, D.J., concurring in part and dissenting in part). In the words of Justice Breyer, who shared the view that the

563 U.S. 247, 253 (2011) (commenting that the Supreme Court "[has] understood the Eleventh Amendment to confirm the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant"). Now, state sovereign immunity generally prevents suits against nonconsenting states in federal and state forums.

Yet state sovereign immunity is not absolute. The first limits are those the States impose on themselves. "[A] State's sovereign immunity is a personal privilege which it may waive at pleasure." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 675 (1999) (quotation omitted). "A state may of course consent to suit, although such consent must be unequivocally expressed." *PennEast*, 594 U.S. at 500 (quotations omitted). There are also "certain waivers of sovereign immunity to which all states implicitly consented at the founding." *PennEast*, 594 U.S. at 500. These "plan of the Convention waivers" spring from the structure of the Constitution. "Actions do not offend state sovereignty if the States consented to them at the founding." *Torres*, 597 U.S. at 587 (cleaned up) (quotations omitted). But plan of the Convention waivers are few and far between.[8]

The next limits come from Congress's power to abrogate the States' sovereign immunity through § 5 of the Fourteenth Amendment. '[T]he Fourteenth Amendment, by expanding federal power, at the expense of state autonomy, . . . fundamentally altered the balance of state and federal

_____

sovereign-immunity precedents were amiss, the undersigned "recogniz[es] that my longstanding view has not carried the day." *Allen*, 589 U.S. at 248 (Breyer, J., concurring).

[8] In *Allen*, the Supreme Court described the plan of the Convention waiver of sovereign immunity under the Bankruptcy Clause recognized in *Central Va. Community College v. Katz*, 546 U.S. 356, 359 (2006), as "a good-for-one-clause-only holding." 589 U.S. at 259. Yet not long after, the Court recognized additional plan of the convention waivers in two cases. *PennEast*, 594 U.S. at 500–02 (concluding that a private party's action under federal eminent domain power "falls comfortably within the class of suits to which State consented under the plan of the Convention); *Torres*, 587 U.S. at 594 (holding that under "the plan of the Convention, the States waived their immunity under Congress' Article I power 'to raise and support armies' and 'provide and maintain a Navy.' " (cleaned up)).

power struck by the Constitution." *Seminole Tribe*, 517 U.S. at 59. Section 5 of the Fourteenth Amendment thus authorizes Congress to "provide for suits against state or state officials that are Constitutionally impermissible in other contexts." *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Section 5, however, does not provide an unlimited power to abrogate.

When exercising its § 5 power to abrogate the States' sovereign immunity, Congress can take two paths. The first path is prophylactic abrogation, which occurs when Congress legislates broadly to deter or remedy constitutional violations even if in the process its remedial statute prohibits constitutional conduct. *Allen*, 589 U.S. at 260. Still, prophylactic abrogation is limited. The abrogation "must sufficiently connect[] to conduct courts have held Section 1 to proscribe." *Id.* This comes down to "a means-end test." *Id.* at 261. "There must be a congruence and proportionality between the injury to prevented or remedied and the means adopted to that end." *Fla. Prepaid*, 527 U.S. at 639 (quoting *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)). In other words, the abrogation must strike the proper balance between constitutional wrong and statutory remedy. Where the scope of the remedial or preventative statute exceeds the constitutional authorization, Congress goes beyond its authority under § 5 of the Fourteenth Amendment, and the statute is an invalid for that purpose.

The second path, seldom traveled, is case-by-case (or as-applied) abrogation. Case-by-case abrogation arises from the unassailable statement that "§ 5 [of the Fourteenth Amendment] grants Congress the power to 'enforce . . . the provisions' of the Amendment by creating private remedies against the states for *actual* violations of those provisions." *Georgia*, 546 U.S. at 158. When Congress provides "a private cause of action for damages against the State for conduct that actually violates the Fourteenth Amendment," *Id.* at 159, the court "consider[s] only whether [a] claim

alleges conduct that, if it occurred and wasn't justified by a valid defense, would have violated the Fourteenth Amendment," *Alaska v. EEOC*, 564 F.3d 1062, 1068 (9th Cir. 2009)

Compared to its more aggressive and well-known sibling, as-applied abrogation ducks the risk of Congress regulating beyond its underlying constitutional authorization. A claim that meets *Georgia*'s test will always be within the bounds of Section 5 of the Fourteenth Amendment because of the symmetry between the statutory remedy and constitutional harm. Put differently, a private cause of action for damages against the State for conduct that actually violates the Fourteenth Amendment will be, by itself, perfectly congruent and perfectly proportional. *See* Ernest A. Young, *State Sovereign Immunity After the Revolution*, 102 Tex. L. Rev. 697, 759 (2024). *Cf. Alaska v. EEOC*, 564 F.3d at 1068 (stating that "congruence and proportionality requirement applies only to prophylactic legislation; it doesn't apply to a direct remedy for unconstitutional conduct").

C.     **Allen's first theory: abrogation under the "self-executing" Fifth Amendment**

Allen's alleges that this Court may hear his Fifth Amendment takings claims against the state because the "self-executing nature" of the Fifth Amendment directly abrogates state sovereign immunity. As discussed, Allen's argument rests on the theory that the Supreme Court's decision in *Knick* altered the sovereign-immunity framework.

But In *Zito v. North Carolina Coastal Resources Commission*, the Fourth Circuit held that *Knick*'s discussion of the self-executing nature of the Fifth Amendment did not alter the sovereign immunity framework. 8 F.3d at 286–88. Pre-*Knick* decisions such as *Hutto*—which held that "the Eleventh Amendment bars the Fifth Amendment takings claims against States in federal courts where the States Court remain open to adjudicating such claims," *Hutto*, 773 F.3d at 552—are undisturbed. The Fourth Circuit said it succinctly: "*Knick* did not undermine *Hutto*." *Zito*, 8 F.3d

at 288. Actions under the Takings Clause are subject to the same limits as other constitutional rights—including state sovereign immunity. *Id.*

Allen contends that *Zito* was wrongly decided and maintains that *Knick* fatally undermined *Hutto*. This Court "cannot for even a moment entertain" Allen's argument. *United States v. Pate*, 754 F.3d 550, 554 (8th Cir. 2014). Fourth Circuit precedent binds this Court and the parties alike. *See Carrera v. E.M.D. Sales Inc.*, 75 F.4th 345, 352 (4th Cir. 2023). *Hutto* and *Zito* are circuit precedent. Neither are susceptible to being second-guessed much less overruled here. *See Allen*, 244 F. Supp. 3d at 540 ("[T]his Court is constrained[] [by] the absolute hierarchical system of courts in the federal judiciary."). That task is for the Fourth Circuit sitting en banc or for the Supreme Court. *Taylor v. Grubbs*, 930 F.3d 611, 619 (4th Cir. 2019); *Warfaa v. Ali*, 811 F.3d 653, 661 (4th Cir. 2016); *United States v. Collins*, 415 F.3d 304, 311 (4th Cir. 2005). Thus, the Court will perform its duty and apply the rules set forth in *Hutto* and *Zito* to the extent they are applicable here.

Changing tacks and working within the confines of those decisions, Allen argues *Hutto* and *Zito* do not apply because the reasoning underlying those decisions is inapposite when federally created property interests are involved. *Hutto*'s holding, he contends, is premised on the assumption "that states have a sovereign interest in resolving disputes over state-based property rights." [DE 153 at 12].

The Court does not share that reading of *Hutto*. To be sure, *Hutto* involved property interests created by state law. *See Hutto*, 773 F.3d at 540–41 (describing Fifth Amendment claims arising from state pension benefits). But the underlying law creating the property interest did not play a meaningful much less decisive role in the outcome. Instead, *Hutto*'s reasoning is premised on the nature of constitutional remedies. The *Hutto* court analogized from *Reich v. Collins*, 513

U.S. 106 (1995), which involved state sovereign immunity and the remedies under the Due Process clause. Just as in *Reich*, where the Supreme Court noted that the Due Process Clause did not abrogate state sovereign immunity in federal court when state courts remain open for those claims, so too did *Hutto* conclude that state sovereign immunity bars "Fifth Amendment takings claims against States *in federal court* when the *State's courts* remain open to adjudicate such claims," *Hutto*, 773 F.3d at 552; *Reich*, 513 U.S. at 109.

Worse, Allen's property-rights argument does not square with key sovereign-immunity principles. Put any theory of abrogation under the Fifth or Fourteenth Amendment to the side and consider copyrights only as property. The Constitution doesn't create property interests. *Webb's Fabolous Pharmacies v. Beckwith*, 449 U.S. 155, 161 (1980). Instead, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source." *Board of Regent of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). A copyright is a property interest created by Congress exercising its authority under Article I, Section 8, Clause 8 of the Constitution. *See Ladd v. Law & Tech. Press*, 762 F.2d 809, 812 (9th Cir. 1985). Authority incapable of abrogating state sovereign immunity. *Allen*, 589 U.S. at 1001–02 ("[T]he power 'to secur[e] an intellectual property owner's exclusive [r]ight[s]' under Article I stops when it runs into sovereign immunity." (quoting Art. I, § 8, cl.8)); *Fla. Prepaid*, 527 U.S. at 636. What's more, whatever limitations the Due Process and Just Compensation Clauses impose on state sovereign immunity, those limitations "arise from the Constitution itself" which means they do not "speak to the power of Congress to subject States to suits in [federal] courts." *See Alden*, 527 U.S. at 740 (discussing *Reich*'s limits). Accordingly, were this Court to accept Allen's theory— i.e., let the provenance of the property interests drive the analysis—it would let rejected theories of abrogation in through the backdoor.

Because *Hutto* remains valid, binding precedent, North Carolina's sovereign immunity bars this Court from hearing Allen's direct Fifth Amendment claims unless Allen can show that North Carolina courts do not offer a " 'reasonable, certain, and adequate' means for challenging an action as a taking and obtaining compensation if the challenge is successful." *Zito*, 8 F.4th at 288 (quoting *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 213 (4th Cir. 2019)). At bottom, this ask if there a recognized cause of action available in state court. *See, e.g.*, *Gerlach v. Rokita*, 95 F.4th 493, 499 (7th Cir. 2024); *74 Pinehurst LLC v. New York*, 59 F.4th 557, 570 n.7 (2d Cir. 2023); *EEE Minerals, LLC v. North Dakota*, 81 F.4th 809, 816; *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 734 –35 (6th Cir. 2022); *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1213–14 (10th Cir. 2019).

North Carolina law provides Allen a cause of action to pursue a claim for just compensation in state court. Although the North Carolina Constitution does not have a lockstep provision for the Fifth Amendment, Article I, Section 19 of the North Carolina Constitution protects against takings of private property without compensation. *Kirby v. N.C. Dep't of Transp.*, 368 N.C. 847, 853, 786 S.E.2d 919, 924 (2016) (quoting *Long v. City of Charlotte*, 306 N.C. 187, 195–96, 293 S.Ed.2d 101, 107-08 (1982)). The North Carolina Supreme Court has held that "one whose constitutional rights have been abridged has a direct claim against the State under [the North Carolina] Constitution." *Corum v. Univ. of N.C.*, 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992) This direct cause of action, moreover, is not limited by North Carolina's sovereign immunity. *See Id.* at 786, 413 S.E.2d. at 291.

Allen argues that no state remedy is adequate, including a direct implied cause of action under *Corum*, because North Carolina's courts lack jurisdiction to hear those claims. Such claims, Allen contends, would either be preempted under the Copyright Act or must proceed in federal

court because of the exclusive jurisdiction of the federal courts for "any Act of Congress relating to . . . copyrights" under 28 U.S.C. § 1338.

This line of argument presents a question that goes beyond *Zito* and *Hutto*. How courts outside the Fourth Circuit have resolved copyright infringement actions with associated constitutional claims casts doubt on Allen's argument. For example, the Fifth Circuit recently dismissed a suit for copyright infringement with corresponding Fifth and Fourteenth Amendment claims on sovereign immunity grounds because the plaintiff could proceed in state court under the state constitution. *Can. Hockey L.L.C. v. Tex. A&M Univ. Athletic Dep't*, 2021 U.S. App. LEXIS 3976, 2022 WL 445172 (5th Cir. Feb. 14, 2022), *cert. denied*, 143 S.Ct. 118 (2022); *see also Jim Olive Photography v. Univ. of Hous. Sys.*, 624 S.W.3d 764 (Tex. 2021) (deciding copyright infringement takings claims under Fifth Amendment and Texas Constitution). Assuming, however, that either the Copyright Act or § 1338 precluded North Carolina's courts from hearing Allen's takings claim, the Court is not persuaded that state sovereign immunity under *Hutto* is susceptible to artful pleading. Again, the animating sovereign-immunity principle *Hutto* acknowledged is that whatever remedy the Constitution requires—be it under the Due Process clause as in *Reich*, or the Just Compensation Clause as in *Hutto*—a suit for that remedy in *federal court* must come after *the State* has closed its own courts. 773 F.3d at 552.

Allen flips of this principle on its head. Despite North Carolina's openness to takings claims in its courts, he argues that he is entitled to proceed directly in federal court because two federal statutes—17 U.S.C. § 301 and 28 U.S.C. § 1338—combine to preclude his claims from being heard in state court. Put differently, because Congress has decided to shut the doors of North Carolina's courts to the claims Allen wishes to bring, he argues the Fifth Amendment abrogates the State's sovereign immunity in federal court.

Allen's preemption argument runs into the same problem as his federal-property interest argument. At its root, abrogation of sovereign immunity through federal legislation is not concerned with *if* Congress can do so but *how* Congress may do so. Congress cannot use its Article I powers to abrogate the States' sovereign immunity: "The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Seminole Tribe*, 517 U.S. at 72–73. It follows that it is equally impermissible for Congress to indirectly do the same via its Article I power to control the jurisdiction of the federal courts. *See Patchak v. Zinke*, 584 U.S. 244, 253 ("So long as Congress does not violate other constitutional provisions, its 'control over the jurisdiction of the federal courts' is plenary." (quoting *Trainmen v. Toledo, P.& W.R. Co.*, 321 U.S. 50, 63 -64 (1944)); *Cf. Bowles v. Russell*, 551 U.S. 205, 212 (2007) ("Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider.").

Finally, the Court draws attention to and rejects an implied premise of Allen's argument—that he could not bring a Fifth Amendment takings claim in state court. While *Hutto* makes clear that state sovereign immunity prevents Allen from proceeding on his takings claims in this Court, nothing in that decision forecloses Allen from raising the same in state court. *See Hutto*, 773. F.3d at 552; *Zito v. N.C. Coastal Resources Comm'n*, 449 F. Supp. 3d 567, 582 (E.D.N.C. 2020); *Cf. Jim Olive Photography*, 624 S.W.3d 764 (considering copyright infringement claims under Texas and United States Constitution). State courts have the jurisdiction and the obligation to hear federal constitutional claims. *Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 823 (1990) *Claflin v. Houseman*, 93 U.S. 130, 136 (1876); *Cf. Burt v. Titlow*, 571 U.S. 12, 19 (2013) ("State courts are adequate forums for the vindication of federal rights."). And this Court is "unwilling to assume

the State[] will refuse to honor the Constitution or obey the binding laws of the United States." *Alden*, 527 U.S. at 755; *see DeVillier*, 601 U.S. at 292 (same).

Whether North Carolina could invoke its sovereign immunity in state court for a Fifth Amendment takings claim is not before this Court. *Corum*, of course, waives the State's immunity for takings claims under the State Constitution only. 330 N.C. at 785–86, 413 S.E.2d at 291. But precedent suggests the North Carolina's waiver of its sovereign immunity for takings claims under the North Carolina Constitution bodes well for takings claims under the Constitution. *See Howlett v. Rose*, 496 U.S. 356, 375–76 (1990) (holding that the state court cannot "refus[e] to entertain" federal-law actions on jurisdictional grounds because of state sovereign immunity "when [those] courts entertain[] similar state-law actions against state defendants."). A definitive answer will have to be supplied by a North Carolina court.

Because North Carolina's Courts remain open for Allen to assert takings claims directly in state court, this Court returns to its original conclusion—Allen's takings claims against the State and the Department are barred from federal court under *Hutto*. *See Allen*, 244 F. Supp. 3d at 540.[9] Allen has failed to show the "self-executing' Fifth Amendment provides an exception to sovereign

---

[9] Independent of sovereign immunity, Allen's direct Fifth Amendment Takings Claim against the State and the Department raise additional thorny questions. Because "[c]onstitutional rights do not typically come with a built-in-cause of action to allow for private enforcement in courts," *DeVillier*, 601 U.S. at 291, to proceed directly under the Takings Clause without a procedural vehicle requires a plaintiff to show that "the Fifth Amendment Takings Clause creates an implied direct cause of action by its text alone," *Gerlach v. Rokita*, 95 F.4th 493, 498 (7th Cir. 2024). In 2017, this Court dismissed Allen and Nautilus's Takings Claims brought under § 1983 as barred by sovereign immunity under *Hutto*. *Allen*, 244 F. Supp. 3d at 540. In Allen's Second Amended Complaint, however, he does not return to this theory. Section 1983 provides an independent cause of action and thereby acts as a procedural vehicle. Of course, neither States nor "arms of the State" are "persons" under § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70–71 (1989). Still, the absence of a procedural vehicle is potentially fatal, especially as nothing before this Court indicates that Allen attempts to state the Fifth Amendment provides an implied cause of action. Not to mention that such an attempt would face considerable challenges. In *DeVillier*, for example, the Supreme Court took up that question, acknowledged its "precedents do not cleanly answer" it, and declined to provide an answer. 601 U.S. at 292. Because North Carolina's sovereign immunity bars this Court from hearing Allen's claims as they are currently formulated, there is no need to discuss this issue further.

immunity. The Court therefore will dismiss Allen's Fifth Amendment Takings claims without prejudice unless he can show an abrogation of state sovereign immunity on other grounds.

**D.    Allen's second theory: case-by-case abrogation under *Georgia***

Because Allen's "self-executing" Fifth Amendment theory of abrogation does not pass muster, North Carolina's sovereign immunity will bar this Court from hearing Allen's claims absent a valid abrogation. To that end, Allen argues that claim-by-claim abrogation under *Georgia* allows his copyright infringement, takings, and procedural due process claims to proceed in federal court notwithstanding North Carolina's sovereign immunity.

*Georgia* sets out a three-part test instructing lowers courts to determine, "on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated [a federal statute]; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated [the federal statute] but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." 546 U.S. at 159. The Supreme Court has already determined that the CRCA's prophylactic abrogation of sovereign immunity for copyright infringement is invalid. *Allen*, 589 U.S. at 265–66. So this Court need only consider whether Allen states claims for copyright infringement and that same conduct also violates the Fourteenth Amendment. *See Alaska v. EEOC*, 564 F.3d at 1068.

Case-by-case abrogation under *Georgia* intertwines the jurisdictional issue with the underlying merits of the statutory and constitutional violations. In order to have a valid abrogation, a plaintiff must show that both violations have occurred, which means that if either claim fails on the merits then there is no subject-matter jurisdiction. "[W]hen subject matter jurisdiction is dependent on the same statute that forms the basis of the underlying claim, the jurisdictional question is tied up with the merits of the case," as such "a decision of the jurisdictional issue

requires a ruling on the underlying substantive merits of the case." 5B Charles A. Wright et al.,

*Federal Practice and Procedure* § 1350 (4th ed. 2024). In such circumstances, the jurisdictional

issue "should not be decided on a motion to dismiss but may be appropriate for summary

judgment." *Id.*

With that in mind, the Court must consider whether Allen states a claim by accepting his

well-pleaded allegations as true and considering them in the light most favorable to him. *See, e.g.*,

*Pickett v. Texas Tech Univ. Health Sciences Center*, 37 F.4th 1013, 1031 (5th Cir. 2022) (analyzing

*Georgia* claim under 12(b)(6) standard because "the jurisdictional and merits questions . . are

inextricable). To that end, the Court will not consider evidence submitted by the State that is not

integral to the complaint. *See Secretary of State for Defence v. Trimble Navigation Limited,* 484

F.3d 700, 705 (explaining the court, on a motion to dismiss, may "consider documents attached to

the motion to dismiss, so long as they are integral to the complaint and authentic.").

### 1. DNCR's alleged violation of the Copyright Act

The Court begins with the first requirement under the *Georgia* framework: Whether Allen

has plausibly alleged the DNCR violated the Copyright Act through its infringements. Satisfying

this first prong is critical. *See, e.g.*, *Buchanan v. Maine*, 469 F.3d 158 (for the *Georgia* analysis,

"if the State's conduct does not violate [the federal state], the court does not proceed to the next

step in the analysis").

The Copyright act grants the owner of copyright "the 'exclusive rights' to 'reproduce,'

'distribute,' 'perform,' 'display,' or 'prepare derivative works based upon' their copyrighted

works." *Entm't v. Cox Commc'ns, Inc.*, 93 F.4th 222, 227 (4th Cir. 2024) (quoting 17 U.S.C.

§ 106). "Anyone who violates any of the[se] exclusive rights . . . is an infringer," 17 U.S.C.

§ 501(a), and the copyright owner may "institute an action" against an infringer, *Id.* § 501(b). A

direct infringement claim requires proof that (1) plaintiff had a valid copyright and (2) defendant

infringed upon that copyright by violating one of the exclusive rights under § 106. *Smith v. Barnesandnoble.com*, 839 F.3d 163, 166 (2d Cir. 2016).

Taking the facts in the light most favorable to Allen, the Court concludes Allen has plausibly stated a claim that the DNCR infringed on his copyrights. It is undisputed that Allen holds valid copyrights in the materials he alleges the DNCR infringed. In the Second Amended Complaint, Allen provides detailed accounts of his copyrights and the DNCR's alleged infringements of specific copyrights by copying, displaying, distributing, and performing his works without permission online and in a state museum.

The State argues that the alleged infringements fall under the use exceptions under 17 U.S.C. §§ 108 and 109. Section 108 provides exemptions for infringements related to archival use but carves out pictorial works, with some exceptions. *See Id.* § 108(i). Section 109 codifies the first sales doctrine, which "provides that a 'rights holder's control over the distribution of any particular copy or phonorecord that was lawfully made effectively terminate when that copy or phonorecord is distributed to its first recipient." *Hachette Book Group, Inc. v. Internet Archive*, 664 F. Supp. 3d 370, 384–85 (S.D.N.Y. 2023) (quoting *Capital Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 655 (2d Cir. 2018)). Like exemptions for fair use, the exemptions under § 108 and § 109 are affirmative defenses to copyright infringement. *See Adobe Systems Inc. v. Christenson*, 809 F.3d 1071, 1078–79 (9th Cir. 2015) (first sale); *Hachette Book Group*, 664 F. Supp. 3d, at 381 (fair use). Affirmative defense to copyright infringement provide "a permissible basis for dismissal only where the facts necessary to establish the defense are evident of the face of the complaint." *Spinelli v. National Football League*, 902 F.3d 185, 199 (2d Cir. 2018) (quotations omitted); *see also Santos v. Kimmel*, ---F. Supp. 3d ----, 2024 WL 3862149, at *3 (S.D.N.Y 2024) (explaining that affirmative defenses to copyright infringement are "most frequently resolved at summary

judgment"). Here, all the facts necessary to the resolution of the State's affirmative defenses do not clearly appear on the face of the Second Amended Complaint. The State's arguments, replete with citations to various exhibits, consist almost entirely of evidence beyond the face of the amended complaint. The State's arguments involve mixed questions of law and fact better suited to summary judgment. The Court, therefore, concludes that resolving these defenses is premature in this posture.

Allen has also plausibly alleged that the DNCR's infringements were willful or intentional. The Copyright Act does not define willful infringement. *Lyons P'ship v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001). Courts have held that willful infringement occurs, at minimum, when the defendant recklessly disregards the copyright holder's rights. *BMG Right Mgmt. (US) LLC v. Cox Communications, Inc.*, 881 F.3d 293, 312 (4th Cir. 2018); *see Market Research Grp., Inc. v. Berge*, 953 F.3d 907, 920 (6th Cir. 2020) ("[A] defendant willfully commits copyright infringement when he knowingly or recklessly copies another's work."). The State was clearly on notice of Allen's copyrights given his proactive approach to policing potential infringements, his assertion of his exclusive rights after the fact, and his watermarks and other identifiers on works. What's more, the patter and timing of the infringements permit a reasonable inference that the DNCR knew of, or disregarded, the risk that posting would violate Allen's exclusive rights. At least six of the infringements, for example, were online posts that had previously been removed in 2013, which was the time a dispute over licenses between Allen, Intersal, and the State arose. After § 121-25(b) was enacted, those posts returned online. Accordingly, Allen has adequately stated a claim for willful copyright infringement.

### 2. Actual Constitutional Violations

Allen asserts that the State's copyright infringement and physical appropriation of his media during, after, and through § 121-125(b) constitute takings and a denial of procedural due

process in violation of the Fifth and Fourteenth Amendments. As to his Fifth Amendment claims, Allen alleges the State took his property in three distinct ways: (1) "by engaging in wide-scale, willful, and indiscriminate infringement of [his] copyrights"; (2) "by physical[ly] taking [ ] Allen's property by withholding and refusing to return Allen's physical media containing copies of his works"; and (3) by "plac[ing] the vast majority of Allen's portfolio into the public domain[]" through § 121-125(b). (*See* [DE 134 ¶¶ 162, 163, 177].)

Allen's Fourteenth Amendment due process claim piggyback of these allegations. Allen asserts he was not given "due process in connection with [the State's] takings . . . [because,] Allen did not have an opportunity to be heard and had not means to challenge the infringements." Likewise, because "[N.C. Gen. Stat. § 121-125(b)] is self-enforcing[,]" Allen claims he did not have "any opportunity to oppose the entry of his work into the public domain, or to seek reclassification once the work was added to the public domain." (See [DE 134 ¶¶ 169, 183].)

The State, not conceding that *Georgia* extends here, responds that Allen's allegations fail regardless because he has failed to allege actual constitutional violations within § 1 of the Fourteenth Amendment. The Court will address each violation in turn.

### (a) Allen's Fifth Amendment claims

"The Fifth Amendment's Takings Clause provides: 'nor shall private property be taken for public use, without just compensation.' " *Blackburn v. Dare County*, 58 F.4th 807, 810 (4th Cir. 2023) (quoting U.S. Const. Amend V). The Takings Clause applies to the States by incorporation through the Fourteenth Amendment. *Cedar Point Nursery v. Hassid,* 594 U.S. 139, 147 (2021); *Chi. B & Q R. Co. v. City of Chicago*, 166 U.S. 226 (1897). And the Takings Clause's protections extends to intellectual property. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04, (1984) (trade secrets); *James v. Campell*, 104 U.S. 356, 357–58 (1882) (patents). Because the parties agree

that the copyrights are property protected by the Fifth Amendment, the Court will proceed under the assumption that the Fifth Amendment's guarantee extends to copyrights.[10]

Government takings fall into one of two categories: physical appropriations or use restrictions. *Blackburn.* 58 F.4th at 810 n.3 (adopting "physical-appropriation versus use-restriction dichotomy). Direct government appropriation or physical invasion of private property is the paradigmatic taking. *Lingle v. Chevron U.S.A Inc.*, 544 U.S. 28, 537 (2005); *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Plan. Agency*, 525 U.S. 302, 324 (2002). Moreover, a "physical appropriation is a taking whether it is permanent or temporary." *Cedar Point Nursery*, 594 U.S. at 153.

Takings also occur when government regulations go too far in restricting the use of a property. *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922). Use restrictions amounting to takings come in two varieties. Occasionally, a use restriction will deny the owner all economically beneficial use of the property, resulting in a per se taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). More common, however, are use restrictions which fall short of that mark. *See Tahoe-Sierra Preservation*, 535 U.S. at 322 (describing *Lucas* per se taking as rule for an "extraordinary case."). Those restrictions are evaluated under the "ad hoc, factual inquiry" set out in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), which tells courts "to examine (1) the economic impact of the use restriction, (2) how much the restriction interferes with investment-backed expectations, and (3) the character of the governmental action." *Blackburn*, 58 F.4th at 810–11 (quotation marks omitted).

---

[10] In *Allen*, the Supreme Court stated that "[c]opyrights are a form of property." 589 U.S. at 1004. That statement addressed whether are copyrights are property in the context of the Fourteenth Amendment Due Process Clause not the Fifth Amendment Takings Clause.

Here, the alleged taking is one of intellectual property. While Allen claims that the end of the State's action is the same—the taking of his copyrights—he alleges that the State used different means. These means can be placed in two buckets. The first bucket, Allen claims that the State took his copyright through § 121-25(b) when it placed them in public domain, eliminating his right to exclude others from using his copyrights; the second bucket, Allen claims that the state took his copyrights by its direct infringements. As discussed, Allen has not alleged a violation of the Copyright Act relating to the first bucket. Accordingly, the Court need only consider whether Allen has stated a takings claim stemming from the State's direct infringements.

The Supreme Court has addressed an alleged taking of intellectual property only once, in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), and the intellectual property at issue there was trade secrets not copyrights. The *Ruckelshaus* Court applied the multi-factor *Penn Central* test. 467 U.S. at 1005. When *Ruckelshaus* was decided, the distinction between the two lines of Taking Clause cases (physical takings or use-restrictions) was hazy. *See Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 34, n.6 (1st Cir. 2002) (en banc). But even as takings clause jurisprudence has matured, courts have followed *Ruckelshaus*'s lead and analyzed alleged takings of intellectual property under *Penn Central* multi-factor test. *See Philip Morris*, 312 F.3d at 35–36 (trade secrets); *Maine Educ. Ass'n Benefits trust v. Cioppa*, 695 F.3d 145, 153 n.5 (1st Cir. 2012) (declining to analyze taking of trade secret under physical taking *per se* rules because of inadequate development in the district court but noting that circuit precedent "supports the application of the *Penn Central* factors"). So this Court will follow the Supreme Court's lead.

To determine whether governmental action—here, direct copyright infringements—effects a taking, the Court must weigh factors in what is "essentially an 'ad hoc, factual' inquiry," *Ruckelshaus*, 467 U.S. at 1005. "This balancing requires the Court to consider, at least, three

factors of 'particular significance': (1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action." *Blackburn*, 58 F.4th at 812 (quoting *Penn Central*, 438 U.S. at 424); *see also Ruckelshaus*, 467 U.S. at 1005 (applying *Penn Central* factors to intellectual property).

The first *Penn Central* factor—the economic impact of the regulation on the claimant—favors the State. For this factor, the Court must weigh the diminution in value caused by the State's infringements against the value of the uninfringed copyrights. *See Blackburn*, 58 F.4th at 812. A diminution is value by itself is not enough to prevail; instead, a plaintiff must show a *substantial* diminution in the value of the property. *Id.* A substantial diminution is not easily satisfied. *See Clayland Farm Enters., LLC v. Talbot Cnty.*, 987 F.3d 346, (4th Cir. 2020) (40 percent diminution in value was insufficient to show a regulatory taking); *Pulte Home Corp. v. Montgomery Cnty.*, 909 F.3d 685, 696 (4th Cir. 2018) (83 percent diminution in value insufficient to show regulatory takings). What's more, Allen must either plead facts establishing a substantial diminution in value or allege facts allowing the Court to infer a substantial diminution. *Blackburn*, 58 F.4th at 812.

Allen does not meet this standard. He claims that "Defendants' infringements cause the loss of all economically beneficial uses of [his] copyright." [DE 134 ¶ 164]. According to Allen, "the only economically beneficial use of his copyrights was to monetize the rights for license or sale," and the State's infringements prevent that since "there is no reason to license what can be used for free." *Id.* He also claims that the State's infringements caused the loss of "at least 150,000 in potential licensing fees." [DE 134 ¶ 168]. Once the legal conclusions are stripped away, there is nothing that allows the Court to infer a *substantial* diminution in the value of his copyrights. Even in the light most favorable to Allen, an assertion of potential lost licensing revenue does not

lead to the plausible inference that the copyrights are so incapable of generating other licensing revenue that the decrease in their value is substantial. And Allen's claims that he has lost all "economically beneficial uses of his copyrights" is a conclusory statement of the elements of a per se taking under *Lucas*. As such, it does not satisfy the pleading standard. *See Blackburn*, 58 F.4th at 812 (rejecting conclusory statement "because it simply alleges there as a taking and then recites the standard for compensation"). In sum, the first factor cuts against Allen.

The second *Penn Central* factor—interference with reasonable distinct investment-backed expectations—slightly favors Allen. Allen alleges that during the course of his involvement on the *QAR* project he made substantial investments of his time and money in obtaining his copyrights. For these investments, Allen expected to a return in the form of licensing fees for commercial media. Allen's copyrights and the State's entitlement to use them for some purposes are governed by several agreements. When he joined the *QAR* project, Allen obtained the rights to make non-commercial videos and photos of the *QAR* from Intersal; Intersal obtained the rights from the Department. Per the underlying agreements, the Department retained the right to use photographs and videos of the *QAR* and its artifacts for non-commercial purposes, including displaying on the Department's website and curating public records. To be reasonable, Allen's investment-backed expectations must have been consistent with those agreements. *Cf. Clayland Farm*, 987 F.3d at 345 (explaining that a taking is defined by the preexisting property right). Accepting Allen's allegations, the DNCR's infringements frustrated Allen's expectations of licensing his copyrights for commercial use, including the State's use for commercial purposes.

The third and final *Penn Central* factor—the character of the State's action—weighs in favor of the State. Conceptually, this factor is mess, as the Fourth Circuit has aptly noted: "combine an ad hoc balancing test with an open-ended factor and you're left with a doctrine that is a veritable

mess. " *Id.* at 813 (quotation marks omitted). That said, for the third factor courts "should seek to identify regulatory actions that are functionally equivalent to the classic taking in which the government directly appropriates private property or ousts the owner from his domain." *Id.*

The mere infringement of a copyright by a state actor is not "functionally equivalent" to a government appropriation of the Copyright itself. Allen contends the State's appropriation of his right to exclude is tantamount to appropriation of his copyrights. The right to exclude is one of the exclusive rights conferred under the Copyright Act. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392 (2006) (A copyright holder possess 'the right to exclude others from using his property.'" (quoting *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932))). The Copyright Act precludes a state, or its agencies, from "seiz[ing], expropriat[ing], transfer[ing], or exercising rights of ownership to the copyright or any exclusive rights under a copyright." 17 U.S.C. § 201(d). As a result, the State's infringements cannot divest him of that right nor can the State actually possess that right for itself. Allen has always retained "the key legal rights that constitute property for purposes of the a [classic takings] analysis, despite government interference." *Jim Olive Photography*, 624 S.W.3d at 775. Accordingly, the State's infringements are not functionally equivalent to a classic taking, and the third *Penn Central* factor—the character of the government action—weighs against him.

Weighing these three factors, the Court concludes Allen has failed to plausibly state a claim for relief under *Penn Central*. As a result, Allen has failed to plausibly state a constitutional violation as required by *Georgia*'s second prong. And, absent an actual constitutional violation, he cannot show case-by-case abrogation under § 5 of the Fourteenth Amendment. Accordingly, the Court dismisses without prejudice his claims for copyright infringement insofar as they rely on actual violations of the Fifth Amendment as incorporated by the Fourteenth Amendment.

*(b) Allen's Fourteenth Amendment Procedural Due Process Claims*

Allen asserts that the DNCR's copyright infringements constituted a denial of due process, abrogating state sovereign immunity under *Georgia*'s case-by-case abrogation. The Second Amended Complaint elaborates that due process was denied because § 121-25(b) is (or was, now) self-enforcing, and Allen received no neither notice nor a hearing before his copyrights entered the public domain. There is no need to consider whether any procedural due process violations tied to § 121-25(b) beyond the DNCR's direct infringements under the policy set by that statute. As discussed, the *Georgia* framework looks to the actual constitutional violation only if that conduct also works a statutory violation, and Allen does not state that his copyrights were infringed directly by § 121-25(b). Now, on to Allen's claims for direct copyright infringement tied to actual violations of his right to procedural due process.

The Supreme Court has made it clear that the Due Process Clause cares about only a small subset of state copyright infringements. *Allen*, 589 U.S. at 261–62. Specifically, the Due Process Clause cares only about copyright infringements that satisfy two conditions: (1) "the infringements must be intentional, or at least, reckless"; and (2) the state must "fail to offer an adequate remedy for an infringement, because such a remedy itself satisfies the demand of the due process clause." *Id.*

Defendants argue that Allen has failed to show that either condition is satisfied. The Court, however, has already determined that Allen has plausibly alleged that the DNCR's infringements were willful—that is, intentional or at least reckless. So that leaves only the "failure to offer an adequate remedy." On that front, Defendants argue that the adequate post-deprivation remedies are available to Allen in state court, resulting in Allen's failure to satisfy that condition.

When detailing the extent the Due Process Clause is concerned with copyright infringements, Supreme Court did not conclude that the State would violate the Clause only if it

38

failed to provide adequate post-deprivation remedies. *Allen*, 589 U.S. at 261–62. Instead, the Court stated only that "[a] State cannot violate that Clause unless it fails to offer *an adequate remedy* for an infringement, because such a remedy itself satisfies the demand of "due process." *Id.* at 262 (emphasis added) (citing *Hudson v. Palmer*, 468 U.S. 517, 533, (1984)). The State elides the nuances of the constitutional violation in its rush to rest on the purported adequacies of North Carolina's post-deprivation remedies. The adequacy of post-deprivation remedies must come after a determination that the demands of due process can be satisfied through a post-deprivation remedies.

Due process generally requires some sort of notice and opportunity to be heard before the deprivation of a protected property interest. 891 F.3d 141, 145-46; *Memphis Light, Gas & Water Div. v. Craft*, 435 U.S. 1, 19 ("Ordinarily, due process of law requires an opportunity for some kind of hearing prior to the deprivation of a significant property interest." (quotations omitted)). A meaningful opportunity to be heard is the core of a due process claim. For "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property,' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (quoting *Parratt v. Taylor*, 451 U.S. 527, 537 (1981)).

Still, due process is a "flexible concept that varies with the particular situation." *Id.* at 127; *see also Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895 ("[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation."). For that reason, "to determine whether a constitutional violation has occurred, it is necessary to ask what process the state provided, and whether it constitutionally

adequate." *Zinermon*, 494 U.S. at 983. What functions as constitutionally adequate process in one situation might be inadequate in others.

It is constitutionally adequate for the State to provide only post-deprivation remedies "where a loss of property is occasioned by a random, unauthorized act by a state employee, rather than by an established state procedure," *Hudson*, 468 U.S. at 532. Likewise, post-deprivation remedies "can satisfy the requirements of procedural due process" where, because of "the necessity of quick action by the State" or "the impracticability of providing any meaningful pre-deprivation process," that is all that can be expected. *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), *overruled on other ground by*, *Daniel v. Williams*, 474 U.S. 327 (1986). But post-deprivation remedies are constitutionally inadequate where it is foreseeable that individuals would be deprived of property because of state actors acting pursuant to established state procedure. Thus, "[i]n situations where the State can feasibly provide a pre-deprivation hearing before taking property, it generally must do so regardless of the adequacy of a post-deprivation tort remedy to compensate for the taking." *Zinermon*, 494 U.S. at 132; *see also Zimmerman Brush Co.*, 455 U.S. at 436 (holding post-deprivation hearing as constitutionally inadequate where established state procedure destroyed plaintiff's property interest).

An Eleventh Circuit case, *National Association of Boards of Pharmacy v. Board of Regents of the University System of Georgia,* illustrates a situation where post-deprivation remedies provided constitutionally adequate process for copyright infringement.[11] 633 F.3d 1297 (11th Cir. 2011) (hereafter "*NABP*"). In that case, the copyright owner sued the Board of Regents of a state university for copyright infringement and procedural due process violations after a professor used copyrighted materials in his course materials. The Eleventh Circuit held that the copyright holder

---

[11] To make the case even more on point here, the copyright holder sued under *Georgia* framework.

failed to establish that due process required a pre-deprivation hearing, concluding that "predeprivation process was not feasible under the acts alleged." *Id.* at 1319. Critically, the amended complaint was devoid of allegations that university officials "were acting pursuant to an established state procedure *designed* to deprive individuals of their copyrights." *Id.* at 1318. Because any copyright infringement was the random and unauthorized act of the professor, beyond the control of the state, the deprivation was not foreseeable rendering it impracticable, and unnecessary, to provide pre-deprivation process. *Id.* 1318 – 19.

Unlike in *NABP*, Allen has adequately alleged that the State committed direct infringements while operating under an established state procedure—§ 121-25(b)—designed to facilitate such a deprivation. The State was in the position to foresee a deprivation and the DNCR acted pursuant to an established state procedure—§ 121-25(b)—whose purpose was to deprive Allen of his protected interest in his copyrights. Section 121-25(b) permitted the DNCR to use copyrighted documentary materials in its custody without limitation. What's more, Allen has sufficiently alleged that § 121-25(b) was specifically passed to help the DNCR in its ongoing dispute with Allen and Intersal over the use of documentary materials from the *QAR*. So too does § 121-25(b)'s "in the custody of" requirement permit a reasonable inference that it was readily foreseeable to the State that the DNCR would be able, before infringing, to not only identify copyrighted materials but also the identity of the copyright holder. Thus, the DNCR's infringement under § 121-25(b) is a situation where" the state actor knows not only that he is depriving someone of property, but also the identity of the aggrieved party." *NABP*, 633 F.3d at 1319 (emphasis omitted). Allen has alleged that the State committed copyright infringements through an established state procedure rendering post-deprivation remedies inadequate to satisfy due process.

Accordingly, the Court concludes that he has shown an actual constitutional violation to satisfy the second prong of the *Georgia* framework.

Because Allen has adequately paired his statutory cause of action under the Copyright Act with a procedural due process claim, the State plays its ace in the hole, arguing that Allen fails to state a *Georgia* claim because his statutory violations are not capable of aligning with his due process claims. That is, the conduct that violates the Copyright Act—copyright infringement—is not identical to the conduct that violates the Due Process Clause—deprivation without due process of law. The State crafts this argument from a footnote in *NABP* that questions whether a procedural due process claim and a copyright infringement claim can succeed under the *Georgia* framework. *NABP*, 633 F.3d at 1316 n.32. The footnote's commentary has guided other district courts to dismiss *Georgia* claims that pair a copyright infringement and due process claims. *See Campinha-Bacote v. Regents of the Univ. of Mich.*, 2016 U.S. Dist. LEXIS 5958, 2016 WL 223408, at *4–5 (S.D. Ohio Jan. 19, 2016); *Am. Shooting Ctr., Inc. v. Secfor Intn'l*, 2016 U.S. Dist. LEXIS 96111, 2016 WL 3952130, at *3–4 (S.D. Cal. Jul. 22, 2016). In the footnote, however, the Eleventh Circuit expressly acknowledged it was unnecessary to reach that conclusion since the plaintiff failed to state a *Georgia* claim. The footnote is pure dicta. *See Karsten v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, 36 F.3d 8, 11 (1994) ("If the first reason given is independently sufficient, then all those that follow are surplusage; thus, the strength of the first makes all the rest *dicta*.").

More to the point, the Court does not read *Georgia* so narrowly. Case-by-case abrogation under *Georgia* occurs when a plaintiff can show that the conduct that violates a federal statute, which provides a private cause of action for damages against the States, also works an "independent[] violat[ion] [of] the provisions of § 1 of the Fourteenth Amendment." 546 U.S. at 157. Nothing in *Georgia* indicates that the Supreme Court limited its decision to the statutory

42

violation in that case or required the actual constitutional violation to be anything other than that—an actual constitutional violation.

A violation of the Copyright Act combined with an actual due process violation checks all of *Georgia*'s boxes. The CRCA creates a private cause of action for damages against the States for copyright infringement. 17 U.S.C. § 511(a). The CRCA, of course, went too far in abrogating state sovereign immunity for it be a valid prophylactic abrogation, but it is still available otherwise. What's more, the Supreme Court has held that state copyright infringements constitute Fourteenth Amendment violations when they are (1) intentional, or at least reckless, and (2) the state fails to offer an adequate remedy satisfies the demands of the Due Process Clause. 589 U.S. at 261–62. That means within the broader world of state copyright infringements there is a smaller class of infringements that also work constitutional violations. *Id.* at 262. *Georgia* does not require more for as-applied abrogation. "Thus, insofar as [the CRCA] creates a private cause of action for damages against the state for conduct that *actually* violates the Fourteenth Amendment, [the CRCA] validly abrogates state sovereign immunity." *Georgia*, 546 U.S. at 159.

In sum, the Court concludes that Allen has plausibly alleged that the State's direct copyright infringements in violation of the Copyright Act also constitute a procedural due process violation. Accordingly, under *Georgia*, 17 U.S.C. § 511 validly abrogates the State's sovereign immunity as-applied. The State's motion to dismiss those claims is denied.

## CONCLUSION

For these reasons, the Court Orders as follows: Plaintiffs' Motion for Leave to File a Surreply [DE 157] is GRANTED; the Clerk of Court is DIRECTED to file Plaintiff's Surreply [DE 157-1]; Defendants' Motion to Strike [DE 144] is GRANTED IN PART and DENIED IN PART. Defendants' Motion to Dismiss [DE 146] is GRANTED IN PART and DENIED IN PART.

Allen may proceed on his claims for direct copyright infringement and procedural due process consistent with this order.

SO ORDERED, this 29 day of August 2024.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE